# 12-2889 (L)

(consol. 12-2940, 12-2972, 12-2976, 12-3078, 12-4556, and 12-4685)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

MICHAEL YARON, MOSHE BUCHNIK, SANTO SAGLIMBENI,
EMILIO A/K/A "TONY" FIGUEROA, CAMBRIDGE ENVIRONMENTAL
& CONSTRUCTION CORP., D/B/A NATIONAL ENVIRONMENTAL
ASSOCIATES, OXFORD CONSTRUCTION & DEVELOPMENT CORP.,
and ARTECH CORP.,

*Defendants-Appellants*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(JUDGE GEORGE B. DANIELS)

_____

FINAL FORM BRIEF FOR THE UNITED STATES

_____

WILLIAM J. BAER
*Assistant Attorney General*

STEPHEN J. MCCAHEY
MARY ANNE F. CARNIVAL
JOHN W. VAN LONKHUYZEN
*Attorneys*
U.S. Dep't of Justice, Antitrust Division

JOHN J. POWERS, III
NICKOLAI G. LEVIN
*Attorneys*
U.S. Dep't of Justice, Antitrust Division
950 Pennsylvania Ave., NW, Room 3224
Washington, DC 20530-0001
(202) 514-2886

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................iv

STATEMENT OF ISSUES PRESENTED.................................................. 1

STATEMENT OF THE CASE .................................................................. 2

STATEMENT OF THE FACTS AND THE PROCEEDINGS BELOW ... 5

    A.  The Wire Fraud Trial ................................................................. 5

        1.  The fraudulent conspiracy to pay kickbacks on asbestos
            abatement and air monitoring contracts began in 2000 .... 6

        2.  The expansion of the fraudulent kickback scheme to
            construction contracts in 2002 ......................................... 10

        3.  The Hospital audit in May 2005 and the consensual audio
            recordings ......................................................................... 13

    B.  The Post-Trial Motions ........................................................... 16

    C.  The Guilty Pleas ..................................................................... 22

    D.  Sentencing .............................................................................. 23

        1.  Yaron, Buchnik, Oxford, Cambridge, and Artech ............ 23

        2.  Saglimbeni and Figueroa ................................................. 25

SUMMARY OF ARGUMENT ................................................................ 26

STANDARDS OF REVIEW .................................................................... 33

ARGUMENT ......................................................................................... 34

    I.  Defendants' Convictions Were Supported By
        Sufficient Evidence......................................................................... 35

A.  There Was Sufficient Evidence of a *Quid Pro Quo*. ............... 35

B.  There Was Sufficient Evidence of Figueroa's Participation in the Wire Fraud Conspiracy. .................................................... 40

II. The Excerpts From The Consensual Audio Recordings Were Properly Admitted Through Special Agent Fortunato. ............... 43

A.  The Government Can Admit Consensual Audio Recordings Without Calling the Cooperating Witness who Made Them. 44

B.  Defendants Had No Constitutional Right To Confront the Then-Cooperating Witness About His Statements on the Recordings Because They Are Nontestimonial. ..................... 47

1.  *Burden* is controlling precedent. ....................................... 48

2.  Porath's statements on the recordings are nontestimonial under *Burden* because they were made with the purpose of eliciting inculpating admissions by Figueroa. .................. 51

3.  Even assuming *arguendo* that there was error, it was harmless. ......................................................................... 55

C.  The Recordings Are Not Hearsay. .......................................... 57

1.  Figueroa's statements on the recordings are not hearsay. ................................................................. 57

2.  Porath's statements on the recordings are not hearsay. ................................................................. 61

III. The District Court Did Not Abuse Its Discretion In Denying The New Trial Motion. ....................................................................... 64

A.  The District Court Properly Rejected Defendants' Compulsory Process Claim. ........................................................................ 64

1. Defendants failed to establish any of the three elements under *Valenzuela-Bernal* and *Buie* ................................... 66

2. The District Court did not abuse its discretion in failing to hold a separate evidentiary hearing on bad faith. ........... 76

B. A New Trial Is Not Warranted on Due Process Grounds. ..... 76

1. There was no *Brady* violation. .......................................... 78

2. The District Court did not abuse its discretion in declining the Government's offer to review Porath's prior written and recorded statements *in camera* ................................. 85

IV. The District Court Properly Calculated Defendants' Offense Levels ....................................................................................... 86

CONCLUSION ........................................................................... 90

CERTIFICATE OF COMPLIANCE ....................................... 91

CERTIFICATE OF SERVICE ................................................ 92

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ................................. 70, 71, 72

*Bierenbaum v. Graham*, 607 F.3d 36 (2d Cir. 2010) ............................. 46

*Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990) ................................. *passim*

*Burden v. United States*, 131 S. Ct. 953 (2011) .......................... 28, 46, 50

*Crawford v. Washington*, 541 U.S. 36 (2004) ......................................... 47

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) ..................... 79, 80, 81, 84

*Lisenba v. California*, 314 U.S. 219 (1941) ............................................. 75

*Michigan v. Bryant*, 131 S. Ct. 1143 (2011) .................................... 49, 50

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ......................................... 83

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................ 78

*United States v. Agurs*, 427 U.S. 97 (1976) ........................................... 84

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ............................. 38

*United States v. Banks*, 464 F.3d 184 (2d Cir. 2006) ............................ 54

*United States v. Barone*, 913 F.2d 46 (2d Cir. 1990) ................. 28, 45, 62

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ...................................................... *passim*

*United States v. Bonventre*, 720 F.3d 126 (2d Cir. 2013) ....................... 34

*United States v. Braunig*, 553 F.2d 777 (2d Cir. 1977) .......................... 78

iv

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) ............................. 36

*United States v. Burden*, 600 F.3d 204 (2d Cir. 2010).................... *passim*

*United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) .................... 34, 78

*United States v. Elfgeeh*, 515 F.3d 100 (2d Cir. 2008)...................... 34, 63

*United States v. Eppolito*, 543 F.3d 25 (2d Cir. 2008)...................... 33, 35

*United States v. Esquillin*, No. 98-1333, 2000 WL 232162
   (2d Cir. Feb. 18, 2000) ................................................................ 70, 71

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011)......................... 34

*United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006)................................ 46

*United States v. Fuentes*, 563 F.2d 527 (2d Cir. 1977) ........................... 45

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002).................... 33, 35, 42

*United States v. Greco*, 298 F.2d 247 (2d Cir. 1962) ............................. 65

*United States v. Guang Ju Lin*, 505 Fed. App'x 10 (2d Cir. 2012)......... 57

*United States v. Harrell*, 268 F.3d 141 (2d Cir. 2001)............................ 78

*United States v. Jackson*, 345 F.3d 59 (2d Cir. 2003) ................ 79, 82, 83

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ................... 48, 49, 50

*United States v. Lacey*, 699 F.3d 710 (2d Cir. 2012) ......................... 34, 88

*United States v. Lovasco*, 431 U.S. 783 (1977) ....................................... 71

*United States v. Madori*, No. S2 02 Cr. 274, 2004 WL 2274756
   (S.D.N.Y. Oct. 7, 2004), *aff'd but sentence vacated*,
   419 F.3d 159 (2d Cir. 2005).................................................................. 82

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ........ 79, 80, 81, 84

*United States v. Marcus*, 130 S. Ct. 2159 (2010) .................................... 64

*United States v. Marion*, 404 U.S. 307 (1971) ........................................ 70

*United States v. McClain*, 377 F.3d 219 (2d Cir. 2004) .................... 33, 54

*United States v. Moon*, 718 F.2d 1210 (2d Cir. 1983) ............................. 76

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001) .............................. 58

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) .............................. 36

*United States v. Olano*, 507 U.S. 725 (1993) .......................................... 63

*United States v. Ortega*, 82 Fed. App'x 717 (2d Cir. 2003),
    *granted, vacated, and remanded*, 543 U.S. 1103 (2005) .................... 77

*United States v. Pavloyianis*, 996 F.2d 1467 (2d Cir. 1993) .................. 76

*United States v. Perez*, No. 05-CR-441, 2005 WL 2709160
    (S.D.N.Y. Oct. 20, 2005) ..................................................................... 82

*United States v. Rahme*, 813 F.2d 31 (2d Cir. 1987) .............................. 58

*United States v. Riggi*, 541 F.3d 94 (2d Cir. 2008) ................................. 54

*United States v. Rodriguez*, 392 F.3d 539 (2d Cir. 2004) ...................... 40

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ................................ 58

*United States v. Spano*, 421 F.3d 599 (7th Cir. 2005) ............................ 39

*United States v. Taubman*, 297 F.3d 161 (2d Cir. 2002) ........................ 34

*United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980) ........................... 72

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982).............. *passim*

*United States v. Vanwort*, 887 F.2d 375 (2d Cir. 1989)......................... 43

*United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010) ................ 88, 89

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004) ...................... 49

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000)..................... 70, 71

*United States v. Wright*, 722 F.3d 1064 (7th Cir. 2013).................. 55, 62

*United States v. Zabaneh*, 837 F.2d 1249 (5th Cir. 1988)...................... 65

*Williams v. Illinois*, 132 S. Ct. 2221 (2012)........................................... 48

## CONTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const. amend. VI..................................................................... *passim*

15 U.S.C. § 1 ............................................................................................. 73

18 U.S.C.:
  § 2.................................................................................................... 2, 73
  § 371..................................................................................................... 73
  § 1341.................................................................................................... 2
  § 1343.................................................................................................... 2
  § 1346.................................................................................................... 2
  § 1349.................................................................................................... 2
  § 3553(a)............................................................................................. 24

26 U.S.C. § 7206(1)................................................................................. 73

Federal Rules of Criminal Procedure:
  29............................................................................................. 4, 16, 33
  33..................................................................................................... 4, 17

Federal Rules of Evidence:

   801(d)(2)(A) ................................................................... 44, 57

   801(d)(2)(E) ................................................................... 44, 57

## MISCELLANEOUS

Eugene Gressman et al., *Supreme Court Practice* (9th ed. 2007) .......... 50

U.S. Federal Sentencing Guidelines Manual:

   § 2B1.1 ....................................................................... *passim*

   § 2B1.1(b)(1) ........................................................ 24, 86, 89

   § 2B1.1(b)(1)(I) ............................................................ 89

   § 2B1.1 n.3(A)(v)(II) ............................................... 89, 90

   § 2B1.1 n.3(B) ......................................................... *passim*

   § 4A1.2(e)(3) ................................................................ 24

## STATEMENT OF ISSUES PRESENTED

1.  Whether the District Court erred by holding that there was sufficient evidence of a *quid pro quo* and of defendant Figueroa's participation in the wire fraud conspiracy.

2.  Whether the admission of four excerpts from two consensual audio recordings made by a then-cooperating witness to elicit inculpating admissions by Figueroa through the FBI agent who supervised the recordings violated the Confrontation Clause.

3.  Whether the District Court abused its discretion by admitting Figueroa's statements on the recordings as party admissions against him and as co-conspirator statements against the other defendants.

4.  Whether the District Court abused its discretion by admitting the then-cooperating witness's statements on the tapes as context for Figueroa's admissions or plainly erred by failing to provide a limiting instruction on the point.

5.  Whether the District Court abused its discretion by denying the new trial motion.

6.  Whether the District Court clearly erred in finding that New York Presbyterian Hospital incurred a loss from the wire fraud and

using the kickback amount as a reasonable estimate of that loss for the purpose of calculating defendants' offense levels under the Sentencing Guidelines, in accordance with U.S.S.G. § 2B1.1, Application Note 3(B).

## STATEMENT OF THE CASE

On June 15, 2011, the grand jury returned a Superseding Indictment charging Michael Yaron, Moshe Buchnik, Santo Saglimbeni, Emilio A/K/A "Tony" Figueroa, Cambridge Environmental & Construction Corp., D/B/A National Environmental Associates (Cambridge), Oxford Construction & Development Corp. (Oxford), and Artech Corp. (Artech), with conspiring to commit wire fraud in violation of 18 U.S.C. § 1349 (Count 1); all the defendants except Figueroa with wire fraud in violation of 18 U.S.C. §§ 1343, 1346 and 2 (Count 2); and Saglimbeni and Figueroa with conspiring to commit mail fraud in violation of 18 U.S.C. § 1349 (Count 3) and mail fraud in violation of 18 U.S.C. §§ 1341, 1346 and 2 (Count 4).  Dkt. 93 (A41-61).[1]

---

[1] "Dkt." refers to the District Court docket number unless otherwise specified.  "Tr." is the trial transcript.  "5/17/12 Tr." is the transcript from the hearing on the post-trial motions.  "7/10/12 Sent. Tr." and "10/17/12 Sent. Tr." are the sentencing transcripts.  "Plea Tr." is the transcript from the plea hearing.  "GX" is Government exhibit or, for audio recordings, a transcript thereof.  "DX" is defense exhibit.

The wire fraud charges involved a scheme in which Yaron and Buchnik paid kickbacks to Salgimbeni – including more than $2.3 million through five intermediaries to a sham corporation Saglimbeni created – so that Saglimbeni and Figueroa, employees of New York Presbyterian Hospital (the Hospital), would steer Hospital contracts for asbestos abatement, air monitoring, and construction to companies owned and/or controlled by Yaron and Buchnik. *Id.* ¶¶ 24, 36 (A47, A52). This scheme violated both the Hospital's competitive bidding policy and a New York City Department of Environmental Protection regulation (DEP Regulation) "requir[ing] that any air monitoring company be completely independent of any asbestos abatement company that was performing work on the same asbestos abatement project." *Id.* ¶¶ 18, 20, 21, 27 (A45-48).

The mail fraud charges involved a scheme in which another vendor paid kickbacks to Saglimbeni and Figueroa to get HVAC contracts from the Hospital. *Id.* ¶¶ 38-52 (A53-58). For both sets of fraud charges, the Superseding Indictment charged both money and property fraud and honest services fraud. *Id.* ¶¶ 21, 36, 44, 51 (A46-57).

