

**U.S. Department of Justice**

Antitrust Division

---

*RFK Main Justice Building*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530-0001*

May 20, 2014

Catherine O'Hagan Wolfe
Clerk of the Court
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re:  *United States v. Yaron et al.*, Nos. 12-2889, 12-2940, 12-2972, 12-2976, 12-3078, 12-4556, 12-4685

Dear Ms. Wolfe:

In preparing for oral argument, I came across a case, *United States v. Zangari*, 677 F.3d 86 (2d Cir. 2012), which I wish to submit to the Court under Federal Rule of Appellate Procedure 28(j). *Zangari* refutes defendants' argument (*see, e.g.*, Yaron Br. 55-59; Buchnik Br. 53-56) that the district court inappropriately relied on the kickback amount as a reasonable estimate of the loss when determining defendants' offense levels, while refusing to award restitution in that amount.

In *Zangari*, the District Court followed a PSR that used the deposited kickback amount to Zangari as an estimate of the loss for offense level and restitution purposes.  677 F.3d at 89-91.  Zangari appealed, arguing "that

1

restitution was improper because the victims of his fraud suffered no loss." *Id.* at 91. This Court held that the District Court appropriately relied on the kickback amount as a reasonable estimate of the loss for offense level purposes. *Id.* at 92 ("Assuming that the victims' actual losses 'reasonably [could] not be determined,' this substitution was permissible for purposes of calculating Zangaris' adjusted offense level under § 2B1.1 of the Guidelines."). Such a substation, however, was inappropriate when ordering restitution under the Mandatory Victims Restitution Act. *Id.* at 93.

Because the District Court in this case appropriately found that there was a loss from the kickback scheme, but its precise amount could not reasonably be determined, the District Court appropriately used the kickback amount as a reasonable estimate of the loss for offense level purposes, in accordance with Application Note 3(B) to U.S.S.G. § 2B1.1. *See* Govt. Br. 86-90.

Sincerely,

/s/ Nickolai G. Levin
Nickolai G. Levin
Counsel for the United States
(202) 514-2886

Encls.

## CERTIFICATE OF SERVICE

I, Nickolai G. Levin, hereby certify that on May 20, 2014, I electronically filed the foregoing 28(j) letter with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the CM/ECF System.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

May 20, 2014                     /s/ Nickolai G. Levin
                                 Nickolai G. Levin

**86**    **677 FEDERAL REPORTER, 3d SERIES**

## CONCLUSION

Accordingly, for the foregoing reasons and consistent with our November 9, 2011 order, we VACATE Scott's conviction and REMAND for new trial.



**UNITED STATES of America, Appellee,**

**v.**

**Salvatore ZANGARI, Defendant–Appellant.**

**Docket No. 10–4546–cr.**

United States Court of Appeals, Second Circuit.

Argued: Dec. 8, 2011.

Decided: April 18, 2012.

**Background:** Defendant was convicted by guilty plea in the United States District Court for the Eastern District of New York, John Gleeson, J., of conspiracy to violate Travel Act, and he appealed.

**Holdings:** The Court of Appeals, José A. Cabranes, Circuit Judge, held that:

(1) as a matter of first impression, defendant's gain could not be used as a proxy for victims' actual losses in ordering restitution under Mandatory Victims Restitution Act (MVRA), but

(2) defendant failed to show that district court's error in using defendant's gain as a proxy for the victim's actual loss under the MVRA was plain error.

Affirmed.

**1. Criminal Law ⟵1042.3(5), 1156.9**

Ordinarily, the Court of Appeals reviews a district court's order of restitution under the Mandatory Victim's Restitution Act (MVRA) for abuse of discretion; however, where the defendant fails to object to the restitution order at the time of sentencing, the Court's review is for plain error. 18 U.S.C.A. § 3663A.

**2. Sentencing and Punishment ⟵2101, 2102**

Federal courts have no inherent power to order restitution, which is traditionally a civil remedy; rather, a sentencing court's power to order restitution depends upon, and is necessarily circumscribed by, statute.

**3. Sentencing and Punishment ⟵2101, 2167**

Because the purpose of restitution is essentially compensatory, and because the Mandatory Victims Restitution Act (MVRA) itself limits restitution to the full amount of each victim's loss, a restitution order must be tied to the victim's actual, provable, loss. 18 U.S.C.A. § 3664(f)(1)(A).

**4. Sentencing and Punishment ⟵2172**

Defendant's gain from a kickback scheme in which he was involved while employed as a stock broker could not be used as a proxy for victims' actual losses in ordering restitution under Mandatory Victims Restitution Act (MVRA) as part of his sentence for conspiracy to violate Travel Act, even though victims' actual losses were difficult to calculate. 18 U.S.C.A. §§ 371, 1952, 3663A.