The District Court severed the wire fraud charges from the mail fraud charges.  After a three-week trial, the jury convicted all the defendants of conspiracy to commit wire fraud and all the defendants with wire fraud except Figueroa (who was not charged in that count).  Tr. 2618 (A808).  The jury specifically found both "a scheme to fraudulently obtain money or property from [the Hospital]" and "a scheme to fraudulently deprive [the Hospital] of the honest and faithful services of its employees through kickbacks."  Tr. 2617 (A807).

Defendants (except Buchnik) moved for acquittal under Federal Rule of Criminal Procedure 29, and all defendants moved for a new trial under Rule 33.  The District Court denied the motions.  Dkt. 174 (SPA1-11).

Saglimbeni and Figueroa subsequently pled guilty to mail fraud and conspiring to commit mail fraud, with each admitting that he gave work to an HVAC vendor in exchange for kickbacks.  Plea Tr. 16-22 (A1351-57).

The District Court sentenced the individual defendants to terms of imprisonment ranging from three to five years on each of the applicable counts, to be served concurrently.  7/10/12 Sent. Tr. 54-55, 90-91

4

(A1322-23, A1343-44); 10/17/12 Sent. Tr. 87-88, 93-94 (A1371-72, A1377-78).  Defendants moved for bail pending appeal, which the District Court denied.  7/10/12 Sent. Tr. 56-61 (A1324-29); 10/17/12 Sent. Tr. 101-02 (A1381-82); Dkt. 198 (A1187).

Defendants appealed and filed five bail motions with this Court. Four of the motions were denied by two separate motions panels.  *See* 12-2889 Dkt. 138 (Katzmann, Parker, Wesley, JJ.); 12-2889 Dkt. 272 (Walker, Chin, JJ., Restani, D.J.).  The fifth was withdrawn shortly thereafter.  12-4556 Dkt. 157, at 1.  Defendants are currently in prison.

## STATEMENT OF THE FACTS AND THE PROCEEDINGS BELOW

### A.  The Wire Fraud Trial

The Government proved the wire fraud charges through the testimony of fifteen witnesses and over 250 exhibits.  That evidence established that, from 2000 to at least January 2008, Yaron and Buchnik conspired with Hospital employees Saglimbeni and Figueroa to defraud the Hospital.  Originally, the kickbacks were limited to the asbestos and air monitoring contracts, but in 2002 Yaron and Buchnik started paying kickbacks to obtain construction services contracts as well.  All together, Yaron and Buchnik paid kickbacks of over $2.3

5

million to Saglimbeni, GX 1504, 1508-01 (A1007-27, A1029), in

exchange for the award of over $76 million in asbestos abatement, air

monitoring, and construction services contracts to companies owned

and/or controlled by Yaron and Buchnik, GX 1503 (A1004-06).

      1.    The fraudulent conspiracy to pay kickbacks on asbestos
abatement and air monitoring contracts began in 2000

In 1999, Saglimbeni was promoted to Director of Facilities

Engineering and Director of Facilities Operations at the uptown

campus of the Hospital, and in August 2000, the positions were

consolidated.  Tr. 908, 918-19 (A344, A354-55).  In these roles, it was

part of Saglimbeni's responsibility to select or approve the selection of

asbestos abatement and air monitoring contractors uptown, and he had

the authority to approve contracts up to $50,000.  Tr. 909, 916, 919, 975

(A345, A352, A355, A389).  It also was part of Saglimbeni's

responsibilities to ensure that all DEP forms were properly completed.

Tr. 977 (A391).

Beginning in 2000, Yaron and Buchnik paid kickbacks to

Saglimbeni so that almost all asbestos removal work at the Hospital

was awarded to National Environmental Associates (NEA), Tr. 1198

(A450), and almost all air monitoring work was awarded to E.Tal

Environmental Consultants, Inc. (E.Tal), Tr. 1202, 1207 (A454, A459) –
companies owned and/or controlled by Yaron and Buchnik.  Tr. 538,
540, 632-33, 686-91, 708-10 (A225, A227, A271-72, A287-92, A300-02).

In particular, Yaron asked Stephen McAnulty, the Vice President of
E.Tal, "to approach Santo Saglimbeni and have a discussion which
would result in an understanding that there would be an overall
payment in cash as a kickback for the awarding of the contracts for air
monitoring at the hospital." Tr. 709 (A301).  McAnulty met with
Saglimbeni a week or two later.  Tr. 710 (A302).  After some "haggling,"
they reached a number "8, 9 percent, something like that." Tr. 711
(A303).

Yaron and Buchnik also paid kickbacks to Saglimbeni on the
asbestos abatement contracts.  Buchnik told Michael Theodorobeakos,
an insulation subcontractor, that "the guys from NEA," including
Yaron, David Porath, and Buchnik, "were getting work through Mr.
Saglimbeni and they were paying off Mr. Saglimbeni." Tr. 540 (A227).
NEA had earlier paid off Henry Kuhlken, another Hospital employee
who previously had been involved in awarding asbestos remediation
contracts at the downtown campus, giving him envelopes of cash and a

7

Rolex to "keep doing what you're doing" and using NEA as a contractor. Tr. 2032-34 (A694-96).

To effectuate the conspiracy, Figueroa helped Saglimbeni direct work to NEA and E.Tal, receiving bills and signing off on invoices submitted by them. Tr. 1237-41 (A464-68). In addition, defendants made numerous fraudulent misrepresentations as to NEA and E.Tal's independence so that both companies could get Hospital contracts. Pursuant to the DEP Regulation, asbestos abatement contractors and air monitors must be completely independent. Tr. 978 (A392). Defendants submitted numerous ACP-7 forms certifying that NEA and E.Tal were completely independent, when they were not in reality. GX 121, 122, 123, 124, 125, 303, 613, 614, 615 (A865-68, A869-71, A872-75, A876-79, A880-84, A912-14, A931-32, A933-34, A935-97); Tr. 261, 1253 (A199, A474). Indeed, Richard Pierce, a former Hospital employee who supervised asbestos removal, asked Buchnik if NEA and E.Tal "were independent, had anything to do with their company and Moshe said totally independent and I trusted Moshe." Tr. 451-52 (A212-13); *see also id.* at 513-14 (A219-20) (if Buchnik had told me they were not separate, "I wouldn't have signed the ACP7 and I would not hire E. Tal

8

or not hire the abatement company"). The Hospital relied on these misrepresentations, and other false representations by Buchnik, in hiring both NEA and E.Tal. Tr. 451-52 (A212-13).

The defendants' fraudulent conduct also subverted the Hospital's competitive bidding process. In 1999, the Hospital initiated a competitive bidding policy generally requiring three sealed competitive bids for any service contract whose annual value exceeded $50,000. Tr. 174, 939-41 (A171, A370-72). Under that policy, the kickbacks Saglimbeni received were "strictly prohibited." Tr. 189 (A184); *see also* GX 102-01, 102-02 (A811-22, A823-42).

In addition, the conspirators violated the policy by manipulating bids and sharing bid information. Tr. 954-55 (A385-86). For some asbestos abatement contracts, E.Tal served as a consultant to the Hospital, compiling bid documents. Tr. 716 (A308). At Buchnik's request, Theodorobeakos submitted a fake bid for an asbestos abatement contract (which Buchnik prepared), Tr. 542-48 (A229-35); GX 127-05 (A885-88), and found someone else in the building to submit a second fake bid, Tr. 547-49 (A234-36). And, on at least one occasion,

Buchnik used a steamer to open a sealed bid from another contractor before preparing NEA's bid.  Tr. 726-27 (A312-13).

    2.    The expansion of the fraudulent kickback scheme to construction contracts in 2002

In 2002, the kickback scheme expanded to include construction contracts awarded to Oxford, a firm owned by Yaron.  Tr. 989, 1265 (A395, A481).  In August 2003, Saglimbeni created a sham corporation, Artech, with his mother, Vincenza Saglimbeni, listed as the owner, to conceal the kickback payments he received.  Tr. 1141 (A430); GX 1001, at 1 (A941).  From October 23, 2003 to June 24, 2005, Yaron and Buchnik paid five intermediaries $2,418,051 to funnel $2,327,700 to Artech, using wire transfers and other means.  GX 1504, 1505, 1508-01 (listing the amounts and dates of all the payments) (A1007-27, A1028, A1029).  There was evidence presented at trial that Artech provided no services to the Hospital.  *Cf.* Tr. 1324 (the engineering manager at the Hospital never heard of Artech and was not aware of it doing any work for the Hospital) (A505).  NEA, E.Tal, and Oxford continued to receive payments on the awarded contracts until at least 2008.  GX 1503 (A1004-06); Tr. 1323, 2067-74 (A504, A709-16).

The intermediaries used to pay the kickbacks were Aaron S. Weiner Construction, Inc., Ursus, Inc., Norman Millan, Winmar, Inc., and Jack & Sons, Inc.  Specifically, in June 2004, Yaron met with Aaron Weiner and told him "there was a company called Artech and he needed checks written for Artech" and for which Weiner would get five percent.  Tr. 1484-85 (A516-17).  At another meeting later that night with Yaron, Weiner "was given the dates of the checks" and told "not to put them in exact, they had to be in a different order so it didn't look like it was the only job they were running."  Tr. 1540 (A525).  Weiner wrote checks to Artech totaling $1,010,000 for which he was paid $1,065,000 by wire transfer or check by Oxford or Cambridge.  Tr. 1580 (A531); GX 1508-01 (A1029).  Yaron later told him that he "should definitely get rid of [his] files for Artech."  Tr. 1594 (A537).

Buchnik also used intermediaries to funnel kickbacks to Artech.  At his direction, Mariusz Debowski, the owner of Ursus wrote two checks to "Arpech" totaling $190,250 for which he was paid $199,881 by Oxford.  Tr. 1862-87 (A607-32); GX 650, 651, 1504, at 9 (A938, A939-40, A1015).  Buchnik also used a company he owned (Tr. 1694 (A542)), Jack

11

& Sons Services, to write eight checks to Artech totaling $491,000. GX 1504, at 20 (A1026).

Finally, Norman Millan wrote three checks to Artech totaling $153,300 for which he was paid $168,300 by Oxford, and Winmar wrote eight checks to Artech totaling $483,450 for which it was paid $498,370 by Oxford and Cambridge. GX 1504, at 14, 17 (A1020, A1023).

Saglimbeni used the kickback money to buy land in the Hamptons. In April 2004, WF3, a company co-owned by Artech and Saglimbeni's mother, Tr. 1150-51 (A439-40); GX 1011 (A990-1003), purchased a parcel of land in the Hamptons. Tr. 1820-34 (A587-601). The original check for the down payment was drawn on Artech's bank account. Tr. 1825 (A592).

Figueroa helped Saglimbeni direct construction work to Oxford. Saglimbeni was promoted to Vice President in 2005. As Saglimbeni advanced, Figueroa did too (on Saglimbeni's recommendation), becoming a Building Systems Manager in 2003, and then Director of Facilities Operations for the uptown campus in 2005, even though he was not a "graduate engineer" (lacking a college degree). Tr. 197, 922-

28 (A187, A358-64); GX 293-02, 293-08, 294-01 (A899-904, A905, A906-11).

Figueroa used these positions to help Oxford get several jobs. For example, with respect to the contract to renovate the office space within Saglimbeni's uptown facilities department – the first job awarded to Oxford after the kickback scheme expanded to include construction contracts in 2002 – Oxford's proposal was addressed to Figueroa, Tr. 999 (A398); GX 147-01 (A889), Figueroa requested the purchase order, Tr. 999-1000 (A398-399); GX 147-05 (A890), and approved Oxford's invoice for payment, Tr. 1003-05 (A402-404); GX 147-08 (A892). Additionally, Figueroa, reporting directly to Saglimbeni, acted as the project manager on this and other Oxford jobs. Tr. 1271 (A487). Figueroa also initiated other Oxford requisitions and approved other invoices. Tr. 1005-15 (A404-14); GX 147-07, 147-12, 147-13, 147-14, 147-18 (A891, A893, A894, A895, A896).

### 3. The Hospital audit in May 2005 and the consensual audio recordings

On December 16, 2004, the New York County District Attorney's office indicted three companies for "giving kick-backs to clients in return for being awarded asbestos remediation and monitoring

business." GX 239 (A897-98). On May 18, 2005, the Hospital commenced an audit "to validate that controls are in place to ensure that qualified vendors performing monitoring, analysis and abatement of asbestos are selected in accordance with [Hospital] policies and procedures and the work performed is monitored to ensure that contract specifications are fulfilled." *Id.* Initial findings of the audit committee were, *inter alia*, that over the past four to five years NEA had received 93% of the $21.7 million on asbestos abatement contracts; that "[c]ompetitive bidding for air monitoring services at [the Hospital] is not conducted" and E.Tal received 83% of the $2.7 million awarded on air monitoring contracts; and that "[l]ack of competition for air monitoring services may result in higher prices to [the Hospital]." DX 104 (A1054-66); GX 106 (A843-55). Saglimbeni and his staff were responsible for preparing a response to these findings and developing a plan of correction. Tr. 979 (A393).

During the audit, Porath recorded meetings with Figueroa on June 10, 2005, and June 16, 2005. Porath had previously worked for NEA and had been a member of the conspiracy, but left NEA to form his own company. Tr. 540, 684, 704-12 (A227, A285, A296-304). Subsequently,

he began cooperating with the Government and recorded the meetings in question.  However, by the time of the trial, he was no longer cooperating with the Government, had been indicted, and was in Israel awaiting extradition.  Four excerpts from these recordings (totaling 14 minutes) were introduced through the testimony of the FBI agent, Melissa Fortunato, who supervised the recordings.[2]

At the June 10 meeting, Figueroa discussed how Yaron had called him to set up a meeting to discuss Saglimbeni and how Yaron was "pissed" at Saglimbeni for giving a construction job to another company. GX 1701-02, at 62, 64 (A1032, A1034).  Figueroa also mentioned that Yaron had given him some advice:  "Never bite the hand that feeds you."  GX 1701-02, at 63 (A1033).