**5. Sentencing and Punishment ⟵2172**

Defendant's gain from a kickback scheme in which he was involved while employed as a stock broker was not directly correlated to victims' actual losses, and, thus, his gain could not be used as a measure of victims' losses in ordering restitution under Mandatory Victim's Restitution Act (MVRA) as part of his sentence

for conspiracy to violate Travel Act; because scheme involved stock-loan transactions in which securities were returned to their previous owners at end of loan terms, any loss could only have come in form of opportunity cost. 18 U.S.C.A. §§ 371, 1952, 3663A.

**6. Criminal Law ⬭1141(2)**

The burden of establishing entitlement to relief for plain error is on the defendant claiming it. Fed.Rules Cr.Proc. Rule 52(b), 18 U.S.C.A.

**7. Criminal Law ⬭1042.3(5)**

While it may be true that an improper restitution order is always error that is plain, which is to say error that is clear or obvious, it does not follow that such an error is always plain error. Fed.Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**8. Criminal Law ⬭1030(1)**

Before an appellate court may exercise its discretion to correct unpreserved error that is "plain," the defendant-appellant must satisfy the remaining prongs of the plain error test, namely, that the error affected his substantial rights and seriously affects the fairness, integrity or public reputation of judicial proceedings. Fed. Rules Cr.Proc.Rule 52(b), 18 U.S.C.A.

**9. Criminal Law ⬭1042.3(5)**

Defendant failed to establish that district court's error in using defendant's gain as a proxy for victims' actual losses in ordering restitution under Mandatory Victims Restitution Act (MVRA) resulted in prejudice to defendant or undermined fairness, integrity, or public reputation of judicial proceedings, as required to find plain error; court's restitution order may have actually understated victims' losses from a kickback scheme, considering that defendant's actions while employed as a stock broker involved an industry-wide conspiracy. 18 U.S.C.A. § 3663A; Fed.Rules Cr. Proc.Rule 52(b), 18 U.S.C.A.

**10. Sentencing and Punishment ⬭2180**

Where restitution is governed by the Mandatory Victims Restitution Act (MVRA), a victim's decision not to participate in the sentencing process does not relieve the defendant from having to pay restitution. 18 U.S.C.A. § 3663A.

—————

Randy Zelin, Moritt Hock & Hamroff, LLP, Garden City, NY, for Defendant–Appellant Salvatore Zangari.

Winston M. Paes, Assistant United States Attorney (Jo Ann M. Navickas, Assistant United States Attorney, of counsel), for Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee the United States of America.

Before: CABRANES, POOLER, and WESLEY, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

In this appeal, we consider, as a matter of first impression in this Circuit, the propriety of substituting a defendant's gain for his victims' losses in calculating restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A–3664. Although we join several of our sister circuits in concluding that such a substitution is error, we decline to exercise our discretion under Federal Rule of Criminal Procedure 52(b) to notice the error in this case because the defendant failed to object to the restitution calculation before the District Court and has not satisfied his burden of persuading us that the erroneous restitution order both "affected [his] substantial rights" and "seri-

ously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (internal citation and quotation marks omitted). The judgment of the District Court is therefore affirmed.

## BACKGROUND

From about August 1998 through October 2006, defendant-appellant Salvatore Zangari worked as a securities broker in the securities-lending departments of, first, Morgan Stanley and, subsequently, Bank of America. As a broker, Zangari's responsibilities included borrowing and loaning securities on behalf of his employers and their clients in the securities-lending market.

> As described by a leading commentator: Securities lending is an important and significant business that describes the market practice whereby securities are temporarily transferred by one party (the lender) to another (the borrower). The borrower is obliged to return the securities to the lender, either on demand, or at the end of any agreed term. For the period of the loan the lender is secured by acceptable assets delivered by the borrower to the lender as collateral.

Mark C. Faulkner, "An Introduction to Securities Lending," *in Securities Lending & Repurchase Agreements* 3–4 (Frank J. Fabozzi & Steven V. Mann eds., 2005). Typically, the collateral—which, in the United States, often takes the form of cash [1]—is valued at 102%–105% of the market value of the loaned securities. Peter Economou, "Risk, Return, and Performance Measurement in Securities Lending," *in Securities Lending & Repurchase Agreements* 152–53.

The borrower of securities may be motivated by any number of factors, including the desire to cover a short position, to sell the borrowed securities in hopes of buying them back at a lower price before returning them to the lender, or to gain tax advantages associated with the temporary transfer of ownership of the securities. *See* Faulkner, *supra*, at 21–25. The lender, meanwhile, is principally motivated by the ability to earn a return on the collateral during the course of the loan, either through fees paid by the borrower (in the case of noncash collateral) or (in the case of cash collateral) by reinvesting it or making short-term loans to other borrowers at a higher interest rate than that paid to the borrower. *See id.* at 6–9.