At the June 16 meeting, Figueroa discussed how the Hospital auditor was going through all the asbestos manifests, proposals, and requisitions, and how it threatened to uncover the conspiracy.  GX 1702-02 A &B, at 100-103 (A1042-46).  Figueroa directly admitted that Saglimbeni "was writing them reqs so they could write him checks" and

---

[2] Buchnik includes portions of these excerpts at pp. 25-28 of his opening brief but omits several inculpating statements by Figueroa (especially in the June 16 meeting).

15

that if the Hospital finds out about the connection between NEA and E.Tal, the conspiracy would be over ("If they find out it's done").  GX 1702-02B, at 101-03 (A1044-46).  Figueroa also stated that he "would keep [the] relationships open" but stop for a while and "pick it up in a year or so when things quiet down."  GX 1702-04A, at 124 (A1049).  And Figueroa explained that he told "'Santo, one weak link, that's all it takes'" and emphasized the importance of staying silent if the police investigated: "you could [expletive] keep [] me in a precinct for three days and ask me questions, I'm gonna keep telling you to go [expletive] yourself."  *Id.* at 125 (A1050).

### B.  The Post-Trial Motions

Following their convictions on all the tried wire fraud charges, Yaron, Saglimbeni, Oxford, Cambridge, and Artech moved for acquittal under Rule 29, arguing there was insufficient evidence that they had a specific intent to harm the Hospital and that the $2.3 million in payments to Artech was a "quid pro quo" for any contract.  Dkts. 145, 148 (A1069-76, A1077-83).  Figueroa also moved for acquittal due to insufficient evidence of his participation in the conspiracy.  Dkt. 174 (SPA1-11).

16

Defendants also sought a new trial under Rule 33 on the ground that the Government was responsible for Porath's unavailability at trial.  Porath was arrested in Israel on November 27, 2011.  On January 5, 2012 (a few days before the trial here was to begin), an Israeli magistrate declared Porath extradictable, and Porath waived appeal. Porath was returned to the United States on February 16, 2012 (after the trial here was complete).  Defendants claimed that the Government "deliberately kept [him] out of the jurisdiction until after the defendants' trial" and "concealed from the Court and from defense counsel" that Porath could "be called as a witness" and "consent[ed] to return" in violation of the Compulsory Process Clause.  Dkt. 152, at 1-2 (A1086-87).  As support for their concealment allegation, they noted that the Government had told defense counsel and the Court on January 4 that "Porath is no longer cooperating with the Government, and is now in Israel awaiting extradition to the United States to stand trial" (Dkt. 128-1, at 3 (A89)) but did not later disclose that Porath had ceased contesting extradition.  Dkt. 152, at 4-5 (A1089-90).

The Government responded to defendants' allegations by explaining, among other things, that "[a]t no time did any member of the trial team,

17

or of the Antitrust Division, ask anyone to delay the extradition proceeding for any reason"; Porath's extradition was timely and proper under standard Department of Justice procedures; and that the Government did not "'conceal' the status of Porath's extradition proceedings, or make any false statement or misrepresentation about the status of those proceedings." Dkt. 156, at 1 (A1133). Moreover, the Government noted that it had clearly represented long before trial that it did not intend to call Porath as a Government witness; "[d]efendants never, at any time before or during trial, so much as mentioned any interest in Porath as a defense witness"; and defendants had never asked for additional information about the status of the extradition proceedings. *Id.* at 2, 5-6 (A1134, A1137-38). The Government also submitted a declaration from Patricia L. Petty, Office of International Affairs, the attorney who handled Porath's extradition, attesting that, "[a]t no time did I, or to my knowledge did anyone in my office, receive a request from any person to delay this extradition proceeding for any reason" and that Porath's extradition "was handled in a routine and timely manner, and executed within the requirements of the extradition treaty and U.S. and Israeli law." Dkt. 157, at ¶¶ 14, 15 (A1157-58); *see*

18

*also id.* ¶¶ 7-12 (discussing required steps for extradition from Israel) (A1156-57).

Defendants later filed supplemental memoranda, requesting an evidentiary hearing on their compulsory process claim and that the Court order production of all the Government's documents "concerning the extradition of David Porath and his participation as a witness in the trial of this case." Dkt. 166, at 1-2 (A1172-73); Dkt. 162 (A1168-71).

The District Court held a hearing on the motions at which it made clear that its rulings on the admissibility of the Porath tapes would have been the same "even if Porath had been here in the courtroom at the time they offered the tapes," as the Government "had no responsibility, nor necessity, to call Porath in order to admit those tapes into evidence" and had "laid a proper foundation to admit those tapes into evidence through the agent." 5/17/12 Tr. 6 (A1192). The Court further observed that this hearing was "the first time that I've heard anybody from the defense say that you would have called him as your witness had he been in the United States." *Id.* at 19 (A1205); *see also id.* at 47 (A1233) ("No defense lawyer has ever said, Porath is my critical witness; I want to call him. No one has ever said that.").

19

The District Court asked the Government why it did not provide updated information regarding Porath's extradition to the Court or defendants. *Id.* at 118-126 (A1260-68). The Government replied that the new developments were "not inconsistent with the representations we made"; that there was no "conscious decision to keep something from them"; and that, "[i]f [defense counsel] had asked, we would have [told them what we knew]." *Id.* at 118-21 (A1260-63). Moreover, "[f]rom what we knew, everything [Porath] would say would be inculpatory," and "[t]here was absolutely no reason for us to have any idea they had any interest in him." *Id.* at 121-22 (A1263-64). Indeed, the Government noted, by the time of the hearing Porath had been back in the United States for over three months, but there was no indication that defense counsel had interviewed him or asked him what he would say if called as a witness. *Id.* at 122 (A1264). The Court asked the Government about Porath's prior written and recorded statements to the FBI. *Id.* at 127 (A1269). The Government offered to give them to the Court but argued that defendants were not entitled to them because they "are highly inculpatory" and "there's no *Brady* information in them that we see." *Id.* at 127-28 (A1269-70).

20

The District Court denied defendants' motions.  Dkt. 174 (SPA1-11).  In denying the motion for acquittal, the Court held that the conspiracy harmed the Hospital by interfering with its property right to control the award of contracts, which here was sufficiently established by "the abundance of evidence at trial that established the transfer of funds to Artech" and the misrepresentations regarding NEA's and E.Tal's independence.  *Id.* at 3-4 (SPA3- 4).  The Court further held that "a rational jury could infer from the totality of the evidence that a *quid pro quo* occurred" from "the circuitous route" the "$2.3 million was delivered to Artech."  *Id.*  The Court also held that there was sufficient evidence of Figueroa's knowing participation in the conspiracy "based on his own statements and activities."  *Id.* at 6 (SPA6).

In denying the new trial motion, the Court held that defendants failed to prove any of the three elements of a Compulsory Process Clause claim under *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), and *Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990):  bad faith by the Government, materiality, and lack of fundamental fairness.  Dkt. 174, at 8-11 (SPA8-11).  In particular, there was no evidence that "the government deliberately delayed Porath's return" and that claim was

21

"entirely contravened by Petty's declaration." *Id.* at 9 (SPA9).

Moreover, Porath "was now a non-cooperating witness facing three felony counts" who could "have invoked his Fifth Amendment Right not to incriminate himself." *Id.* at 10 (SPA10). Even assuming that Porath testified, there was no basis to assume that testimony would have helped defendants, because they did not "proffer any specific testimony that Porath would have given that is exculpatory or favorable to the defense." *Id.* Finally, even if there was error, "there was no prejudicial impact on the outcome of the trial" because the jury separately found both money and property fraud and honest services fraud, and there was an "abundance of evidence" supporting those charges. *Id.*[3]

## C. The Guilty Pleas

On July 31, 2012, Saglimbeni and Figueroa pled guilty to mail fraud and conspiracy to commit mail fraud. Saglimbeni and Figueroa each admitted that from 2003 to 2006 he gave work to an HVAC vendor in exchange for goods, services, and cash. Plea Tr. 16-22 (A1351-57).

---

[3] Defendants' supplemental filings requesting Porath's prior statements did not mention *Brady*. *See* Dkts. 162, 166 (A1168-71, A1172-75). But defendants did so at the new trial hearing. *See* 5/17/12 Tr. 14, 32-34, 86-87 (A1200, A1218-20, A1256-57). The District Court's ruling denying the post-trial motions did not address any *Brady* claims.

**D. Sentencing**

The District Court sentenced Yaron, Buchnik, Oxford, Cambridge, and Artech on July 10, 2012, and Saglimbeni and Figueroa on October 17, 2012.

### 1. Yaron, Buchnik, Oxford, Cambridge, and Artech

The District Court imposed a $1,000,000 fine and $200 special assessment against each of the corporate defendants. 7/10/12 Sent. Tr. 12 (A1297). As for Yaron and Buchnik, the District Court found that the Hospital suffered a loss from the wire fraud conspiracy, but the exact amount of that loss could not reasonably be determined. *Id.* at 26, 68-69 (A1304, A1336-37). Accordingly, the Court held that restitution was inappropriate, *id.* at 3-7 (A1290-94), but that a different conclusion was warranted when calculating Yaron and Buchnik's offense level based on the fraud guideline. *Id.* at 23 (A1301). Specifically, the District Court used "the gain that resulted from the offense [$2.4 million[4]] as an alternative measure of loss," in accordance with Application Note 3(B) to U.S.S.G. § 2B1.1: "The court shall use the gain

---

[4] $2.4 million was the amount paid to the five intermediaries. 7/10/12 Sent. Tr. 22 (A1300).

23

that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." 7/10/12 Sent. Tr. 25 (A1303). That led to a 16-level increase in Yaron and Buchnik's offense level under U.S.S.G. § 2B1.1(b)(1).

Yaron's total offense level was 29, Criminal History I, corresponding to Guidelines sentencing range of 87-108 months. 7/10/12 Sent. Tr. 54 (A1322). The Court sentenced Yaron to 60 months' imprisonment and imposed a $500,000 fine and a $200 special assessment, finding that the appropriate sentence was below the Guidelines range yet still "substantial" given "the nature of this serious crime and the nature of his prior criminal history." *Id.* at 54-55 (A1322-23).[5]

Buchnik's total offense level was 25, Criminal History I, corresponding to a Guidelines sentencing range of 57-71 months. *Id.* at 89 (A1342). The District Court sentenced Buchnik to 48 months' imprisonment and imposed a $500,000 fine and a $200 special

---

[5] Yaron had prior convictions for mail fraud and other offenses. *See* Yaron PSR ¶¶ 59-68. These convictions did not factor into his criminal history under the Guidelines due to their age, U.S.S.G. § 4A1.2(e)(3), but the Court was entitled to consider them under 18 U.S.C. § 3553(a) in imposing his sentence.

assessment, finding that his lack of a criminal history supported a below Guidelines sentence even though he had committed a "very serious crime." *Id.* at 90-91 (A1343-44).

2.    Saglimbeni and Figueroa

The District Court reaffirmed that it was "appropriate for guideline purposes to use the amount that was received as payments" to estimate the loss when calculating Saglimbeni's and Figueroa's offense level, leading to a 16-level increase.  10/17/12 Sent. Tr. 14, 20 (A1359, A1363). Saglimbeni's total offense level was 27, Criminal History I, corresponding to a Guidelines sentencing range of 70-87-months.  *Id.* at 86 (A1370).  The District Court sentenced Saglimbeni to 48 months' imprisonment on each of the four counts to be served concurrently, finding that while "Mr. Saglimbeni was involved in a very serious crime," he lacked prior convictions.  *Id.* at 87-88 (A1371-72).  The District Court also imposed a $250,000 fine and a $400 special assessment; and ordered forfeiture of the kickbacks and $603,981.98 in restitution to be paid to the Hospital jointly with Figueroa to cover the Hospital's outside legal fees.  *Id.* at 38-39, 88-90 (A1366-67, A1372-74).

Figueroa's total offense level was 25, Criminal History II, corresponding to a Guidelines sentencing range of 63-78 months. *Id.* at 92-93 (A1376-77). The Court sentenced Figueroa to 36 months' imprisonment on each of the three counts to be served concurrently, explaining that his "relative role in this offense is probably less than the other defendants," but "he has a particular lack of remorse in attempting even today to minimize his conduct." *Id.* at 93-94 (A1377-78). The Court also imposed a $25,000 fine and a mandatory special assessment, and ordered $603,981.98 in restitution to the Hospital jointly with Saglimbeni. *Id.* at 94 (A1378).

## SUMMARY OF ARGUMENT

I. The evidence is sufficient to sustain defendants' convictions. Neither Saglimbeni nor Figueroa challenge their convictions for the mail fraud charges to which they pled guilty and, as the District Court recognized, there was an "abundance of evidence" supporting the wire fraud charges tried to the jury. Dkt. 174, at 10 (SPA10).

A. There was sufficient evidence of a *quid pro quo*. Yaron and Buchnik funneled over $2.3 million through five intermediaries to a sham corporation Saglimbeni created, and Figueroa admitted that

26

Saglimbeni "was writing them req[uisitions] so they could write him checks," GX 1702, at 103 (A1046). Moreover, several witnesses testified that Yaron and Buchnik were paying kickbacks to Saglimbeni to get work at the Hospital.