In addition to the lender and borrower, stock-loan transactions often involve a third party, known as a "stock-loan finder." According to the Information filed in this case,

> [s]tock-loan finders [are] entities that [are] in the business of facilitating stock loan transactions in exchange for fees . . . . Borrowers and lenders typically pa[y] the finders' fees from the fees, rebates and negative rebates that they earn[ ] in connection with particular stock-loan transactions.

Information ¶ 3, *United States v. Zangari*, No. 10–cr–255 (E.D.N.Y. Apr. 15, 2010), ECF No. 3. *See generally Morgan, Olmstead, Kennedy & Gardner, Inc. v. Fed. Ins. Co.,* 637 F.Supp. 973, 975 n. 2 (S.D.N.Y.1986).

---

**1.** *Id.* at 4, 8. When cash is posted as collateral, the lender is generally obligated to pay a rebate or interest charge to the borrower for its use. In contrast, when noncash collateral is employed, the borrower typically pays a fee

to the lender. *See* Peter Economou, *"Risk, Return, and Performance Measurement in Securities Lending," in Securities Lending & Repurchase Agreements* 153.

The Information alleged that, while Zangari was employed as a broker with Morgan Stanley, he and a co-worker, Peter Sherlock, agreed to cause Morgan Stanley to enter into stock-loan transactions with two other financial institutions, Paloma Securities, LLC ("Paloma") and Swiss American Securities, Inc. ("SASI"). As a result of those transactions, Paloma and SASI paid sham finder's fees to Clinton Management, Ltd. ("Clinton Management"), a straw stock-loan finder operated by Anthony Lupo, an acquaintance of Sherlock's. Lupo, in turn, paid cash kickbacks to Sherlock (among other co-conspirators) and Sherlock paid a portion of these kickbacks to Zangari. The arrangement continued when Zangari moved to Bank of America. Neither Morgan Stanley nor Bank of America approved the stock-loan transactions that were the subject of the Information.

According to the Government, as a result of the fraudulent scheme, Bank of America and Morgan Stanley suffered losses in the form of unrealized profit. As summarized in its brief on appeal:

> Zangari knew Paloma and SASI were willing to charge less to loan or pay more to borrow securities than Morgan Stanley or Bank of America ultimately paid or received. Rather than obtain this readily available profit for his employers, however, Zangari had his employers pay the higher price and receive

the lower price, thereby causing his employers and their clients to lose money.

Government's Brief at 13.[2]

On April 15, 2010, Zangari waived indictment and pleaded guilty to the Information, which charged him with one count of conspiracy to violate the Travel Act, in violation of 18 U.S.C. §§ 371 & 1952. By the terms of his plea agreement, Zangari conceded that his conduct involved a bribe greater than $70,000, but agreed to forfeit the smaller sum of $65,600, which represented the amount that he had actually deposited into his bank account. The plea agreement also stipulated that restitution was "[a]pplicable, in an amount to be determined by the [District] Court." Plea Agreement, *United States v. Zangari*, No. 10–cr–255 (E.D.N.Y. Apr. 15, 2010).

Following Zangari's plea, the United States Probation Office prepared a Presentence Investigation Report ("PSR"), which laid out the facts underlying Zangari's plea and calculated the applicable sentencing range pursuant to the United States Sentencing Guidelines ("Guidelines" or "USSG"). In calculating Zangari's adjusted offense level, the PSR included a six-level enhancement under USSG § 2B4.1, reflecting that the amount of loss to the victims of Zangari's crime was more than $30,000 and less than $70,000.[3] To support this enhancement, the PSR stated that, though neither Morgan Stanley nor Bank of America had submitted affidavits of

---

**2.** The Government has not specified whether Morgan Stanley and Bank of America were lenders or borrowers in these transactions, but it is clear from the Information and Plea Agreement that the finder's fees were alleged to have been paid by wire transfers from Paloma and SASI to Clinton Management. Specifically, the overt acts supporting the charge of conspiracy consisted of three wire transfers that Zangari "caused" to be sent from Paloma to Clinton Management "as payment for finder's fees."