B. There was sufficient evidence supporting Figueroa's conviction for conspiracy to commit wire fraud. His statements on the tapes establish his knowledge of the conspiracy. Moreover, the Government presented ample evidence that he assisted Saglimbeni in directing work to conspirators' companies (especially Oxford). That the Government never proved that he received any kickbacks from the wire fraud conspiracy is irrelevant. Personal benefit is not an element of conspiracy to commit wire fraud. In any event, Figueroa benefited from promotions recommended by Saglimbeni.

II.A. The excerpts from the consensual audio recordings were properly admitted through Special Agent Fortunato. "[T]he government is not required to call as a witness a participant in a recorded conversation in order to authenticate the recording; it may lay the foundation for the recording through the testimony of the technician

27

who actually made it." *United States v. Barone*, 913 F.2d 46, 48-49 (2d Cir. 1990).

B.  Defendants had no constitutional right to confront Porath about his statements on the tapes.  In *United States v. Burden*, 600 F.3d 204, 225 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 953 (2011), this Court held that a cooperating witness's statements made on an audio recording "to elicit inculpating statements by others present" are nontestimonial, and therefore do not implicate the Confrontation Clause, even if the cooperator "knew his statements could be used at a future trial."  That is the case here, as Porath's statements were made to elicit inculpating admissions by Figueroa.  To ensure compliance with *Burden*, the District Court admitted only those statements by Porath that were intended to and did, in fact, elicit a response by Figueroa.

Defendants are wrong that *Burden* is no longer good law and distinguishable.  This Court has not overruled *Burden* or questioned its reasoning.  Indeed, none of the cited subsequent decisions involved consensual audio recordings.  Nor are the circumstances here materially different from *Burden*.

Finally, even assuming *arguendo* that any of Porath's statements are testimonial, any error admitting them was harmless. As the District Court correctly recognized, it was Figueroa's responses – not Porath's statements – that were incriminating, and the tapes were only a small part of the abundance of evidence supporting the jury's verdict.

C. The tapes are not hearsay. Figueroa's statements were admissible against him as nonhearsay party admissions. They also were admissible against other defendants as co-conspirator statements in furtherance of the conspiracy. Porath was previously a member of the conspiracy when working for NEA, and the conspiracy was ongoing when the tapes were made. Indeed, Figueroa urged Porath to stay silent during the Hospital audit and told Porath that he "would keep the – those relationships [with Yaron and Buchnik] open," and "pick it up in a year or so when things quiet down." GX 1702-04A, at 124 (A1049). This Court has previously held that a trial court's finding that similar statements were in furtherance of the conspiracy was not clearly erroneous. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989).

29

Porath's statements also are not hearsay. They were admissible as context to show what Figueroa had adopted or responded to, not for their truth. While the jury was not instructed on that point, the failure to give such an instruction (which defendants never requested) was not plain error. Based on the testimony presented at trial, particularly that of the FBI agent explaining how and why the recordings were made, and the Government's closing argument, there is every reason to believe that the jury fully understood that the tapes were inculpating because they showed what Figueroa knew and did.

III.A. The District Court properly rejected defendants' claim that the Government deliberately delayed Porath's extradition until after the trial in violation of the Compulsory Process Clause. As the District Court correctly found, there is no evidence supporting that claim. While defendants argue that the Government should have provided updates on Porath's extradition status following its January 4 representation that Porath "is now in Israel awaiting extradition to the United States to stand trial" (Dkt. 128-1, at 3 (A89)), none of the subsequent developments rendered that statement inaccurate or misleading. Moreover, there was no need for the Government to

30

provide any updates since the Government made clear that it was not calling Porath as a witness; defendants gave no indication they wanted him as a defense witness; and defendants never asked for any additional information on his extradition proceedings.  Defendants' arguments that are not required to prove bad faith or were entitled to an evidentiary hearing on bad faith to engage in a fishing expedition are contrary to settled law.

Defendants' compulsory process claim also fails because they did not proffer any specific testimony by Porath that would have been exculpatory or favorable to the defense.  While defendants argue that failure is because they lacked access to Porath, nothing prevented them from getting a declaration from him during the three months between his extradition and the new trial hearing.  Defendants also failed to prove that the trial was fundamentally unfair without Porath.

B.  There was no *Brady* violation.  Defendants waived any *Brady* claims by failing to clearly raise them below.  Even if those claims were preserved, they are meritless.  Defendants failed to prove that information on Porath's extradition or his prior written and recorded statements were exculpatory or impeaching or that any prejudice

31

resulted from their lack of access to these materials.  While defendants argue that they could have impeached Porath's statements on the tapes, those statements were admitted as context, not for the truth, so Porath's credibility was never at issue.  Moreover, there was not a reasonable probability that the outcome would have been different.

IV.   The District Court properly calculated defendants' offense levels.  The District Court's use of the gain to Saglimbeni as an alternative measure of loss to the Hospital for purposes of calculating defendants' offense levels was amply supported by the plain language of Application Note 3(B) to U.S.S.G. § 2B1.1 and the District Court's factual findings that the Hospital incurred some loss from the wire fraud conspiracy, but the exact amount of that loss could not reasonably be determined.  Though defendants argue there was no evidence of loss to the Hospital, they simply ignore the evidence showing that at least $90,000 of the kickback payments was passed onto the Hospital as part of one of the contracts, as well as three reasons given by the District Court in support of its conclusion.

32

## STANDARDS OF REVIEW

"A defendant challenging the sufficiency of the evidence supporting a conviction faces a 'heavy burden.'" *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (citation omitted).  A court may overturn a conviction under Rule 29 "only if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in [the government's] favor," the Court finds that "no rational trier of fact could have concluded that the Government met its burden of proof."  *Id.* (citation and internal quotation marks omitted).  The "deference accorded to a jury's verdict 'is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008).

Alleged Confrontation Clause violations are subject to harmless error review.  *United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004).

33

Evidentiary rulings, including hearsay rulings, are reviewed for abuse of discretion. *United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002). So too is a denial of a request for an evidentiary hearing. *United States v. Bonventre*, 720 F.3d 126, 128 (2d Cir. 2013). The denial of a motion for a new trial, including one that contains *Brady* claims, is also reviewed for abuse of discretion. *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011); *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008).

This Court reviews findings of fact for clear error, including findings that statements were in furtherance of a conspiracy, *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989), and a district court's loss determination, *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012). And the Court reviews for "plain error" a failure to give a limiting instruction that was not requested below. *United States v. Elfgeeh*, 515 F.3d 100, 126 (2d Cir. 2008).

## ARGUMENT

The jury convicted all defendants on all the tried wire fraud charges and, as the District Court recognized, there was an "abundance

34

of evidence" supporting the jury's verdict.  Dkt. 174, at 10 (SPA10).

None of defendants' arguments on appeal has any merit.

## I.   Defendants' Convictions Were Supported By Sufficient Evidence.

Buchnik, Saglimbeni, Figueroa, and Artech raise two sufficiency arguments on appeal with respect to the wire fraud charges.  Neither satisfies the heavy burden a defendant challenging the sufficiency of the evidence in a conspiracy case faces.  *See Eppolito*, 543 F.3d at 46; *Glenn*, 312 F.3d at 63.

### A.   There Was Sufficient Evidence of a *Quid Pro Quo*.

It is undisputed that Yaron and Buchnik funneled over $2.3 million through five intermediaries to a sham corporation Saglimbeni created. *See, e.g.*, Saglimbeni Br. 5 ("The evidence is undisputed that the payments were made."); Buchnik Br. 5; Figueroa  Br. 5; Yaron Br. 9 n.3.[6]  Nevertheless, Buchnik, Saglimbeni, Figueroa, and Artech claim that there was insufficient evidence that these funneled payments were

_____

[6] Yaron, Cambridge and Oxford adopt Buchnik's statement of facts, and Saglimbeni's and Figueroa's appear virtually identical to Buchnik's. In addition, Buchnik, Saglimbeni, Figueroa, and Artech adopt Yaron's compulsory process and due process arguments.  Thus, citations to these portions of the briefs apply to all defendants.

a kickback for work awarded, as necessary to support the honest services fraud charges. *See* Buchnik Br. 50-52; Saglimbeni Br. 51-53; Figueroa Br. 45-47; *see also United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013) ("to violate the right to honest services, the charged conduct must involve a quid pro quo, *i.e.*, an 'intent to give or receive something of value in exchange for an . . . act.'") (quoting *United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011)).[7] That is unfounded.

As discussed above at pp. 6-8, both McAnulty and Theodorobeakos testified that Yaron and Buchnik were paying kickbacks to Saglimbeni in exchange for air monitoring and asbestos abatement contracts, *see* Tr. 540, 709-11 (A227, A301-03), and Henry Kuhlken testified that Buchnik had previously given him cash and gifts to keep awarding NEA work, Tr. 2032-34 (A694-96) (which was admitted as 404(b) evidence against Buchnik only). Moreover, Figueroa admitted on the recordings that Saglimbeni "was writing them req[uisitions] so they could write him checks," GX 1702-02B, at 103 (A1046), and discussed the need to hide the scheme from the Hospital and the police, *id.* at 102, 125

---

[7] A *quid pro quo* is not a required element of money and property fraud.

(A1045, A1050).  This evidence is sufficient, by itself, to support the jury's finding of a *quid pro quo*.

So too is the money trail.  As the District Court held, and common sense confirms, "[c]onsidering the circuitous route, established by the Government, by which $2.3 million was delivered to Artech, a rational jury could in fact infer from the totality of the evidence that a quid pro quo occurred."  Dkt. 174, at 4 (SPA4).

The arguments to the contrary are unavailing.  First, Buchnik, Saglimbeni, Figueroa, and Artech are wrong that there was no evidence "that Saglimbeni or Figueroa did anything, or tried to do anything, to help Yaron or Buchnik get hospital contracts."  Buchnik Br. 50-51; Saglimbeni Br. 51; Figueroa Br. 46.  Saglimbeni and his staff were responsible for selecting vendors and making sure that the ACP-7 forms certifying that the air monitor and asbestos abatement contractor were independent were properly filled out (which defendants do not dispute were falsified here).  *See* p. 6, *supra*.  Moreover, Figueroa himself admitted on the recording that "I did a lot of Oxford work."  GX 1702-02B, at 103 (A1046).

37

While it is true that there was a hierarchy within Hospital management and other employees played a role in the awarding of some contracts, Buchnik Br. 51; Saglimbeni Br. 52; Figueroa Br. 46, the evidence showed that management significantly relied on Saglimbeni's recommendations and that he did in fact influence the Hospital's selection of contractors.  *See, e.g.*, Tr. 909, 946-48 (A345, A377-79). This, combined with the undisputed payoffs to Saglimbeni, was more than enough to establish a *quid pro quo.  Cf. United States v. Bahel*, 662 F.3d 610, 640 (2d Cir. 2011) (misrepresentations or omissions that are "capable of influencing" employer are material (citation and internal quotation marks omitted)).

Second, contrary to their claim (Buchnik Br. 51; Saglimbeni Br. 52; Figueroa Br. 46), there was "evidence that NEA benefitted from the alleged payments" in that it was chosen as the asbestos abatement contractor along with E.Tal as the air monitor on almost all of the projects awarded during the conspiracy, when that was a clear violation of the DEP regulation.  *See* pp. 6-8*, supra*.  It is true that NEA had been hired for abatement work before the conspiracy, but that is fully consistent with the jury's verdict of fraud, because that prior work was

38

awarded at least partly because Buchnik was paying off Kuhlken to award NEA contracts.  In any event, benefit is not an element of conspiracy, and "[a] participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants, just as a conspirator doesn't have to benefit personally to be guilty of conspiracy."  *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (Posner, J.) (citations omitted).

Finally, Buchnik is wrong (Br. 52) that there is no evidence "that [he] was aware that the payments to Artech were a kickback."  As discussed above, Buchnik had previously given cash and gifts to Kuhlken so that NEA could keep getting work.  Moreover, Buchnik owned Jack and Sons, one of the intermediaries funneling money to Artech, and directed Ursus, another intermediary, in making the payments.  *See* pp. 11-12, *supra*.  That Buchnik was making and directing these circuitous payments, but was ignorant of what the payments were, simply begs credulity.[8]

---

[8] Buchnik also furthered the wire fraud conspiracy by lying to Hospital management about NEA and E.Tal's independence to circumvent the DEP regulation, using a steamer to open at least one

39

### B.  There Was Sufficient Evidence of Figueroa's Participation in the Wire Fraud Conspiracy.

Figueroa also challenges the sufficiency of the evidence supporting his conviction.  Figueroa Br. 47-48.  He does not dispute that the evidence was sufficient to convict some of his co-conspirators.  *See* 12-4685 Dkt. 86, at 1 (conceding that Yaron and Buchnik do not have a "realistic insufficiency of the evidence argument").  But he claims (Figueroa Br. 47-48) that there is insufficient evidence of his participation in the conspiracy.  His argument is unpersuasive.

"To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it."  *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) (internal quotation marks omitted).  Figueroa's admissions on the tapes directly establish his knowledge of the illegal kickback scheme, including that "[Saglimbeni] was writing them req[uisitions] so they could write him

---

other bid by a competitor, and preparing a fake bid in violation of the Hospital's competitive bidding policy.  *See* pp. 9-10, *supra*.

checks," GX 1702-02B, at 103 (A1046), and that hiding the connection between NEA and E.Tal from the Hospital was essential, GX 1702-02B, at 102 (A1045) (Figueroa: "If [the hospital auditors] find out [about the connection between NEA and E.Tal] it's done").