**3.** Under USSG § 2B4.1(b)(1)(B), which provides for the calculation of an offense level in cases of commercial bribery, "[i]f the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded $5,000," the offense level is to be "increase[d] by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." Section 2B1.1, in turn, prescribes a six-level increase if the loss was more than $30,000, but less than $70,000. USSG § 2B1.1(b)(1)(D).

loss, it was decided following a conversation with Morgan Stanley's legal counsel "that a starting point to determine the loss . . . would be the amount of money each defendant gained from kickbacks." Presentence Investigation Report ¶ 14, *United States v. Zangari*, No. 10–cr–255 (E.D.N.Y. July 12, 2010). Elsewhere, the PSR reported that, "[a]ccording to the Government and Morgan Stanley representatives, the loss to Morgan Stanley and Bank of America is the difference between the selling price of the securities and the lower price that was negotiated by the defendants without Morgan Stanley and Bank of America's authorization." *Id.* ¶ 16. The PSR went on to state, without explanation, that "it was this difference in price that the defendants gained in kickbacks and bribes." *Id.* Citing Application Note 3(b) to Guideline § 2B1.1, which allows a sentencing court to "use the gain that resulted from the offenses as an alternative measure of loss only if there is a loss, but it reasonably cannot be determined," the PSR proceeded to substitute the amount of Zangari's gain for the amount of the victims' losses, resulting in a six-level increase in Zangari's adjusted offense level.[4]

The PSR also reported that restitution was required under the MVRA, and concluded that Zangari was "liable for restitution in the amount of $65,600 ($38,800 owed to Morgan Stanley and $26,800 owed to Bank of America)." *Id.* ¶ 78. It did not include any explanation for this conclusion, except that it was "[p]ursuant to the guidance found in *United States v. Liu*, 200 [Fed.Appx.] 39, [2006 WL 2853027] (2d Cir.2006)." *Id.* The amount and apportionment of loss identified for purposes of restitution was, of course, identical to that justifying the six-level enhancement, which itself was expressly based on Zangari's gain from the fraud.

Prior to sentencing, Zangari's attorney submitted a list of "objections, clarifications and additions" to the PSR. The list did not contain any objection to the PSR's restitution calculation. At the sentencing hearing, the District Judge asked if there were any other objections or corrections to the PSR and Zangari, through counsel, confirmed that there were none.[5] Later, in the course of a discussion of whether Zangari ought to be made to pay a fine, given his significant assets, the District Judge asked if restitution had already been paid. The Assistant U.S. Attorney confirmed that forfeiture, not restitution, had already been paid, but that restitution was set at the same amount, $65,600. Once again, Zangari made no objection to the restitution amount. Finally, in their affirmative presentation to the court, neither Zangari nor his attorney made any reference to the restitution amount stated in the PSR. In short, Zangari failed on multiple occasions to alert the District Court to any potential error in the restitution calculation.

---

**4.** The Base Offense Level for Zangari's crime, which involved commercial bribery, was 8. USSG § 2B4.1(a). Six levels were then added pursuant to USSG § 2B4.1(b)(1)(B) and another two levels pursuant to § 3B1.3, because Zangari abused a position of trust. Three levels were subtracted pursuant to § 3E1.1(a) and (b) to reflect Zangari's acceptance of responsibility. Thus, his Total Offense Level was 13, which, in Criminal History Category I, resulted in a Guidelines range of 12–18 months' imprisonment.

**5.** The parties did correct an error in the PSR with respect its calculation of Zangari's Total Offense Level. The PSR had understated Zangari's Total Offense Level because it had based its loss calculation on the amount of forfeiture, rather than the amount stipulated in the plea agreement. By agreement of the parties, the Total Offense Level was corrected to reflect a loss of more than $70,000.

The District Court entered judgment on November 3, 2010, sentencing Zangari to one year and one day of imprisonment, three years of supervised release, 80 hours of community service, a fine of $3,000, a $100 special assessment, and restitution in the amount of $65,600. Two days later, Zangari filed a notice of appeal. He now argues, for the first time, that restitution was improper because the victims of his fraud suffered no loss.

We agree that the restitution order was entered in error, but not because Zangari's victims suffered no loss. Rather, we hold that it was error to base the restitution order on Zangari's gain rather than the victims' actual losses. However, because Zangari failed to object to the restitution order in the District Court, and because even now he has failed to show that he was unfairly prejudiced by the order, we decline to exercise our discretion to notice the District Court's error.

## DISCUSSION

### A. Standard of Review

**[1]** Ordinarily, we review a district court's order of restitution under the MVRA for abuse of discretion. *See United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir.2006); *cf. Sims v. Blot*, 534 F.3d 117, 132 (2d Cir.2008) ("A district court has abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or rendered a decision that cannot be located within the range of permissible decisions." (internal citation and quotation marks omitted)). However, where, as here, a defendant fails to object to the restitution order at the time of sentencing, our review is for plain error. *See United States v. Pescatore*, 637 F.3d 128, 141 (2d Cir.2011).

### B. The District Court Erred in Ordering Restitution in the Amount of the Defendant's Gain Rather than the Amount of the Victims' Loss

**[2]** Federal courts have no inherent power to order restitution, which is traditionally a civil remedy. *See United States v. Reifler*, 446 F.3d 65, 127, 137 (2d Cir. 2006). A sentencing court's power to order restitution, therefore, depends upon, and is necessarily circumscribed by, statute. *See United States v. Elkin*, 731 F.2d 1005, 1010–11 (2d Cir.1984), *overruled on other grounds by United States v. Ali*, 68 F.3d 1468, 1474–75 (2d Cir.1995). In this case, the relevant statute is the MVRA.