Moreover, the Government presented evidence that Figueroa was repeatedly promoted during the course of the conspiracy ultimately to Director, despite weak qualifications for the position, on the recommendation of Saglimbeni, and used these positions to assist Saglimbeni in directing work to Yaron's and Buchnik's companies – especially Oxford. *See* pp. 12-13, *supra*. After the kickback scheme expanded to construction contracts in 2002, the first Oxford proposal was addressed to Figueroa; Figueroa acted as project manager on several Oxford jobs; and Figueroa repeatedly initiated Oxford requisitions and approved its invoices for payment (among other things). *See* p. 13, *supra*; *see also* Tr. 1237-41 (A464-68) (Figueroa helped Saglimbeni direct work to NEA and E.Tal, receiving bills and signing off on invoices submitted by them).

Figueroa argues (Br. 47) that "there is absolutely no evidence that [he] ever received any money with regard to the Count 1 conspiracy that

41

went to trial."[9]  But, as discussed above (at p. 39), direct benefit is not an element of wire fraud conspiracy.  In any event, it was a reasonable inference from the evidence here that Figueroa did personally benefit in terms of promotions.  *See* pp. 12-13*, supra*.

Figueora claims that the reason he said things on the tapes like "'Santo, one weak link, that's all it takes'" and "you could [expletive] keep [] me in a precinct for three days and ask me questions, I'm gonna keep telling you to go [expletive] yourself," GX 1702-04, at 125 (A1050), was merely to speculate about what he would do "<u>if</u>" he were involved in the conspiracy and investigated.  Figueroa Br. 48.  But his attorney suggested this interpretation of Figueroa's comments to the jury, *see* Tr. 2432 (A776) (Figueroa "wants to puff a little bit" on the tapes), which the jury rejected when convicting him for participating in the conspiracy.  The jury's interpretation of the evidence should be respected.  *See Glenn*, 312 F.3d at 63 (the Court should "draw[] all reasonable inferences in [the Government's] favor").

---

[9] Figueroa admitted to accepting kickbacks on the HVAC contracts as part of the pleaded mail fraud counts.  Plea Tr. 16-22 (A1351-57).

Finally, there is no inconsistency between the jury's verdict and Figueroa's statement on the tapes that "I sit in my office with my feet up, no worries," GX 1702, at 102 (A1045).  *See* Figueroa Br. 48.  That statement was about the Hospital audit, which was looking into the award of asbestos and air monitoring contracts in particular.  *See id.*; *see also* p. 14, *supra*.  Figueroa distinguished the construction contracts from "asbestos," noting he "did a lot of Oxford work."  GX 1702-02B, at 103 (A1046).  Even assuming *arguendo* that Figueroa played no role in earlier parts of the conspiracy – which is not true, *see* p. 8, *supra* – his conspiracy conviction was amply supported through the evidence of him helping Saglimbeni steer construction work to Oxford.  *See United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir. 1989) ("a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy") (citation omitted).

## II. The Excerpts From The Consensual Audio Recordings Were Properly Admitted Through Special Agent Fortunato.

By the time of trial, Porath had stopped cooperating with the Government and had been indicted.  The Government thus introduced the audio recordings at trial through the FBI agent who supervised the recording, Special Agent Melissa Fortunato, not Porath.  Figueroa's

43

statements on the recordings were admissible against him as party

admissions under Federal Rule of Evidence 801(d)(2)(A) and against the

other defendants as co-conspirator statements in furtherance of the

conspiracy under Federal Rule of Evidence 801(d)(2)(E).  Tr. 1747-48

(A583-84).  And Porath's statements on the recordings were admissible

as context to show what had been "adopted or responded to by

Figueroa," Tr. 1709 (A551).  Defendants' challenges to the recordings

are unavailing.

## A.   The Government Can Admit Consensual Audio Recordings Without Calling the Cooperating Witness who Made Them.

Defendants suggest that it was improper for the Government to

admit the tapes through the FBI agent instead of Porath, because

Porath had stopped contesting extradition shortly before the wire fraud

trial began and was therefore potentially available as a witness (even

though he had been indicted).  *See* Yaron Br. 14-17 & n.7 (arguing

Porath should have been called as a "foundational witness" because he

was available); *cf.* Buchnik Br. 35; Saglimbeni Br. 35; Figueroa Br. 31.

But as this Court has explained, "the government is not required to call

as a witness a participant in a recorded conversation in order to

44

authenticate the recording; it may lay the foundation for the recording through the testimony of the technician who actually made it." *United States v. Barone*, 913 F.2d 46, 48-49 (2d Cir. 1990); *see also United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977) (tapes were "fully admissible" without calling the cooperator as "[t]here simply is no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations").  It makes no difference if the witness is in federal custody at the time.  *See Barone*, 913 F.2d at 48 (cooperating witness was incarcerated in a federal facility).

Thus, as the District Court properly observed at the new trial hearing, the tapes were admissible through Special Agent Fortunato "even if Porath had been here in the courtroom at the time they offered the tapes" because the Government "had no responsibility, nor necessity, to call Porath in order to admit those tapes into evidence" and had "laid a proper foundation to admit those tapes into evidence through the agent."  5/17/12 Tr. 6 (A1192).

Defendants argue that, because Porath was available, they should have been able to cross-examine him on the tapes.  *See* Yaron Br. 14-17;

45

Buchnik Br. 35; Saglimbeni Br. 35; Figueroa Br. 31.  But the Government made clear well in advance of trial that it was not going to call Porath as a witness.  Thus, the defense was never going to be able to cross-examine Porath even if he had been in the courtroom.  To be sure, the defense could have called Porath as a defense witness if he had been present.  But that possibility must be viewed with skepticism because, as the District Court found, "[p]rior to trial, the defendants never indicated to the Court, or to the Government, that they wished to call Porath as a witness, nor did they show any interest in delaying the trial until his return."  Dkt. 174, at 9 (SPA9).

Moreover, defendants are wrong that admitting the tapes without allowing them to cross-examine Porath violated the Confrontation Clause.  As the next section explains, Porath's statements on the tapes are nontestimonial under *United States v. Burden*, 600 F.3d 204 (2d Cir. 2010), *cert. denied* 131 S. Ct. 953 (2011).  Whether or not a witness is available, nontestimonial statements "do not implicate the Confrontation Clause."  *Bierenbaum v. Graham*, 607 F.3d 36, 49 (2d Cir. 2010); *see also United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006).

46

## B. Defendants Had No Constitutional Right To Confront the Then-Cooperating Witness About His Statements on the Recordings Because They Are Nontestimonial.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause bars the introduction of out-of-court testimonial statements in criminal proceedings unless the declarant is unavailable to testify and the defendant previously had the opportunity to cross-examine the witness. Defendants concede that Figueroa's statements on the tapes are not testimonial because he was unaware of the recordings. *See* Yaron Br. 14 n.5. But they claim that Porath's statements are testimonial because he knew that he was being recorded and therefore that his statements on the tapes might be used later at trial. *Id.* at 17-22.

This argument fails. In *United States v. Burden*, this Court held that a cooperating witness's statements made on an audio recording "to elicit inculpating statements by others present" are nontestimonial, and therefore not subject to exclusion under *Crawford*, even if the cooperator "knew his statements could be used at a future trial." 600 F.3d at 225. As the Court explained, the key to the Confrontation Clause analysis is the "purpose" of the declarant's statements. *Id.*

47

Although the cooperating witness might have known that the recordings could be used at trial, his statements were not testimonial in purpose because they were "meant not as an accusation in [their] own right but as bait." *Id.*

As in *Burden*, Porath's statements were made not to accuse defendants of wrongdoing but to elicit inculpating admissions by Figueroa. To ensure compliance with *Burden*, the District Court "very scrupulously examined" the audio recordings to ensure that it only admitted statements by Porath that were intended to, and did, elicit a response by Figueroa, 5/17/12 Tr. 64-65, 82 (A1245-46, A1253); Tr. 1709 (A551), requiring redaction of one statement by Porath that was not "adopted or responded to by Figueroa." Tr. 1709, 1737 (A551, A579). Defendants' attempts to escape the clear application of *Burden* are unpersuasive.

       1.    *Burden* is controlling precedent.

Implicitly recognizing that they cannot win under *Burden*, Yaron, Cambridge, and Oxford suggest that it is no longer good law, because in *United States v. James*, 712 F.3d 79 (2d Cir. 2013), "this Court repaired to the Supreme Court's jurisprudence pre-[*Williams v. Illinois*, 132

48

S. Ct. 2221 (2012)]: a statement is testimonial if it is made with the primary purpose of creating a record for use at a later criminal trial." Yaron Br. 18.  And "[t]hat definition of 'testimonial' actually commanded a majority in [*Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011)]." *Id.*

These subsequent decisions – which do not involve consensual audio recordings – do not undermine *Burden* in any way.  In *Burden*, this Court held that the key consideration to whether a statement is testimonial is its "purpose."  600 F.3d at 225.  *James* and *Bryant* say it is the declarant's "primary purpose." *Bryant*, 131 S. Ct. at 1156; *James*, 712 F.3d at 96.  There is no substantive difference between the two standards.

Moreover, the panel in *James* was bound by *Burden*.  *See United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).  The *James* panel majority followed *Burden* at the beginning of its "primary purpose" analysis of the autopsy report, 712 F.3d at 97, and Judge Eaton's concurrence cited *Burden* for the proposition that statements made "to elicit inculpatory statements from others[]lack the required purpose,"

49

*id.* at 109 (Eaton, J., concurring). There is no indication anywhere in *James* that *Burden* is no longer good law.

Nor is there a reasonable argument that *Bryant* implicitly overruled *Burden*. *Bryant* held that statements made by a "mortally wounded" victim to the police, which included the identity and description of his attacker as well as the location of the crime scene, are nontestimonial and admissible. 131 S. Ct. at 1164, 1167. The rationale for that holding is completely consistent with this Court's holding in *Burden* that statements made during a secretly recorded conversation between a witness cooperating with the government and a defendant are nontestimonial and admissible.[10] Thus, *Burden* is the controlling precedent in this Court with respect to the Confrontation Clause issue defendants raise.

---

[10] The Supreme Court denied a petition for certiorari in *Burden* raising a Confrontation Clause issue (131 S. Ct. 953 (2011)) shortly after the oral argument in *Bryant*, instead of holding it until *Bryant* was decided and then granting the petition, vacating the judgment, and remanding for further proceedings (GVR). *Cf.* Eugene Gressman et al., *Supreme Court Practice* 251 & n.31 (9th ed. 2007) (GVRs are "not infrequent" when the Court perceives a potential conflict between a Supreme Court opinion and prior court of appeals opinion).

2. Porath's statements on the recordings are nontestimonial under *Burden* because they were made with the purpose of eliciting inculpating admissions by Figueroa.

Defendants' efforts to distinguish *Burden* are also unpersuasive. Defendants identify two statements by Porath that they deem testimonial because they were used to establish "two critically important facts."  Buchnik Br. 37-38; Saglimbeni Br. 37-38; Figueroa Br. 33.  "First, Porath made the detailed factual assertion that Santo (Saglimbeni) signed and filled out every one of those reqs (requisitions)."  *Id.*  "Second, Porath made the detailed, factual assertion that E.Tal (an air monitoring company connected to Yaron and Buchnik) and NEA (an asbestos abatement company connected to Yaron and Buchnik) were connected and that this connection was the 'worst part' of conduct that was clearly unlawful."  *Id.*; *cf.* Yaron Br. 22-23.

But both of these statements were made to elicit incriminating admissions by Figueroa and are therefore nontestimonial under *Burden*.  As the District Court explained, Porath's statement about the NEA-E.Tal. connection was made to elicit the "incriminating" admission by Figueroa that "'[i]f [the auditors] find out [about the connection],

51

we're done.'"  5/17/12 Tr. 70-71 (A1249-50); Tr. 1713-17 (A555-59)

(same); Tr. 1726 (A568).  And Porath's statement about Saglimbeni

signing the requisitions was adopted by Figueroa (and confirmed what

Figueroa had previously implied).[11]  Tr. 1726 (A568) (The Court:  "And

Figueora says every one of them.  That's the whole point.  I looked at

this in minute detail. . . . Obviously Mr. Figueroa thinks that

[Saglimbeni] signed them all.  Whether [Saglimbeni] signed them all or

not is not the import of the statement.").

Defendants also seek to distinguish *Burden* on the ground that

Porath sought to generate evidence of "past events," instead of

"contemporaneous ones."  Yaron Br. 20; *see also* Buchnik Br. 34, 37;

Saglimbeni Br. 35, 37; Figueroa Br. 31-33.  This distinction is

untenable, however, because the evidence established that the

conspiracy was ongoing when the recordings were made (June 10 and

16, 2005), as one of Yaron's payments to an intermediary was afterward

(June 24, 2005), GX 1508-01 (A1029), and the Hospital's payments on

---

[11] *See* GX 1702-02B, at 101-02 (A1044-45) (Figueroa: "[The auditor is] going through every manifest, every single [expletive] proposal, every single requisition, everything.  Guess who signed every one of those reqs."  Porath: "Santo."  Figueroa: "Who filled out every one of those reqs?"  Porath: "Santo."  Figueroa: "Every one of 'em.").

52

the affected contracts continued until January 2008, *e.g.*, GX 1503 (A1004-06); Tr. 1323-24, 2067-74 (A504-05, A709-16). Moreover, as the District Court found, a "reasonable interpretation of [the June 16] conversation" was that Figueroa was trying to get Porath (who had previously been a conspirator) to "keep [his] mouth shut" and "close ranks" during the Hospital audit. Tr. 1724 (A566). This attempt to conceal the conspiracy from the Hospital was an essential part of the ongoing scheme to defraud. Indeed, Figueroa stated on the tapes that he wanted to "keep the – those relationships open," "stop for a while," and "pick it up in a year or so when things quiet down." GX 1702, at 124 (A1049).