As relevant here, the MVRA applies to "an offense against property under this title, . . . including any offense committed by fraud or deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), "in which an identifiable victim or victims has suffered a . . . pecuniary loss," *id.* § 3663A(c)(1)(B). In such a case, a sentencing court "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." *Id.* § 3663A(a)(1).

#### 1. A Restitution Order under the MVRA May Not Substitute the Defendant's Gain for the Victim's Losses

**[3]** Because "the purpose of restitution is essentially compensatory," *Boccagna*, 450 F.3d at 115, and because the MVRA itself limits restitution to "the full amount of each victim's loss," 18 U.S.C. § 3664(f)(1)(A), a restitution order must be tied to the victim's actual, provable, loss. *See United States v. Marino*, 654 F.3d 310, 319–20 (2d Cir.2011) ("[R]estitution is authorized only for losses that [were] . . . directly caused by the conduct composing the offense of conviction and only for the victim's actual loss." (internal citation and

**92**                     **677 FEDERAL REPORTER, 3d SERIES**

quotation marks omitted) (second alteration and ellipsis in original)); *Boccagna*, 450 F.3d at 119 ("Criminal restitution . . . is not concerned with a victim's disappointed expectations but only with his actual loss."); *cf. United States v. Germosen*, 139 F.3d 120, 130 (2d Cir.1998) ("[The Victim and Witness Protection Act] requires a showing of actual loss for purposes of restitution.").[6]  The Government bears the burden of proving a victim's actual loss by a preponderance of the evidence. 18 U.S.C. § 3664(e).

In this case, it appears that the restitution order was not based on the victims' actual losses, but rather on Zangari's ill-gotten gains. In ordering restitution, the District Court relied on the PSR prepared by the probation officer, which stated that the loss to the victims had not been calculated because it was "amorphous." The PSR therefore substituted Zangari's gain from unlawful kickbacks in the place of the victims' losses. Assuming that the victims' actual losses "reasonably [could ]not be

determined," this substitution was permissible for purposes of calculating Zangari's adjusted offense level under § 2B1.1 of the Guidelines. *See* USSG § 2B1.1, application n. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."). However, the PSR proceeded to employ the same substitution for purposes of calculating restitution. There is no provision in the Guidelines or in the MVRA itself that allows the defendant's gain to be substituted for the victim's loss for purposes of calculating restitution.[7]

[4] We have not yet had occasion to address the precise question of whether a defendant's gain may stand in as a proxy for his victim's loss for restitution purposes. Several of our sister circuits have addressed the issue, however, and all have agreed that "a defendant's gain cannot be used as a proxy for actual loss." *United States v. Harvey*, 532 F.3d 326, 340 (4th Cir.2008).[8] We now join these courts and

---

6. The Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, is a predecessor to the MVRA, which still applies in cases that do not fall under the MVRA. For present purposes, the statutes are identical, because each states that "[a]n order of restitution" made under it "shall be issued and enforced in accordance with section 3664." *Id.* § 3663(d), § 3663A(d). Section 3664 was itself amended as part of the MVRA. *See* Pub.L. No. 104–32, § 206, 110 Stat. 1214 (1996).

7. The PSR states that its conclusion that Zangari is liable for $65,600 in restitution is based on "the guidance found in *United States v. Liu*, 200 [Fed.Appx.] 39, [2006 WL 2853027] (2d Cir.2006) [ (summary order) ]." In *Liu*, we affirmed by summary order a restitution order of $1,127,500 where the victim bank "was directly harmed by the subordination of the collateral, and the [victim] bank's subsequent loss of $1,127,500 was a foreseeable result of the subordination." *Id.* at 40. Inasmuch as the restitution ordered in *Liu* was based on the victim's actual loss of

$1,127,500, we fail to see how *Liu* provides the guidance suggested in the PSR.

8. *See also United States v. Judy Yeung*, 672 F.3d 594, 604 (9th Cir.2012) ("[A] loss determination used for Sentencing Guidelines purposes [cannot] be used to determine the amount of restitution, given the different methods of calculation and different purposes of calculation."); *United States v. Chalupnik*, 514 F.3d 748, 754 (8th Cir.2008) ("[T]he *amount* of restitution that may be awarded is limited to the victim's provable actual loss, even if more punitive remedies would be available in a civil action. Thus, while the fact that a defendant profited from the crime without causing actual loss to an identifiable victim may be an appropriate reason to increase his punishment, . . . . [r]estitution to MVRA victims must be based on the amount of loss *actually* caused by the defendant's offense." (internal quotation marks omitted)); *United States v. Arledge*, 553 F.3d 881, 899 (5th Cir.2008) ("[T]he amount of the [restitution] award must be tied to the losses suffered

hold that a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss.