Defendants also claim that *Burden* is distinguishable because several of Porath's statements on the tapes are in the form of "factual assertions." Yaron Br. 20, 23; Buchnik Br. 37; Saglimbeni Br. 37; Figueroa Br. 33. But as this Court made clear in *Burden*, the key is the "purpose" of the comments not their form. 600 F.3d at 225. Because Porath's statements were made as "bait" for the purpose of "elicit[ing] inculpating statements by others present," and not "accusing," they are

nontestimonial, "even to the extent that [Porath] knew his statements could be used at a future trial." *Id.*

Defendants dispute this characterization of Porath's purpose, claiming that "Porath's primary purpose for making the challenged statements was to create a record for use at a later criminal trial." Yaron Br. 20; *see also* Buchnik Br. 41; Saglimbeni Br. 41; Figueroa Br. 37. But the record Porath was trying to create was of *Figueroa's* statements, not his own, as that is what made Porath's cooperation valuable to the Government. *See, e.g.*, Tr. 1945-46 (A678-79) (Agent Fortunato "wanted [Porath] to engage people in conversations about things that were going on at the hospital" and "hop[ed] that they would say things that would incriminate them in terms of allegations of crime"). This is markedly different from the types of circumstances in which this Court has held statements to be testimonial because the declarant created a record for use at a later trial. *See, e.g.*, *United States v. Riggi*, 541 F.3d 94, 102 (2d Cir. 2008) (plea allocutions); *United States v. Banks*, 464 F.3d 184, 189 (2d Cir. 2006) (pleas, allocutions, and post-arrest statement made at a proffer session); *United States v.*

*McClain*, 377 F.3d 219, 222 (2d Cir. 2004) (plea allocution by a conspirator).

Of course, Porath might have been aware that the recording could be used at a later trial and that his statements could be heard by the jury to provide context for Figueroa's admissions. But his primary purpose was (successfully) baiting Figueroa. No right of confrontation applied. *Cf. United States v. Wright*, 722 F.3d 1064, 1066-67 (7th Cir. 2013) (the admission of non-testifying informant's recorded statements as context for defendant's admissions and responses did not violate the Confrontation Clause).

> 3.    Even assuming *arguendo* that there was error, it was harmless.

Even assuming *arguendo* that Porath's statements are testimonial, any error in admitting them did not affect defendants' convictions or sentences. The District Court only admitted statements by Porath that were "adopted or responded to by Figueroa," Tr. 1709 (A551), and "[t]he incriminating part" of the recordings were Figueroa's statements, not Porath's. 5/17/12 Tr. 70 (A1249); *see also* Tr. 1714 (A556) (The Court: "Then Figueroa says, which is the significance of this exchange, if they find out, it's done. That's the import of the conversation, not whether

55

there was an E.Tal-NEA connection or whether or not they were looking at the E.Tal-NEA connection or whether or not these individuals should be concerned about the disclosure of the E.Tal-NEA connection. Quite frankly I don't think any of that is in dispute. That's already in front of the jury."). While Yaron, Cambridge, and Oxford accuse the Government of "inaccurately attributing [Porath's statements] to Figueroa" in closing argument (Yaron Br. 23), they disregard Figueroa's adoption of those statements. Tr. 1713 (A555).

Moreover, the jury separately found both "a scheme to fraudulently obtain money or property from [the Hospital]" and "a scheme to fraudulently deprive [the Hospital] of the honest and faithful services of its employees through kickbacks," Tr. 2617-18 (A807-08), and the tapes were only a small part of the "abundance of evidence" supporting the charges. Dkt. 174, at 10 (SPA10). Indeed, the "circuitous" money trail and the numerous fraudulent misrepresentations as to NEA's and E.Tal's independence (relied on by the Hospital) are more than sufficient to convict Yaron, Buchnik, Saglimbeni, and their companies. *Id.* at 3-4, 6 (SPA3-4, SPA6). And Figueroa's "own statements and

activities" suffice to establish his knowing participation in the conspiracy. *Id.* at 6 (SPA6).

### C. The Recordings Are Not Hearsay.

1. Figueroa's statements on the recordings are not hearsay.

Defendants (including Figueroa) do not dispute that Figueroa's statements on the tapes were admissible against him as nonhearsay party admissions under Federal Rule of Evidence 801(d)(2)(A). *See United States v. Guang Ju Lin*, 505 Fed. App'x 10, 13 (2d Cir. 2012) (summary order) (recorded statements as party admissions were not hearsay); Dkt. 118, at 4 n.3 (A66). But they claim that the District Court improperly admitted Figueroa's statements against the other defendants as co-conspirator statements in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E). *See* Yaron Br. 52-54; Buchnik Br. 47-48; Saglimbeni Br. 48; Figueroa Br. 43-44. The evidence, however, amply supports the District Court's ruling.

At trial, the government proved that Porath had previously worked for NEA, Tr. 684 (A285), and was a member of the conspiracy at that time, Tr. 704-12 (A296-304). Figueroa's statements on the tapes furthered the conspiracy – which was ongoing at the time, *see* pp. 52-53,

57

*supra* – because they helped "maintain trust and cohesiveness," *United States v. Rahme*, 813 F.2d 31, 35-36 (2d Cir. 1987), discussed its progress, *United States v. Mulder*, 273 F.3d 91, 103 (2d Cir. 2001), or explained its status and hierarchy, *United States v. Russo*, 302 F.3d 37, 46-47 (2d Cir. 2002). *See* Dkt. 118, at 5-9 (A67-71).

Defendants do not directly challenge any of this. Instead they argue that Figueroa's statements cannot be "in furtherance of the conspiracy" as a matter of law, because "[t]he Government was not able to provide any evidence that Porath was involved in the conspiracy at the point-in-time he recorded his conversation with Figueroa [in June 2005]" and "Figueroa's statements to Porath are idle in nature, informal, in the realm of gossip." Buchnik Br. 47-48; Saglimbeni Br. 48; Figueroa Br. 43-44; *cf.* Yaron Br. 53-54. This is wrong.

While "both the declarant and the party against whom the statement is offered [must] be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *Beech-Nut Nutrition*, 871 F.2d at 1199 (internal citation omitted). It is sufficient if the recipient of the statement has inside

58

knowledge about the conspiracy.  *See id.* (co-conspirator statement to uninvolved but knowledgeable employee was admissible).

Even if Porath were no longer a member of the conspiracy, he readily falls within this category.  As the District Court correctly explained:  "Mr. Porath [was] not a rank outsider."  Tr. 1718 (A560).  "It doesn't matter" if Porath had formed his own company, because Figueroa was "sharing information about the conspiracy that he knows Porath was a part of and he knows and he believes that is still going on as far as the government is concerned."  *Id.* at 1722 (A564).  "[I]f Mr. Porath was a co-conspirator at any time and now an investigation is going on and now they are afraid somebody is going to be a weak link, everyone would want Figueroa to say to Porath keep your mouth shut, OK, we are being investigated, everybody has to close ranks, nobody can say anything. . . . That's a reasonable interpretation of this conversation."  *Id.* at 1724 (A566).

Moreover, defendants are incorrect that Figueroa's statements were "idle," "recounting [] past events."  Buchnik Br. 48; Saglimbeni Br. 48; Figueroa Br. 43; *see also* Yaron Br. 54.  As discussed above (at pp. 52-53), the conspiracy was ongoing at the time, and Figueora's

59

statements were highly incriminating. Thus, the cases defendants cite (Buchnik Br. 48; Saglimbeni Br. 48-49; Figueroa Br. 43-44; Yaron Br. 54) are inapposite.

Indeed, Figueroa stated on the tapes that, while it was important to stay silent now that the audit was occurring, he "would keep the – those relationships open," and "pick it up in a year or so when things quiet down." GX 1702-04A, at 124 (A1049); *cf.* Tr. 1716 (A558) (finding that this is not a "case where this is a cover-up act that the crime has been completed"). In that sense, this case is very much like *Beech-Nut Nutrition*, in which this Court held that a trial court's finding that statements made by a conspirator to someone who was "intimately aware" of the conspiracy (though "not alleged to have been a member") to "encourage him to not reveal incriminating information [on an ongoing conspiracy]" were "in furtherance of the conspiracy because they were designed to 'cover [it] up'" was not clearly erroneous. 871 F.2d at 1199. Defendants likewise have not met their burden of proving clear error with the District Court's finding that Figueroa's statements were in furtherance of the conspiracy. *Id.*

60

2.    Porath's statements on the recordings are not hearsay.

Yaron, Cambridge, and Oxford also argue that Porath's statements should have been excluded as hearsay.  Yaron Br. 52-53.  That too is incorrect.

a.  As Yaron, Cambridge, and Oxford correctly note (Br. 52), the District Court never expressly addressed its basis for admitting Porath's statements on the recordings.  The District Court's rulings and reasoning, however, make clear that Porath's statements were admitted as context for Figueroa's admissions, not for their truth. *See* Tr. 1709 (A551) (admitting only those statements by Porath that were "adopted or responded to by Figueroa"); Tr. 1737 (A579) (requiring redaction of one statement by Porath to which Figueroa did not respond); *see also* Tr. 1713 (A555) ("The question really is are Mr. Figueroa's statements admissible and are Mr. Figueroa's adoptions of other statements that are made by these cooperator admissible."); Tr. 1714, 1726, 1729-30 (A556, A568, A571-72) (explaining that the "import" of various statements by Porath was not whether they were true but how Figueroa responded).  Because Porath's statements were admissible as context for Figueroa's admissions, and not for their truth, they are not hearsay.

61

*Cf. Wright*, 722 F.3d at 1066-67 (non-testifying informant's statements on recordings were admissible for context because without them, defendant's "responses would have been unintelligible, and a jury would not have any sense of why the conversation was even happening").[12]

b.  While Porath's statements on the recordings were admissible as context for Figueroa's statements, the jury was not expressly instructed on that point because defendants never requested a limiting instruction.[13]  Had defendants requested that the jury be instructed that it should only consider Porath's statements as context to understand Figueroa's admissions, that limiting instruction would have been appropriate.  *See Barone*, 913 F.2d at 49; *cf. Wright*, 722 F.3d at 1067 (providing a possible instruction in plain English).  But the

---

[12] Contrary to Yaron's suggestion (Br. 52), there was little discussion of whether Porath's statements are hearsay; the main focus of the argument was whether admission of Porath's statements violated the Confrontation Clause and whether Figueroa's statements were in furtherance of the conspiracy.  *See* Tr. 1709-33 (A551-75).

[13] Defendants requested a limiting instruction that the jury had to find that Figueroa was a member of the conspiracy before considering the tapes, Tr. 1735 (A577), which was given, Tr. 2524 (A793), but defendants never requested that the jury be instructed not to consider Porath's statements for their truth.

District Court's failure to give such a limiting instruction is not a proper basis for vacating the conviction here.

The failure to give an instruction that was not requested below is reviewed for "plain error." *Elfgeeh*, 515 F.3d at 126. "A plain error is one that, *inter alia*, prejudicially affected the defendant's 'substantial rights' and 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). The lack of the limiting instruction does not meet that test.

Before the tapes were played to the jury, Special Agent Fortunato testified that Porath was cooperating with the Government and had agreed to record meetings with his former co-conspirators such as Figueroa to engage them "in conversations about things that were going on at the hospital." Tr. 1913, 1926, 1945 (A653, A662, A678). She also told the jury which voice was Porath's, Tr. 1934 (A667), and identified the other voice as Figueroa's, Tr. 1936 (A669). Moreover, Figueroa had adopted or responded to each admitted statement by Porath, Tr. 1709 (A551), and in closing arguments, the Government explained that the recordings were probative because they showed "what Tony knew, what

63

Tony did, and what was going on, that he [was a] knowing participant in this conspiracy," Tr. 2298 (A755).

Furthermore, as discussed above (at pp. 55-57), the "incriminating part" of the tapes were Figueroa's statements, not Porath's, and there was abundant other evidence supporting the convictions. Thus, there is not a reasonable probability that the failure to give the limiting instruction affected the outcome of the trial, and thus it did not prejudicially affect defendants' substantial rights or affect the integrity of the judicial proceedings. *United States v. Marcus*, 130 S. Ct. 2159, 2164, 2166 (2010).

## III. The District Court Did Not Abuse Its Discretion In Denying The New Trial Motion.

The District Court properly denied the new trial motion. Neither defendants' compulsory process claim nor their due process claims have any merit.

### A. The District Court Properly Rejected Defendants' Compulsory Process Claim.

The Sixth Amendment guarantees criminal defendants "compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. In *United States v. Valenzuela-Bernal*, the Supreme Court

held that this right is violated when the Government, acting in bad faith, deports a witness with material and favorable testimony so as to prevent the witness from testifying at trial.  458 U.S. 858, 867 (1982).

Though the Government did not deport any potential witnesses here, defendants argued that the Government violated *Valenzula-Bernal* because it "deliberately kept David Porath out of the jurisdiction until after the defendants' trial."  Dkt. 152, at 1-2 (A1086-87).  The District Court denied the claim because defendants failed to prove any of the three elements for a compulsory process violation under *Valenzuela-Bernal* and *Buie v. Sullivan*, 923 F.2d 10 (2d Cir. 1990):  (i) that the Government acted with bad faith; (ii) that Porath's testimony would have been material and favorable to defendants; and (iii) that his failure to testify resulted in a fundamentally unfair trial.  Dkt. 174, at 8-11 (SPA8-11).[14]  Each of these determinations was correct.

---

[14] To our knowledge, no court has ever found a compulsory process violation based on the Government's failure to extradite a potential witness from a foreign country.  *Cf. United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962) (no compulsory process violation for failing to compel attendance of a Canadian witness).  *See generally United States v. Zabaneh*, 837 F.2d 1249, 1260 (5th Cir. 1988) (the right to compulsory process "does not ordinarily extend beyond the boundaries of the United States").