We recognize that there may be cases where calculating the victims' actual losses is difficult, particularly where there are multiple victims or complex issues of fact attending the offense conduct. But the MVRA, unlike Guideline § 2B1.1, does not allow a sentencing court to substitute gain for loss in such a case. Rather, it prescribes, in 18 U.S.C. § 3664(d), several measures that the court may take to determine restitution in hard cases. The court may, for example: "require additional documentation or hear testimony," 18 U.S.C. § 3664(d)(4); allow additional time "for the final determination of the victim's losses, not to exceed 90 days after the sentencing," *id.* § 3664(d)(5); and "refer any issue arising in connection with a proposed order of restitution to a magistrate judge or special master for proposed findings of fact and recommendation as to disposition," *id.* § 3664(d)(6). Ultimately, if the court finds that "complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process," then the court may, in the exercise of its sound discretion, decide not to order restitution at all. 18 U.S.C. § 3663A(c)(3)(B); *see also* USSG § 5E1.1(b)(2) (same).

### 2. There Was No Direct Correlation Between the Victims' Losses and the Defendant's Gain

**[5]** The Government argues that the PSR did not simply substitute Zangari's gain for the victims' losses; rather, the Government contends, the PSR "drew a direct correlation between the kickbacks and the loss suffered by Morgan Stanley and Bank of America." Government's Brief at 15. To be sure, there may be cases where there is a direct correlation between gain and loss, such that the defendant's gain can act as a *measure* of—as opposed to a *substitute* for—the victim's loss. *See, e.g., United States v. Berardini,* 112 F.3d 606, 609–10 (2d Cir.1997) (defendant's gain appropriately used as measure of victim's actual loss where loss took the form of fraudulently induced sales directly to defendant). But this is not such a case, given the nature of the transactions at issue. The transactions described in the Information and PSR were stock-loan transactions, in which the securities and collateral exchanged by the parties were necessarily returned to their previous respective owners at the end of the loan terms. Therefore, any loss to the identified victims in this case could only have come in the form of opportunity cost.

A concrete example may be of assistance. Suppose "Security X" is valued at $100. Paloma wishes to borrow Security X and pays Clinton Management $5 to arrange a loan, whereby Morgan Stanley loans Security X to Paloma in exchange for

---

by victims of the defendant's crime, not the defendant's gain from his illegal conduct."); *United States v. Galloway,* 509 F.3d 1246, 1253 (10th Cir.2007) ("[A]lthough gain may be used to determine a defendant's offense level under the Guidelines (if it more closely reflects actual harm than actual loss does), it is not an appropriate estimate of loss when determining the amount of restitution under § 5E1.1 or the MVRA."); *United States v.*

*George,* 403 F.3d 470, 474 (7th Cir.2005) ("Restitution must be based on the victim's loss rather than the offender's gain."); *United States v. Badaracco,* 954 F.2d 928, 942–43 (3d Cir.1992) ("Although ... gross gain is a valid measure of the loss attributable to this offense for purposes of guideline sentencing, a restitution order, in contrast, must be limited to the amount of [the victim's] loss as a result of [the defendant's] bank fraud.").

$100 in cash. Because Paloma paid a total of $105 to secure the loan (and therefore effectively valued Security X at $105), it could be said that Morgan Stanley lost out on $5 of potential collateral that it might have received in a direct transaction with Paloma, cutting out the middleman. However, because the collateral (whether $100 or $105) would be returned to Paloma at the end of the loan term, it cannot be said that Morgan Stanley actually *lost* $5. Rather, it lost the opportunity to earn a return on that $5 over the duration of the loan.

Similarly, suppose SASI wishes to loan Security X for cash and pays a $5 finder's fee to Clinton Management to arrange a loan, whereby Bank of America exchanges $100 cash for Security X. On these facts, it could be said that Bank of America paid $5 more in collateral than would have been necessary in a direct loan. (Because SASI paid $5 in finder's fees, it effectively received only $95 to secure the loan; therefore, Bank of America could conceivably have paid only $95 to borrow Security X directly from SASI.) However, because the collateral (whether $100 or $95) would have been returned to Bank of America at the end of the loan term, Bank of America's loss is really only the foregone return it could have earned on that $5 difference over the duration of the loan.

In short, based on the information provided in the PSR, whether the identified victims, Morgan Stanley and Bank of America, were borrowers or lenders in the subject transactions, their losses are not equivalent to the sham finder's fees paid by Paloma and SASI to Clinton Management—let alone the kickbacks that Clinton Management in turn paid to Zangari and his coconspirators.[9] Therefore, this is not a case in which a direct correlation exists between the victims' losses and the defendant's gain such that the latter can be used as a measure of the former.