Indeed, rather than trying to show why the District Court's compulsory process analysis was wrong on the facts and the record, defendants commingle their compulsory process and due process claims and argue that various elements of the three-part *Valenzuela-Bernal* / *Buie* test either do not apply at all or apply only in a relaxed manner. *See* Yaron Br. 24-51. This section explains why defendants' arguments fail as to their compulsory process claim, and the next section addresses the deficiencies in their due process claims.

> 1. Defendants failed to establish any of the three elements under *Valenzuela-Bernal* and *Buie*.

a. Bad faith. The District Court held a hearing at which it explored defendants' misconduct allegations in depth and found that there was no evidence that "the government deliberately delayed Porath's return" and that claim was "entirely contravened by Petty's declaration," which attested that the Government followed standard procedures for extraditing Porath from Israel. Dkt. 174, at 9 (SPA9); *see also* Dkt. 157, Petty Decl. ¶ 15 (A1158). Now apparently conceding that the Government did not deliberately delay Porath's extradition, defendants fault the Government for not trying to expedite the extradition so that Porath would be back before trial, citing a

66

declaration attesting to that possibility from a law professor.  Yaron Br. 50 (citing Dkt. 167, Kittrie Decl. ¶¶ 7-11 (A1180-81)); *see also* Dkt. 161, at 3 (A1161) (arguing that, "notwithstanding the 'general' procedures," the Government should have requested that "Porath be accompanied to the United States in time for him to testify about the recordings he had made in 2005").  But the law professor did not claim any experience with extraditions from Israel.[15]  Moreover, even if the Government could have tried to expedite the extradition, there was no apparent need to do so here because the Government stated long before trial that it was not planning to call Porath and defendants never gave any indication they wanted him as their witness either.  5/17/12 Tr. 19 (A1205); Dkt. 174, at 9 (SPA9).

Defendants now argue that they exhibited no interest in Porath because they "regarded a subpoena to [Porath] as futile" and, had they known he was available, they could have attempted "to secure him as a witness for the defense case-in-chief."  Yaron Br. 31.  But by the time of the new trial hearing, Porath had been in New York in federal custody

---

[15] He provided advice on one extradition from Great Britain to the United States and another from the United States to Trinidad-Tobago. Dkt. 167, Kittrie Decl. ¶1 (A1179).

67

for over three months.  Defendants never obtained an affidavit or other statement from Porath indicating that he would offer any testimony favorable to them.[16]  The suggestion that the competent defense counsel who represented defendants at trial would have called Porath as a witness without knowing whether he would further inculpate, rather than help, their clients lacks credibility.  *Cf.* p. 74, *infra* (discussing why Porath's testimony would likely be inculpatory).

Furthermore, while defendants argue that expediting the extradition would have enabled them to cross-examine Porath on the meaning of the tapes (Yaron Br. 26; *see also* Buchnik Br. 44; Saglimbeni Br. 44; Figueroa Br. 39), there was no right of confrontation here – even if Porath were available – because his statements on the tapes are nontestimonial and were provided simply as context for the jury to

---

[16] Yaron's lead trial attorney declared "that if Porath testified and told the truth, he would say that neither he nor Mr. Figueroa had any knowledge or suspicion that money was transferred to Artech from Oxford or Cambridge"; "that the statement made by Figueroa regarding 'reqs for checks' had nothing to do with such transfers of funds"; and that "he was no longer involved in any business relations with the defendants and that Mr. Figueroa was not suspected to be a co-conspirator."  Dkt. 150, Lewin Decl. ¶ 3 (A1084-85).  But there is an obvious difference between counsel's speculation about what a witness would say and an affidavit from the witness about what he will say.

68

understand Figueroa's admissions and other responses. *See* pp. 46, 47-56, 61-62, *supra*.

Defendants also intimate that the Government violated its "duty of candor" to them and the Court. *See* Yaron Br. 29. That is wrong. The Government told defendants and the District Court on January 4 that Porath "is no longer cooperating with the Government, and is now in Israel awaiting extradition to the United States to stand trial." Dkt. 128-1, at 3 (A89). That statement was true when made and throughout the duration of the trial. *Cf.* 5/17/12 Tr. 145 (A1287) (The Court: "[defendants are] not claiming that [the Government] made a misrepresentation to [the defense] of a fact that they knew was not the case"). While defendants claim they were misled by the statement and the Government should have disclosed on January 6 that Porath was no longer contesting extradition, *see* Yaron Br. 11, defendants never sought clarification or asked for additional information about Porath's extradition status until after their convictions. Nor, as discussed above (at p. 67), was there an apparent need for the Government to provide any updates given that defendants had shown no interest in calling him as a witness.

Lacking evidence of bad faith, defendants argue that proof of bad faith should not be a requirement for a compulsory process violation. Yaron Br. 45-50.  Defendants concede that this Court has twice held to the contrary – *i.e.*, that "bad faith" is an element.  *See* Yaron Br. 49 (citing *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *United States v. Esquillin*, No. 98-1333, 2000 WL 232162 at *4 (2d Cir. Feb. 18, 2000) (summary order)).  But they claim these decisions are based on a misreading of *Buie*.  Yaron Br. 48-50.  Again, defendants are wrong.

In *Valenzuela-Bernal*, the Supreme Court emphasized the importance of "the Executive's *good-faith* determination that they possess no evidence favorable to the defendant in a criminal prosecution."  458 U.S. at 872 (emphasis added).  Six years later, in *Arizona v. Youngblood*, the Supreme Court underscored that this aspect of *Valenzuela-Bernal* was important to its analysis, explaining that "[o]ur decisions in related areas [including *Valenzuela-Bernal*] have stressed the importance for constitutional purposes of good or bad faith on the part of the Government when the claim is based on loss of evidence attributable to the Government."  488 U.S. 51, 57 (1988) (citing *Valenzuela-Bernal* , 458 U.S. at 872, *United States v. Marion*,

70

404 U.S. 307, 325 (1971), and *United States v. Lovasco*, 431 U.S. 783, 790 (1977)).  And in *Buie*, this Court applied *Valenzuela-Bernal*, as clarified by *Youngblood*, and held that "bad faith" by the Government was a required element of a compulsory process claim, 923 F.2d at 12, which both *Williams*, 205 F.3d at 29, and *Esquillin*, 2000 WL 232162 at *4, followed.

Defendants note that "bad faith" is not an element of a *Brady* violation and argue compulsory process claims should be treated equivalently (or "if anything" further relaxed).  Yaron Br. 46-47.  But, as the Supreme Court observed in *Youngblood*, "the Due Process Clause requires a different result" when "the State fails to disclose to the defendant material exculpatory evidence [as in *Brady*]" than when the claim is "the failure of the State to preserve evidentiary material."  488 U.S. at 57.  "[R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."  *Id.* at 58.  While the

71

claim here is not an alleged failure to preserve evidence – but a failure to expedite the extradition of a potential witness to make that evidence potentially available – the same need exists in both contexts to "confine" the doctrine to "that class of cases where the interests of justice most clearly require it," *id.*; *cf. Buie*, 923 F.2d at 11 (the "right to compulsory process" is "not unqualified").[17]

b.  Materiality.  The District Court also held that defendants had failed to carry their burden to show why Porath's testimony "'would have been material and favorable to [their] defense, in ways not merely cumulative to the testimony of available witnesses.'"  Dkt. 174, at 8, 9-10 (SPA8, SPA9-10) (quoting *Valenzuela-Bernal*, 458 U.S. at 873).  As the District Court explained, Porath "was now a non-cooperating witness facing three felony counts" who could "have invoked his Fifth Amendment Right not to incriminate himself."  *Id.* at 10 (SPA10); *see also United States v. Turkish*, 623 F.2d 769, 774 (2d Cir. 1980) (defendant's Sixth Amendment compulsory process right does not

---

[17] There were no charges pending against Porath when he traveled to Israel.  5/17/12 Tr. 138 (A1280).

72

"displace" witness's privilege against self-incrimination).[18]  Even assuming that Porath testified, there was no basis to assume that testimony would have helped defendants, because defendants did not "proffer any specific testimony that Porath would have given that is exculpatory or favorable to the defense."  Dkt. 174, at 10 (SPA10).[19]

Defendants do not rectify their failure to prove materiality on appeal.  While defendants claim that "the defense proffered a hypothetical examination of Porath that could have yielded an alternative explanation for a conversation that otherwise appears incriminating," Yaron Br. 38, they do not state what that "alternative explanation" is, present any evidence in support of it, or explain why it would have created a reasonable probability of a different outcome. While defendants assert that is because they "had literally no means by

---

[18] Porath was charged with bid rigging in violation of 15 U.S.C. § 1, conspiring to commit tax fraud in violation of 18 U.S.C. §§ 371 and 2, and false subscription in violation of 26 U.S.C. § 7206(1).  The bid rigging charge focused on the submission of "fictitious and intentionally high bids [that] created the illusion of a competitive bidding process at [the Hospital]" for re-insulation contracts from 2000 to 2005.  *United States v. David Porath & Andrzej Gosek*, No. 1:10-cr-00120-LAP (S.D.N.Y. Feb. 18, 2010) (Dkt. 2 (A27-39)).  Porath pled guilty to the indictment on July 11, 2012.

[19] *See* note 16, *supra*.

73

which to obtain access to the witness" while Porath was in Israel, Yaron Br. 41, nothing prevented them from talking to him or his lawyer in the three months between his extradition and the new trial hearing while he was in federal custody in New York.

In any event, there is no reason to think that, were Porath to testify, his testimony would be exculpatory, as other witnesses at trial testified to Porath's involvement in the conspiracy while he worked at NEA.  In particular, Stephen McAnulty testified that he had discussed the kickback negotiations on the air monitoring contracts with Porath, with Porath relaying Saglimbeni's comment that McAnulty "[drove] a hard bargain." Tr. 712-13 (A304-05).  And Theodorobeakos included Porath in the group at NEA paying off Saglimbeni on the asbestos abatement contracts.  Tr. 540 (A227).

In addition, there was an "abundance of evidence" supporting the wire fraud charges.  Dkt. 174, at 10 (SPA10).  Thus, there is no reason to believe that any clarification Porath would have provided would have had any effect on the verdict. *Cf. Valenzuela-Bernal*, 458 U.S. at 873-74 (testimony is material "only if there is a reasonable likelihood that [it] could have affected the judgment of the trier of fact").

74

c.  Lack of fundamental fairness.  Finally, reversal is only warranted if the loss of evidence "prevents a fair trial."  *Valenzuela-Bernal*, 458 U.S. at 872.  Defendants do not address this requirement on appeal except in a footnote where they claim that fundamental fairness considerations are incorporated into the materiality analysis under *Valenzuela-Bernal*.  Yaron Br. 48 n.17.  But as this Court recognized in *Buie*, "materiality" and "lack of fundamental fairness" are separate requirements.  923 F.2d at 12-13.

Moreover, as the District Court found, there was no lack of fundamental fairness here.  As the District Court explained, "even if [it] were to find that there was prosecutorial misconduct, which it does not, there was no prejudicial impact on the outcome of the trial."  Dkt. 174, at 10 (SPA10).  "Additionally, considering the abundance of evidence presented to, and considered by, the jury, . . . the inability for the defense to potentially have called or cross-examined Porath as a witness to explain the context of the statements made on the recording did not 'fatally infect[] the trial.'"  *Id.* at 10-11 (SPA10-11) (quoting *Valenzuela-Bernal*, 458 U.S. at 872 (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941))).

75

2. The District Court did not abuse its discretion in failing to hold a separate evidentiary hearing on bad faith.

Defendants also claim that the District Court abused its discretion by failing to hold an evidentiary hearing on bad faith. Yaron Br. 45-46, 50. But "[n]o rule of law requires a hearing [on prosecutorial intent] where the relevant facts can be ascertained from the record." *United States v. Pavloyianis*, 996 F.2d 1467, 1475 (2d Cir. 1993). Here, the District Court found that there was no evidence of bad faith and that claim was "entirely contravened" by Petty's declaration. Dkt. 174, at 9 (SPA9). A "hearing is not held to afford a convicted defendant the opportunity to 'conduct a fishing expedition.'" *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983) (citation omitted). Moreover, defendants failed to satisfy the other two elements of a compulsory process claim, *see* pp. 72-75, *supra*, so an evidentiary hearing on bad faith would simply have been a waste of judicial resources.

**B. A New Trial Is Not Warranted on Due Process Grounds.**

Defendants' due process claims were not a central part of the post-trial proceedings below and were never expressly addressed by the District Court. In two short supplemental filings to their new trial motions, defendants requested that the Government disclose Porath's

76

prior written and recorded statements to them and the Court.  Dkts.

162, 166 (A1168-71, A1172-75).  In these filings, defendants did not

claim that these statements were *Brady* material or reference the Due

Process Clause.  *See id.*  Defendants, however, later did so at the new

trial hearing (also claiming that information on Porath's extradition

was *Brady* material as well).  5/17/12 Tr. 14, 32-34, 86-87 (A1200,

A1218-20, A1256-57).

The Government offered to give Porath's prior written and recorded

statements to the District Court for its examination *in camera* but

argued that defendants were not entitled to them because they "are

highly inculpatory" and "there's no *Brady* information in them that we

see." 5/17/12 Tr. 127-28 (A1269-70).  The issue was dropped as the

discussion turned back to the compulsory process arguments.  *See id.* at

131-42 (A1273-84).  The District Court did not address the claims in its

opinion denying the post-trial motions.  *See* Dkt. 174 (SPA1-11).