Accordingly, we hold that it was error for the District Court to order restitution in the amount of Zangari's gain rather than the victims' actual losses. However, because Zangari did not raise an objection to the restitution order before the District Court, the question remains whether this error was "plain error," as defined by cases construing Rule 52(b), such that we may notice it and exercise our discretion to correct it.

C. *Though the District Court's Error was "Plain," We Decline to Exercise Our Discretion to "Correct" the Error*

[6] Federal Rule of Criminal Procedure 52(b) provides appellate courts with a "*limited* power to correct errors that were forfeited because [they were] not timely raised in [the] district court." *United*

---

**9.** Of course, the analysis might be different if Paloma and SASI had been identified as victims. Because it was Paloma and SASI who were alleged to have paid the sham finder's fees, there is some correlation between (a) the sham finder's fees they paid to Clinton Management and (b) the kickbacks Clinton Management paid to Zangari. However, the Government has never suggested that Paloma and SASI were victims of the fraudulent scheme, and Zangari was ordered to pay restitution only to Morgan Stanley and Bank of America, who were not alleged to have paid any finder's fees.

Neither the Information, the Plea Agreement, nor the PSR permit an inference that the losses to Morgan Stanley and Bank of America were in the form of sham finder's fees. To the extent there was *in fact* a direct correlation between the victims' losses and Zangari's gain, this correlation is not reflected in the PSR. We would therefore still find that the restitution order was in error, because it was not based upon a presentence report containing "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a).

*States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (emphasis added). The Supreme Court has recently clarified that we may exercise this discretionary power

> only where the appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'

*United States v. Marcus,* ── U.S. ──, 130 S.Ct. 2159, 2164, 176 L.Ed.2d 1012 (2010) (quoting *Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009)). "[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it . . . ." *United States v. Dominguez Benitez,* 542 U.S. 74, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). This assignment of the burden "enforce[s] the policies that underpin Rule 52(b) generally, to encourage timely objections and reduce wasteful reversals by demanding strenuous exertion to get relief for unpreserved error." *Id.*

### 1. *An Erroneous Restitution Order Does Not Automatically Amount to "Plain Error"*

As a prefatory matter, we acknowledge that we have previously suggested, without elaboration, that a defendant's failure to object to a restitution order in the district court "is no bar to appellate review because improperly ordered restitution constitutes an illegal sentence amounting to plain error." *United States v. Thompson,* 113 F.3d 13, 15 (2d Cir.1997); *see also United States v. Mortimer,* 52 F.3d 429, 436 (2d Cir.1995). The rationale for this language, however, ultimately finds its root

in the dicta of a since abrogated decision of the Tenth Circuit Court of Appeals, which predated *Olano,* the leading Supreme Court decision on plain error. *See United States v. Vance,* 868 F.2d 1167, 1169 (10th Cir.1989), *abrogated on other grounds by Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). The Supreme Court has since made clear that an appellate court may only notice an unpreserved error if all four prongs of the *Olano* test are satisfied. *See, e.g., Marcus,* 130 S.Ct. at 2164; *Puckett,* 556 U.S. at 135, 129 S.Ct. 1423.

**[7, 8]** Therefore, while it may be true that an improper restitution order is always "error" that is "plain"—which is to say error that is "clear or obvious"—it does not follow that such an error is always "plain error" as the Supreme Court has explained that term of art. Rather, before an appellate court may exercise its discretion to correct unpreserved error, the defendant-appellant must satisfy the remaining prongs of the *Olano* test—namely, that the error "affected his substantial rights" and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Marcus,* 130 S.Ct. at 2164. Here, although we find, in light of the plain meaning of the MVRA and the authorities cited above, that the District Court's error was "clear or obvious," we are not satisfied that Zangari has borne his burden on the last two prongs of the Olano test.

### 2. *Zangari Has Failed to Show That the District Court's Error Prejudiced Him or Resulted in a Miscarriage of Justice*

**[9]** It has long been understood that, for an error to affect an appellant's "substantial rights," it is not enough that it affect the outcome of the district court's

proceedings; rather, "in most cases a court of appeals cannot correct the forfeited error unless the defendant shows that the error was *prejudicial.*" *Olano,* 507 U.S. at 735, 113 S.Ct. 1770 (emphasis added); *see also United States v. Young,* 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("[F]ederal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected 'substantial rights,' but that it had an unfair prejudicial impact. . . ."). Zangari has failed to show that the District Court's error had an unfair prejudicial impact on him, because he has not demonstrated—or given us any reason to infer—that the restitution order would have been less onerous had the PSR correctly calculated the victims' losses. For the same reason, he has not persuaded us that the District Court's error seriously affects the fairness, integrity, and public reputation of judicial proceedings, such that, if we decline to exercise our discretion to notice the error, "a miscarriage of justice would . . . result." *Young,* 470 U.S. at 15, 105 S.Ct. 1038.