Defendants' failure to clearly raise their due process claims in their

new trial motion or supplemental filings constitutes a waiver of the

claims, justifying plain error review.  *See, e.g. United States v. Ortega*,

82 Fed. App'x 717, 718 (2d Cir. 2003) (plain error review applies to

waived *Brady* claim), *granted, vacated, and remanded*, 543 U.S. 1103 (2005); *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001) ("An issue is reviewable on appeal only if it was pressed or passed upon below.") (citation and internal quotation marks omitted); *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.1977) (a party waives an issue where it "has shifted his position on appeal and advances arguments available but not pressed below" and "had ample opportunity to make the point in the trial court in a timely manner"). Even assuming *arguendo* that the claims were properly preserved, the District Court's implicit denial of them is reviewed for abuse of discretion. *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008). That standard is not satisfied here.

1. There was no *Brady* violation.

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To show prejudice, defendants must establish the "materiality" of the

78

suppressed evidence, *i.e.*, there was "a reasonable probability of a different result." *United States v. Jackson*, 345 F.3d 59, 73 (2d Cir. 2003) (internal quotation marks and citation omitted).

Defendants argue both that changes in Porath's extradition status and that Porath's prior written and recorded statements are *Brady* material. *See* Yaron Br. 28-31. Their arguments are unpersuasive.

a. Porath's extradition status. Defendants do not adequately explain why mere information about changes in Porath's extradition status is favorable to them as either exculpatory or impeaching information. They do not argue, for instance, that Porath's extradition status sheds any light on the substantive offenses, or that either his location or custodial status would have impeached any witness's testimony. Rather, defendants argue that "Porath's availability was the essential predicate for the defense to demand the opportunity to cross-examine Porath. Brady requires the government to disclose essential facts that permit the defense to take advantage of favorable evidence, even if the facts are not themselves evidentiary." Yaron Br. 28 (citing *United States v. Mahaffy*, 693 F.3d 113, 131 & n.11 (2d Cir. 2012), and *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001)). Thus, they argue,

79

"the government must do more than merely identify [a] witness" and "supply contact information," it must "tell the defense who the witness is, where to find him, and his potential value" as "soon as practicable." *Id.* (citations omitted); *see also id.* at 29-30 (arguing that this information is especially valuable when a witness is abroad).

As explained above at pp. 46, 47-56, however, there is no right of confrontation here regardless of Porath's availability.  Moreover, defendants confuse (i) what makes information *Brady* material in the first place – its exculpatory and/or impeaching value – and (ii) factors that do not excuse a *Brady* violation once that material has been identified.  *Mahaffy* and *Leka* are illustrative of the difference.

In *Mahaffy*, defendants were convicted of conspiracy to commit securities fraud, and a "critical issue was whether portions of the squawked information actually was confidential."  693 F.3d at 121.[20] This Court held that suppressed SEC investigation deposition testimony indicating "that squawked information was not confidential" was *Brady* material because it was exculpatory.  *Id.* at 127-28, 132-33.

--------------------

[20] Brokerage firms called their internal communications "squawks." 693 F.3d at 120.

While the Court observed that some of the testimony "appears to be inadmissible hearsay," it noted that such testimony was nevertheless *Brady* material because knowledge of that hearsay could lead to admissible evidence. *Id.* at 131. This Court, however, did not remotely suggest that *Brady* applied to anything that could lead to admissible evidence, as defendants appear to be arguing here. Rather, it was limited to information (whether admissible or not) that was exculpatory or impeaching.

Likewise, in *Leka*, a defendant was convicted of murder based solely on the eyewitness testimony of two witnesses. 257 F.3d at 99. The Court held that the suppressed eyewitness evidence of an off-duty police officer that "would have been inconsistent in important respects with the testimony of the two eyewitnesses at trial" was *Brady* material because it cast doubt on the trial testimony. *Id.* at 90, 99. And while the Court held that the *Brady* violation was not excused because the Government disclosed the police officer's name and address on the eve of trial, *id.* at 100, it was the inconsistent testimony that was the *Brady* material, not the name and address.

81

Because defendants never establish that Porath's extradition status is itself exculpatory or impeaching, the Court need not reach the issue of whether that information is material to the outcome, which, in any event, it is not.

b.  Porath's prior written and recorded statements.  Because Porath's prior statements were not produced and are not in the record, defendants do not attempt to show that they are exculpatory.  *See* Yaron Br. 32-35.  Rather, they speculate that the statements are favorable to them because they could be used to "impeach Porath's statements [on the tapes]" and show that they concerned a crime other than the one charged."  *Id.* at 26, 36-38 (citing *Jackson*, 345 F.3d at 72-73).  This showing also is unavailing.

While items that impeach a nontestifying witness can be viewed as *Brady* material, *see Jackson*, 345 F.3d at 71 & n.6, that is only where "the declarant's credibility has been put into issue and can thus be attacked."  *United States v. Perez*, No. 05-CR-441, 2005 WL 2709160, at *4 (S.D.N.Y. Oct. 20, 2005); *see also United States v. Madori*, No. S2 02 Cr. 274, 2004 WL 2274756, at *12 (S.D.N.Y. Oct. 7, 2004) ("[w]hile *Giglio* material must be provided as to an out-of-court declarant whose

82

statements are admitted against a defendant as co-conspirator hearsay," it does not have to be provided where the statements in question are not offered to prove the truth of the matter asserted and the witness's credibility is thus not put into issue (citing *Jackson*, 345 F.3d at 71 n. 6)), *aff'd but sentence vacated*, 419 F.3d 159 (2d Cir. 2005). Here, however, Porath's statements on the tapes were admitted as context, not for their truth, *see* pp. 61-62, *supra*, so his credibility was never put into issue and there was thus nothing to impeach.

Moreover, Porath's prior written and recorded statements are not material to the outcome, because the tapes were only a small part of the evidence at trial (*see* pp. 55-56, *supra*), and there is not a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).

Defendants claim that "had the government disclosed Porath's availability and prior statements, the defense 'could have' requested a short continuance of the trial, interviewed Porath, and 'possibly subpoena[ed]' him for trial." Yaron Br. 41.  But as previously noted, Porath was back in the United States for three months by the time of

the new trial hearing, and nothing in the record suggests that they interviewed him to see what he would say.

In addition, the mere possibility of a subpoena does not establish "'materiality' in the constitutional sense," which looks to the probable effect on the outcome. *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). Indeed, while defendants claim that the possibility of further investigation is enough under *Mahaffy* and *Leka* (Yaron Br. 40-41), in both cases this Court's materiality analysis focused on how the juries had been hung and on the Court's belief that the withheld *Brady* material undermined confidence in the guilty verdicts in those cases. *See Mahaffy*, 693 F.3d at 132-33 (the suppressed testimony was material because defendants were acquitted on 38 other counts, the jury was originally hung on the securities fraud conspiracy count, and "[it] would have called squarely into question" the credibility of the "government's key cooperating witness," calling the jury's verdict into question ); *Leka*, 257 F.3d at 106-07 (nondisclosure of police officer's testimony was material because it likely would "have had seismic impact" at trial, especially given the "fact that the jury was at one point

84

hung"). Unlike those cases, there is nothing to suggest that the outcome was reasonably likely to change here.

> 2. The District Court did not abuse its discretion in declining the Government's offer to review Porath's prior written and recorded statements *in camera*.

Defendants also argue that, "[a]t a minimum, the trial court erred by denying relief without ever examining the requested material *in camera*," claiming that "both the Supreme Court and this Court have mandated *in camera* review by the district court of putatively exculpatory evidence whenever a defendant makes some 'plausible showing' of how particular evidence would be material and favorable to the defense." Yaron Br. 43 (citations omitted). But, as described above, defendants did not even raise this *Brady* issue until the new trial hearing and even then addressed it only briefly. It was hardly surprising, given the belated and purely speculative nature of defendants' *Brady* claims, that the district court saw no need to examine Porath's prior statements. No rule of law requires *in camera* examination when the predicate showing of a possible *Brady* violation is so inadequate.

85

## IV. The District Court Properly Calculated Defendants' Offense Levels.

The District Court found that the Hospital suffered a loss from the wire fraud conspiracy, but that the precise amount of that loss could not reasonably be determined.  *See* p. 23, *supra*.  Accordingly, it used the kickback amount as a reasonable estimate of that loss, for the purpose of calculating defendants' offense level, in accordance with Application Note 3(B) to U.S.S.G. § 2B1.1 – "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined" – leading to a 16-level increase under U.S.S.G. § 2B1.1(b)(1).  *See* pp. 23-24, *supra*.  That was fully within the District Court's discretion.

Defendants argue that "the record demonstrated that the government had proven no loss at all," because "nothing in the record could be read to support an inference that the hospital received anything less than the full value of its contracts."  Yaron Br. 55-56; *see also* Buchnik Br. 54-55 ("[T]his was a case where there was simply no evidence of loss.  In particular, there was no evidence of overbilling, or that the hospital contracted for work that was not performed, or was

86

not performed satisfactorily."); Saglimbeni Br. 55-56; Figueroa Br. 50-
51.

But there was evidence that the conspirators effectively passed-on
at least one of the kickback payments to the Hospital by including it in
their accounting for a construction contract. *See* GX 321 (A915-30)
($90,000 payment to Aaron S. Weiner, Inc. was included in the job costs
detail); Tr. 1704-08 (A546-50). In addition, as the District Court
recognized at the first sentencing hearing, defendants' argument
ignores "three" facts. 7/10/12 Sent. Tr. 68-69 (A1336-37). First, because
of the kickbacks, Saglimbeni "had an incentive to give [contracts] to
these defendants without regard to the consideration of whether or not
someone would do the same quality of work for a cheaper price." *Id.* at
69 (A1337). Second, "there's direct evidence on at least one instance of
opening a bid to see what that bid was so they could make sure and/or
readjust their bid." *Id.* Third, "more importantly," there was "evidence
that on at least one occasion, if not more than one occasion, that the
defendant submitted a false [rigged] bid . . . in addition to the bid that
they made," which eliminated the opportunity for a lower bid. *Id.*
Defendants never explain why any of these points suggesting that the

87

Hospital overpaid on its contracts are wrong, much less why the District Court's reliance on them in finding some loss to the Hospital was "clearly erroneous." *Lacey*, 699 F.3d at 719.[21]

Buchnik, Saglimbeni, and Figueroa claim that it was "equally, if not more, likely that Yaron paid [the $2.4 million] as sort of investment in Oxford's future, and that the $2.4 million came out of the company's profits, and was not incorporated into the price tags of the jobs." Buchnik Br. 55; Saglimbeni Br. 56; Figueroa Br. 51. But this is pure speculation and defies common sense. As Judge Posner explained in *United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010), it "makes good sense" for "the criminal's gain [to be] treated as the measure of loss" under U.S.S.G. § 2B1.1 in a case involving a "kickback" to win a bidding contest, for if the payor was willing to pay a kickback, "it must have thought that if it didn't pay that amount it would have to up its bid by at least that much to win an unrigged bidding contest." *Id.* at 680-81.[22]

---

[21] Yaron, Cambridge, and Oxford state (Br. 57) that "[t]he court never articulated the basis for its finding that 'there was a loss.'" That is demonstrably inaccurate (as the text quoted above shows).

[22] In *Vrdolyak*, a company paid a kickback to buy a property, so the court assumed the bid would have been higher without the kickback. 593 F.3d at 679-80. Yaron and Buchnik, by contrast, sought Hospital

"Only on that assumption did the kickback make sense from [the payor's] standpoint." *Id.* at 681.

In any event, the various increases in offense levels under § 2B1.1(b)(1), correspond to ranges of loss, not precise amounts. Even assuming *arguendo* that only half of $2.4 million would have gone to the Hospital, it would still correspond to the same 16-level increase in the offense level. *See* U.S.S.G. § 2B1.1(b)(1)(I) (add 16 levels for losses between $1,000,000 and $2,500,000).

Yaron, Cambridge, and Oxford argue (Br. 58) that even if there were a loss to the Hospital, the District Court was obligated to use a "zero" loss number for offense level purposes because the government did not prove the actual amount of the loss and it was not "objectively impossible" to do so. That argument disregards the plain text of Application Note 3(B) to U.S.S.G. § 2B1.1, which expressly gives the District Court the discretion to do what it did here.

Finally, defendants' reliance (Buchnik Br. 56; Saglimbeni Br. 57; Figueroa Br. 51-52) on U.S.S.G. § 2B1.1 n.3(A)(v)(II) is misplaced. Even

---

contracts, so it is reasonable to infer that the contract price would have been lower without the kickbacks.

89

if applicable, that Note merely provides that the loss "includes" the costs of repeating or correcting the procurement. *Id.* Loss also includes other reasonably foreseeable pecuniary harm, such as loss due to overpayment on a contract, which is what the District Court found to be the loss here. Because its amount could not reasonably be calculated from the record, the District Court properly relied on Application Note 3(B) in using the $2.4 million in kickbacks as a reasonable alternative measure.

## CONCLUSION

The judgments should be affirmed.

Respectfully submitted.

/s/ Nickolai G. Levin

WILLIAM J. BAER
*Assistant Attorney General*

STEPHEN J. MCCAHEY
MARY ANNE F. CARNIVAL
JOHN W. VAN LONKHUYZEN
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division

JOHN J. POWERS, III
NICKOLAI G. LEVIN
  *Attorneys*
  U.S. Department of Justice
  Antitrust Division
  950 Pennsylvania Ave., NW
  Room 3224
  Washington, DC 20530-0001
  (202) 514-2886

December 13, 2013

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 17,579 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 with 14-point New Century Schoolbook font.

December 13, 2013                       /s/ Nickolai G. Levin
                                        *Attorney*

91

**CERTIFICATE OF SERVICE**

I, Nickolai G. Levin, hereby certify that on December 13, 2013, I electronically filed the foregoing FINAL FORM BRIEF FOR THE UNITED STATES with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the CM/ECF System.  I also sent 6 copies to the Clerk of the Court by First Class Mail with the United States Postal Service.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

December 13, 2013                        /s/ Nickolai G. Levin
                                         *Attorney*