[10] To be sure, Zangari has maintained that the victims in this case suffered no loss, as evidenced by the fact that neither Morgan Stanley nor Bank of America actually claimed a loss pursuant to 18 U.S.C. § 3664(d)(2)(A)(vi). But the fact that the victims did not claim a loss does not mean that they did not sustain a loss, and where, as here, restitution is governed by the MVRA, a victim's decision not to participate in the sentencing process does not relieve the defendant from having to pay restitution. *See United States v. Johnson,* 378 F.3d 230, 245 (2d Cir.2004) (holding that the MVRA "requires restitution regardless of the consent of victims").

As explained above, it is most likely that the victims in this case *did* sustain a loss (in the form of opportunity cost), albeit one

that cannot be accurately measured by reference to Zangari's gains. Because Zangari has never proposed an alternative measure of loss, it is impossible for us to know whether the restitution the District Court ordered in fact exceeded the actual losses suffered by the victim banks. *Cf. United States v. Pescatore,* 637 F.3d 128, 143–45 (2d Cir.2011) (declining to notice unpreserved error in calculation of restitution under MVRA where defendant failed to make payments pending appeal, which may have allowed sufficient monetary penalties and interest on the award to accrue such that the erroneous restitution amount did not, in the end, exceed the victims' losses).

Indeed, this may in the end be a case of salutary error, where the restitution award in fact understated the victims' actual losses. *Cf. United States v. Hicks,* 980 F.2d 963, 974 (5th Cir.1992) (finding that plain-error standard was not met where "if anything [the error] was salutary error, which likely benefitted [the defendant]"). In this regard, we recall that Zangari pleaded guilty to being a member of a multi-defendant, "industry-wide" conspiracy. The MVRA provides that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. § 3664(h); *see also United States v. Nucci,* 364 F.3d 419, 423 (2d Cir.2004). We have construed this language to "provide for restitution payable by all convicted co-conspirators in respect to damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." *United States v. Boyd,* 222 F.3d 47, 50–51 (2d Cir.2000). Thus, Zangari could have been held liable, jointly and severally, for all the losses suffered by the victims during the course

of the conspiracy, not merely those directly tied to his actions.

Moreover, under section 3663A(b)(4), a sentencing court is obliged to "reimburse the victim for . . . expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense," 18 U.S.C. § 3663A(b)(4)—meaning that, had Morgan Stanley and Bank of America undertaken to determine their actual losses, Zangari would have been liable for the cost of their investigations, including attorney fees and accounting costs. *See United States v. Amato*, 540 F.3d 153, 159 (2d Cir.2008). It is therefore not difficult to imagine that, were we to vacate the restitution order and remand for a determination of the victims' actual losses, Zangari would be faced with a larger restitution order than the one he is challenging.

We do not mean to suggest that a defendant appealing an unpreserved error in a restitution order must prove to a certainty that the ordered restitution in fact exceeded the victims' actual losses. But in this case there has been literally no effort—at oral argument or anywhere in Zangari's ten-page brief on appeal—to address any of the *Olano* prongs. Rather, Zangari (while acknowledging at oral argument that the standard of review in this case is plain error) appears to believe that, if he succeeds in persuading us that there was error below, we must automatically vacate the restitution order. This is not the law.

It was Zangari's burden to persuade us to notice the error in the District Court's order of restitution. Under the circumstances here, we conclude that he has not carried this burden because he has failed to show that the order prejudiced him or undermined the fairness, integrity, or public reputation of judicial proceedings. Accordingly, we decline to exercise our dis-

cretion to notice the error and therefore affirm the judgment of the District Court.

## CONCLUSION

For the reasons stated above, we hold that (1) it was error for the District Court to substitute Zangari's gains for the victims' losses in calculating restitution, but (2) we decline to exercise our discretion to notice the error, because Zangari has not shown that the error affected his substantial rights or undermined the fairness, integrity, or public reputation of judicial proceedings.

The judgment of the District Court is therefore **AFFIRMED.**



**Albert Lloyd HIGGINS, Petitioner,**

**v.**

**Eric H. HOLDER, Jr., United States Attorney General, Respondent.**

**No. 11–924(ag).**

United States Court of Appeals,
Second Circuit.

Submitted: Feb. 7, 2012.

Decided: April 19, 2012.

**Background:** Native and citizen of Jamaica filed petition for review from Board of Immigration Appeals' (BIA) decision denying his requests for cancellation of removal and waiver of inadmissibility.

**Holding:** The Court of Appeals held that alien's Connecticut conviction for tampering with witness was aggravated felony.

Petition dismissed.