# 12-2889 -cv-(L),

## 12-2940 (CON), 12-2972 (CON), 12-2976 (CON) 12-3078 (CON),  12-4556(CON),   12-4685 (CON)

———

### UNITED STATES COURT OF APPEALS

### FOR THE

### SECOND CIRCUIT

———

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MOSHE BUCHNIK, MICHAEL YARON, CAMBRIDGE ENVIRONMENTAL & CONSTRUCTION CORP., DBA NATIONAL ENVIRONMENTAL ASSOCIATES, OXFORD CONSTRUCTION & DEVELOPMENT CORP., SANTO SAGLIMBENI, ARTECH CORP. EMILIO FIGUEROA, AKA TONY,

*Defendants-Appellants.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## FINAL BRIEF FOR DEFENDANTS-APPELLANTS SANTO SAGLIMBENI AND ARTECH CORP.

NEAL S. COMER
81 Main Street
White Plains, NY 10601
914-683-5400
Attorney for Santo Saglimbeni
And Artech Corp.

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iv

JURISDICTIONAL STATEMENT.…..................................................1

STATEMENT OF ISSUES PRESENTED............................................ 1

STATEMENT OF THE CASE............................................................ 2

    The Original Indictment............................................................ 2

    The Superseding Indictments and Severance............................... 3

    The Trial, Post Trial Motions and Sentences............................... 3

STATEMENT OF FACTS................................................................. 4

    Introduction............................................................................ 4

    Conduct Between 1999 And 2001: The Porath Years.................... 6

    404(b) Evidence From Before The Charged Conspiracy............... 14

    Conduct Between 2003 And 2005 And the NYPH Audit............... 15

    Porath's Recorded Conversation............................................... 24

    Payments To And From Artech.................................................. 28

    The Summations...................................................................... 30

    Porath Consents To Extradition And Is Brought To New York.................. 32

    Sentencing…………………………………………………………...33

ARGUMENT.................................................................................. 34

    POINT ONE.......................................................................... 34

        Admission Of The Porath Tapes Violated The Sixth Amendments
        Confrontation Clause........................................................ 34

        A.    Porath Was A Witness For Purposes Of The Confrontation
               Clause................................................................ 35

        B.    Porath's Tape Recorded Statements Are Testimonial............. 36

        C.    Porath Was Not Unavailable................................... 41

        D.    By Misleading The Court And Counsel That Porath Was
               Unavailable, Even If Done Unintentionally And
               Through Omission, The Government Prevented The
               Cross Examination Of Porath.................................. 44

        E.    The Government Cannot Show That The Improper Admission
               Of Porath's Testimonial Statements Was Harmless Beyond
               A Reasonable Doubt.............................................. 44

    POINT TWO.......................................................................... 47

        The Recorded Statements Were Not In Furtherance of The
        Conspiracy..................................................................... 49

    POINT THREE...................................................................... 49

        The District Court Erred In Denying The Defendants' Rule 33
        Motion Based On The Violation Of The Fifth And Sixth
        Amendments And In Denying The Defense's Motion For
        Production Of Prior Statements By The Declarant............................ 49

POINT FOUR............................................................................ 50

    The Trial Evidence Was Legally Insufficient Because There Was
    No Evidence That The Artech Payments Were Part Of A
    Kickback ....................................................    50

POINT FIVE.............................................................................. 53

    Because The Government Failed To Prove A monetary Loss To
    The Hospital, And Because The Court Erred In Substituting
    "Gain" For "Loss," Defendants Should Be Resentenced
        ................................................................................

CONCLUSION........................................................................ 57

CERTIFICATE OF COMPLIANCE............................................. 58

## TABLE OF AUTHORITIES

*Cases*

Allen v. United States, 543 U.S. 1092 (2004)...................................................... 50

Chapman v. California, 368 U.S. 18 (1967)........................................................ 49

Crawford v. Washington, 541 U.S. 36 (2004).............................................. *passim*

Davis v. Washington, 547 U.S. 813 (2006)......................................................... 38

Ohio v. Roberts, 448 U.S. 56 (1980).................................................................. 43

Skilling v. United States, 130 S. Ct. 2896 (2010)................................................ 3

United States v. Bruno, 383 F.3d 65, 82 (2d Cir. 2004)...................................... 50

United States v. Burden, 600 F.3d 204 (2d Cir.2010).................................. *passim*

United States v. Coe, 718 F.2d 830,835 (7th Cir. 1983)..................................... 49

United States v. Darwich, 337 F.3d 645 (6th Cir. 2003)..................................... 48

United States v. Desena, 260 F.3d 150,157 (2d Cir. 2001)................................. 48

United States v. Feliz, 467 F.3d 227,235 (2d Cir. 2006)..................................... 40

United States v. Geibel, 369 F.3d 682,689 (2d Cir. 2004)................................... 50

United States v. Mitchell, 31 F.3d 628 (8th Cir. 1994)....................................... 48

United States v. Saget, 337 F.3d 223, 228 (2d Cir. 2004)................................... 40

United States v. Urbanik, 801 F.2d 692,968 (4th Cir. 1986)............................... 48

United States v. Zhou, 428 F.3d 361,369 (2d Cir. 2005)..................................... 50

*U.S. Constitutional Amendments and Statutes*

United State Constitution, Amendment VI....................................................... *passim*

Title 28, U.S.C. § 1291..................................................................................... 1

U.S.S.G. § 2B1.1 (a) (1).................................................................................. 53

U.S.S.G. § 2B1.1(b)(1)(I)................................................................. 53

U.S.S.G. §2B1.1(b)(10)(C)............................................................... 53

U.S.S.G. §2 B1.1.n. 3(B) (2010)....................................................... 54

U.S.S.G. § 2B1.1.n 3 (v)(II)............................................................. 56

### *Federal Rules*

Federal Rule of Evidence 804 (a)..................................................41-42

Fed. R. App. P. 28(i)....................................................................... 49

Fed. R. Crim. P. 29..................................................................... 3, 4

Fed. R. Crim. P. 33.................................................................. 1, 3, 4

JURISDICTIONAL STATEMENT

Santo Saglimbeni and Artech Corp. appeal as of right, pursuant to Title 28, United States Code, Section 1291, from a final judgment of conviction following a jury trial in the United States District Court for the Southern District of New York (Daniels, D.J.). Defendants were sentenced on July 10, 2012. Timely notice of appeal was filed on July 17, 2012.

STATEMENT OF ISSUES PRESENTED

1. Whether defendants' Sixth Amendment right to confrontation was violated where a tape recording was admitted containing testimonial statements implicating the appellant by a Government cooperating witness who was available for trial but not called by the Government?

2. Whether tape recorded conversations between a Government cooperating witness and a co-appellant were admissible as co-conspirator statements?

3. Whether the trial court erred in denying the defendants' Motion for a New Trial Under Fed. R. Crim. Pro. 33, and in denying discovery and a hearing, when the Government violated the defendants' constitutional right of access to evidence under the Due Process and Compulsory Process Clauses?

4. Whether the trial evidence of appellant's guilt was legally sufficient?

5. Whether the trial court properly calculated "loss" in the offense where there was no evidence the hospital suffered a financial loss as a result of the conduct?

STATEMENT OF THE CASE

The Original Indictment

On April 27, 2010, the Government returned the original indictment in this matter, containing four counts.   Count One charged Michael Yaron, Moshe Buchnik, Santo Saglimbeni and the three corporate defendants – Oxford Construction & Development Corp. (Oxford), Cambridge Environmental & Construction Corp., D/B/A National Environmental Associates (Cambridge), and Artech Corp. – with Wire Fraud Conspiracy.   Count Two charged the same three individual and three corporate defendants with substantive Wire Fraud.   Counts One and Two alleged that Yaron and Buchnik made kickback payments to a company called Artech that was controlled by Saglimbeni (the so-called "Artech fraud scheme").

Count Three charged Saglimbeni and Emilio Figueroa only with Mail Fraud Conspiracy.   Count Four charged Saglimbeni and Figueroa with substantive Mail Fraud.   Counts Three and Four were based on a separate, smaller scheme to accept kickbacks.

2

### The Superseding Indictments and Severance

Following the United States Supreme Court's decision in <u>Skilling v. United States</u>, 130 S. Ct. 2896 (2010), the Government superseded the original indictment on October 26, 2010 by adding an "honest services" fraud theory to the economic fraud theory in Counts One and Two of the original indictment.  In addition, the Government added Figueroa to Count One, the Wire Fraud Conspiracy.  On June 15, 2011, the Government again superseded the indictment, making technical changes.

On July 28, 2011, the Court severed Counts One and Two from Counts Three and Four, concluding that the charged Artech scheme of Counts One and Two was too distinct from the scheme charged in Counts Three and Four to permit a joint trial.  The case proceeded to trial as to all individual defendants and all four corporate defendants on Counts One and Two.

### The Trial, Post Trial Motions and Sentences

The trial on Counts One and Two began on January 9, 2012.  On February 2, 2012, the jury convicted all defendants on all charged counts. The defendants moved post-trial for judgment of acquittal under Fed. R. Crim. P. 29 and for a new trial in the interests of justice under Fed. R. Crim. P. 33.  The Rule 33 motion concerned the former Government cooperator David Porath and the consensual recordings he made, which were the cornerstone of the Government's case.  The

3

defendants also moved the court for discovery of Porath's prior statements and for an evidentiary hearing. By an Order dated June 28, 2012, the district court denied the Rule 29 and 33 motions and the motion for discovery and a hearing. On July 10, 2012, Yaron was sentenced to 60 months incarceration, and Buchnik to 48 months. The sentencing hearings for Saglimbeni and Artech and Figueroa were adjourned pending a potential resolution of Counts Three and Four.

On July 31, 2012, Saglimbeni and Figueroa pleaded guilty to Counts Three and Four. On October 17, 2012, Saglimbeni was sentenced to 48 months incarceration and Figueroa to 36 months.

Timely notice of appeals were filed.

STATEMENT OF FACTS

Introduction

The trial evidence shows that this is a case of two cases. The first case features a former Government cooperator named David Porath who, between about 1998 and 2001, committed crimes with virtually all the Government cooperators and purportedly the defendants. In 2005, he wore an FBI recording device to record two conversations with Emilio Figueroa, which recordings comprise the cornerstone of the Government's case. Porath then fled to Israel. On January 5, 2012, four days prior to trial, the Government learned that Porath consented to extradition and was about to be returned to the United States. The Government,

4

however, failed to inform either the Court or the defense of this fact. Instead, the Government chose to play the Porath recordings for the jury without ever calling Porath as a witness, the effect of which was to deny the defense the opportunity to cross-examine him. Within days of the guilty verdicts, Porath was returned to the United States. He pleaded guilty a few months later and was sentenced, despite his significant crimes and the fact that he fled the country, to only three months of home confinement.

The second case involves $2.3 million in payments from three companies – Oxford, Cambridge and Exeter – through five intermediaries, including Buchnik, to Artech, a company controlled by Saglimbeni. Oxford was a construction company owned by Yaron. Cambridge, d/b/a N.E.A., was a company owned by Yaron that received hospital payments for the work performed by National Environmental Associates (NEA), which was owned by Buchnik. Exeter was a construction management company owned by Yaron. Buchnik's N.E.A. was an asbestos abatement company controlled by Buchnik. These payments began three years after the flurry of activity in and around 2000, and lasted between October of 2003 and June of 2005. The evidence is undisputed that the payments were made. However, the evidence fails to establish that Saglimbeni and Figueroa undertook any actions to assist Yaron and Buchnik with securing construction or abatement work in the hospital or that there was an agreement to do so.

<u>Conduct Between 1999 and 2001: The Porath Years</u>

NYPH was formed in 1997 through the merger of New York Hospital and Columbia Presbyterian Hospital. (TR. 898.) The New York Hospital campus, located at York Avenue and 68th Street, became known as the downtown campus. The Columbia Presbyterian campus, located at 627 West 165th Street, New York, New York, became known as the uptown campus. The evidence shows there was a great amount of construction and asbestos abatement at both the downtown and uptown campuses through the late 1990s and throughout the 2000s. In regard to the uptown campus, the main building is about 50 years old and requires a great deal of construction and asbestos abatement work. (TR. 454.) Also, during the 1990s, a major construction project was undertaken at the downtown campus referred to as "the Major Modernization Project" or "Major Mod," during which the hospital building was extended to the east and over the FDR Drive. (TR. 437, 1327.)

The Government called several witnesses who testified about conversations and conduct concerning false bids, complimentary bids and payments to hospital administrators during the time period between about 1999 and 2001. (TR. 593, 602.) Much of this testimony relates to David Porath, who had worked with Yaron and Buchnik at NEA until about 2001, when he left to form his own re-insulation company called Apache. Porath is the centerpiece of the testimony of this time

6

period, having been involved in misconduct with several of the Government's cooperators and others, including Michael Theodorobeakos, Stephen McAnulty, Andre Gosek, and Mariusz Debowski.

Michael Theodorobeakos, a Government cooperator who pleaded guilty to rigging bids along with David Porath in connection with projects at both New York Hospital and Mount Sinai Hospital, testified that he did re-insulation work with NEA. (TR. 537, 592.) Theodorobeakos explained that, after the asbestos was removed from an object, a re-insulation contractor would insulate the object with a safer material. (TR. 537.) Theodorobeakos worked with Moshe Buchnik, Michael Yaron and David Porath at NEA, primarily as a re-insulation subcontractor. (TR. 538-39.) Theodorobeakos also admitted that he was involved in a sophisticated bid rigging scheme involving between 20 and 30 false bids along with David Porath after Porath left NEA. (TR. 593, 602.) He explained that Porath had created his own re-insulation company, Apache, and that he and Porath agreed that Porath would let Theodorobeakos use Porath's Apache letterhead to submit false bids[1] to Mount Sinai Hospital. (TR. 593.) In particular, Porath gave Theodorobeakos his letterhead and said, "do what you need to do." (TR. 593.)

---

[1] Generally, a so-called "false bid" or "complimentary bid" scheme is a form of bid-rigging where a company bidding on a contract solicits bids from other purported competitors that will intentionally be too high to actually be competitive.

Theodorobeakos testified that he once spoke with Buchnik and Porath about how NEA got work at NYPH, and was told that NEA got work "through Mr. Saglimbeni and that they were paying off Mr. Saglimbeni." (TR. 540.) Since Porath was still with NEA, this conversation would have been prior to 2001.

Theodorobeakos also stated that in August 2001, Buchnik asked him to sign a bid proposal for asbestos removal because Buchnik needed another bid. (TR. 542; Gov. Ex. 1275.) Theodorobeakos signed the bid even though his company, Monosis, did not do that type of work, hoping that he would get the re-insulation part of the project. (TR. 547.) He testified that Buchnik asked him for a bid a second time, and he provided Buchnik with the name Xaran Babantoude. (TR. 548.)    The record is devoid of any testimony tending to show that Saglimbeni or Artech were aware of, or had any involvement in, these acts or conversations. In addition, there is no evidence that this conduct was a part of the conspiriacy charged in counts one and two.

Theodorobeakos testified that he saw the company E.Tal Environmental working as the air monitor on projects where NEA was doing the abatement work at NYPH. (TR. 550.)    Theodorobeakos' company Monosis performed work with E.Tal in about 2000.  Theodorobeakos said Buchnik asked him to assist E.Tal in getting certain air survey results quickly. (TR. 553.)  After this first survey from January 2000, Monosis did other projects with E.Tal.  (TR. 555.)   However,

McAnulty asked him to indicate on the paperwork that E.Tal, and not Monosis, performed the survey. (TR. 558.) Here again, the record is devoid of any testimony tending to show that Saglimbeni or Artech were aware of, or had any involvement in, these acts or conversations.

Theodorobeakos testified that both Buchnik and Porath told him that they had gone to Florida with Saglimbeni and "Emilio" to ride on Porath's speed boat. (TR. 563.) When asked later what Emilio's last name was, Theodorobeakos said "Portofino," explaining that "Emilio Portofino" worked in the engineering department of the 168th Street location for Saglimbeni. (TR. 589.)

At some point, Theodorobeakos met with Porath at a Starbucks to discuss the bid rigging scheme Theodorobeakos had done at Mount Sinai Hospital. (Tr. 604.) By the time of trial, Theodorobeakos was aware that the Government had recorded this Starbucks conversation. (TR. 604-05.) Some later time, the FBI served him with a subpoena. He recalls that before being served with the subpoena, he tried to destroy evidence of his criminal activity by having "the IT" guy erase everything related to Mount Sinai from his computers. (TR. 607.) However, the information was not in fact destroyed and he provided it in response to the subpoena.

Stephen McAnulty testified as a Government cooperating witness, having pleaded guilty to lying to a federal agent during the course of this investigation.

(TR. 675.)   McAnulty worked for Yaron and someone named Charles Balsamo as Director of Operations at Exeter Professional Services, which operated apartments in New York City and Philadelphia (TR. 679-681), and then for another of Yaron's companies, Exeter Technologies  (TR. 682).  In late 1998 or 1999, Yaron asked McAnulty to be the head of the air monitoring company E.Tal Environmental. (TR. 684, 686.)  He stated that he gave himself the position of Vice President, so that if he didn't know the answer to something, he could justify calling his "boss," which would have been either Yaron or Buchnik.  (TR. 689.)  McAnulty was familiar with NEA, and stated that Yaron was "the boss" of NEA, Buchnik did the day-to-day work of NEA, and David Porath was a foreman of NEA.  (TR. 684.) McAnulty stated that E.Tal got monitoring work when NEA secured abatement contracts.  (TR. 691.)

McAnulty testified that, when Columbia Presbyterian and New York Hospital were merging, Yaron asked him to approach Saglimbeni about "arranging for there to be a percentage given on the overall invoices submitted to New York Presbyterian."  (TR. 708-09.)  McAnulty said that Yaron had "asked me to approach Santo Saglimbeni and have a discussion which would result in an understanding that there would be an overall payment in cash as a kickback for the awarding of the contracts for air monitoring at the hospital."  (TR. 709.) McAnulty testified he met with Saglimbeni within a week or two in Saglimbeni's office.

10

(TR. 710.)   The two men discussed social issues and then they discussed and "haggled" over what percentage of E.Tal's invoices would be "kicked back" to Saglimbeni.  (TR. 711.)  A percentage was agreed upon; McAnulty couldn't recall the exact amount, but said it was "somewhere, 8, 9 percent, something like that but I am not exactly sure."  (TR. 711.)   McAnulty then reported the number back to Yaron.   (TR. 711.)   Following the meeting with Yaron, McAnulty had a conversation about the matter with David Porath.   (TR. 712.)   Porath told McAnulty that he had a discussion with Saglimbeni, who told Porath that McAnulty had "driven a hard bargain."  (TR. 712.)  Sometime later, Yaron asked McAnulty to make a payment to Saglimbeni but McAnulty "didn't do that" because he was uncomfortable making payments.  (TR. 713.)

McAnulty stated that he never told anyone at the hospital (including, presumably, Saglimbeni) about the connection between NEA and E.Tal because the two were supposed to be separate, and that Yaron and Buchnik persuaded him not to mention it.  (TR. 715.)

As the head of E.Tal, McAnulty collected the bids to a particular job, referred to as the Infrastructure Upgrade Neurological Institute.  Prior to the bid opening, Yaron or Buchnik told McAnulty to bring the bids to their office.  (TR. 724-25, 852.)  When he arrived at the office, McAnulty and Buchnik opened the bid envelope with a clothes steamer and shared the bids with Yaron.  (TR. 726-27;

Gov. Ex. 112.)    There was discussion about how low the bids were.  (TR. 727.)
According to McAnulty, Buchnik then prepared NEA's bid on the project.  (TR.
727.)    Referring to Government Exhibit 112, McAnulty testified that the
competing bids were for $911,950 (by SMJ Environmental) and $730,000 (by
ETS).  (TR. 853.)  According to McAnulty, having been made aware of these
particular bids, which Yaron and Buchnik referred to as very low, NEA bid
$544,230.  (TR. 853; Gov. Ex. 112.)

McAnulty admitted that, while employed at E.Tal, he conducted an
embezzlement scheme to steal money from Yaron and the company by creating a
second E.Tal bank account that he himself controlled.  (TR. 832-34).  McAnulty
opened this second E.Tal account at a different bank, without Yaron's knowledge
and deposited funds that were supposed go to the real E.Tal into this second, bogus
E.Tal account that McAnulty controlled.  (TR. 834.)   McAnulty testified that
David Porath "persuaded" him to open this other bank account.   (TR. 867.)
McAnulty also signed $9,500 E.Tal checks to Safeside Environmental in exchange
for cash, admitting that this was part of a tax scheme by McAnulty and Safeside's
owner Andre Gosek.  (TR. 838.)  McAnulty testified that Porath "steered" him to
Gosek.  (TR. 883.)  McAnulty testified that David Porath had advised him to draft
these checks in amounts of less than $10,000 to avoid IRS scrutiny.  (TR. 839.)

By the time he testified at trial, McAnulty knew that Porath had fled to Israel. As part of the Porath extradition request from Israel, McAnulty submitted an affidavit spelling out a tax evasion scheme between Porath and Gosek whereby Porath provided Gosek with Apache checks in exchange for cash, thereby allowing Porath to take false business deductions. (TR. 840-41.) McAnulty explained that Porath told him this information so that McAnulty could perpetrate the same tax fraud scheme that Porath had been perpetrating. (TR. 841.)

Mariusz Debowski ran a construction payroll company called Ursus. (TR. 1863.) Ursus did the payroll work for Safeside. (TR. 1864.) Specifically, Debowski wrote checks to Safeside's employees in exchange for cash and a fee. (TR. 1865.) Gosek, the owner of Safeside, introduced Debowski to David Porath and his company, Apache, because both Porath and Debowski were interested in an arrangement where checks could be written that appear to be legitimate business expenses but where these checks are exchanged for cash. (TR. 1866-68.) Through this arrangement, Debowski cashed checks for Porath and Apache for about five years. (TR. 1868.) Ultimately, Debowski pleaded guilty due to his role in cashing $2 million in checks from David Porath over a five year period, admitting that he knew that Porath was falsely claiming that these checks were for legitimate business expenses, allowing Porath to fraudulently lower his tax indebtedness by

$2 million.  (TR. 1868, 1894, 1900.)  Debowski also pleaded guilty to lying to the agents about his check-cashing activities.  (TR. 1870.)

Debowski met Moshe Buchnik through Gosek in 2003; he met Buchnik one time.  (TR. 1872.)  Debowski asked Gosek if he knew of anyone who wanted to cash more checks, and Gosek gave Debowski Buchnik's phone number.  The two met and discussed Gosek writing a check for a fee.  (Tr. 1875.)  Gosek wrote a check dated October 23, 2003 in the amount of $95,125 to ARPECH.  On that same date, a wire into Debowski's account in the amount of $99,881 came from Oxford Construction.  (TR. 1880.)  Debowski wrote a second check for $95,125 to ARPECH dated January 21, 2004 for which he received a wire in the amount of $100,000 from Oxford.  (TR. 1883.)   Debowski testified that he wrote the two checks solely for the fee he received, and had no idea if there was another purpose behind these transactions.  (TR. 1891.)

### 404(b) Evidence From Before The Charged Conspiracy

The trial court admitted, as 404(b) evidence as against Buchnik alone, testimony by Henry Kuhlken about gifts and cash payments that Buchnik gave to him between about 1996 and 1998 – dates prior to the charged conspiracy here.  In particular, Kuhlken testified that he was a hospital consultant with New York Hospital and that he often worked with Moshe Buchnik and NEA.  (TR. 2024-26.)  At one point, he couldn't recall the date, he asked Buchnik for a loan because he

14

owed back taxes. (TR. 2030.) Buchnik said he would have to get back to Kuhlken, and when he did, told him that they could not lend him any money. (TR. 2031.) Buchnik gave Kuhlken gifts at Christmas time, including a camera, a Rolex watch and two gift certificates. (TR. 2032.) Kuhlken testified that he and Buchnik were friends, that he liked Buchnik as a person and that he saw that Buchnik was well-liked by others in the hospital. (TR. 2038.) He and Buchnik discussed private family matters concerning the health of Kuhlkin's wife and the well-being of one of his sons. (TR. 2040.) Kuhlkin discussed his financial concerns due to his family situation. After these discussions about Kuhlin's financial hardship, Buchnik gave Kuhlken cash in an envelope; Kuhlken asked what it was for, and Buchnik said "just keep doing what you're doing." (TR. 2033.) Between about 1996 and 1998, Buchnik gave Kuhlken cash in an envelope about once per month. (TR. 2034.) Kuhlken was clear that Buchnik never asked anything of Kuhlken, and that Kuhlken never did any favors for Buchnik. (TR. 2043.) The trial record is devoid of any evidence suggesting that Saglimbeni was involved in, or knew of, this conduct.

<u>Conduct Between 2003 and 2005 and the NYPH Audit</u>

The Government's evidence of misconduct during this time period featured testimony by three high-level NYPH administrators (Robert Volland, Paul Schwabacher and Richard Lampeter) about the nature of the hospital's

15

construction and abatement needs, the specific projects conducted, the contractors that worked on these projects and about an audit of the hospital's asbestos projects conducted in 2005.

Robert Volland testified that he came to NYPH in June of 2001 and assumed the post of Senior Vice President, which involved oversight of, among other things, the buildings owned by the hospital. (TR. 132, 136.) Volland reported directly to the Chief Operations Officer of the hospital and was the highest ranking hospital representative to testify. When Volland came to the hospital, he placed an emphasis on bidding out construction and abatement work as a way of securing price concessions from the contractors. (TR. 1329.) Volland testified that he familiarized himself with the contractors who tended to work at the hospital. (TR. 152.) He met with principals of all of the construction companies, including Bovis, Turner, HM Hughes, that regularly performed hospital work, as well as the asbestos abatement companies, such as NEA. (TR. 153-54.) He testified that he met Moshe Buchnik and another NEA principal, that they had a good reputation in the hospital and seemed like good people. (TR. 155.) Volland testified that he asked Saglimbeni and Schwabacher why the hospital used a Philadelphia company, and that they said that NEA provided the best service at the lowest price. (TR. 158.)

Volland testified that the hospital used an outside consultant named Doug Malone to monitor the progress of construction jobs to ensure that the work was being properly performed, and that the job was on budget and on time. (TR. 165.) Volland stated that he and Malone met every month to discuss the construction and asbestos projects, and that he paid special attention to asbestos projects because of an investigation he learned about from the New York Times into several asbestos companies, competitors of NEA, that were accused of defrauding the Port Authority of New York & New Jersey. (TR. 166-68.)

Richard Lampeter testified that, following the NYPH merger, many of the same contractors used on the "Major Mod" (the large renovation at the downtown location) were also employed on the construction and abatement projects uptown. (TR. 1327.) Construction companies such as Bovis, HM Hughes; consultants such as Doug Malone and Municipal Expediting; and abatement and air monitoring companies such as NEA and E.Tal, all of which worked on the "Major Mod" downtown, also worked at the uptown campus. (TR. 1328.)

Based on Lampeter's extensive experience, he did not find it unusual that the hospital awarded construction and abatement work through a non-bid process. (TR. 1328.) He also testified that while price concessions are important, whether a company and its principals have experience with the particular dangers and safety

17

risks associated with construction and demolition in a hospital setting is likewise important. (TR. 1330.)

In about 1999, Saglimbeni had supervisory responsibilities over matters related to facilities engineering and operations at the uptown campus. (TR. 908.) In particular, on March 1, 1999, he was promoted to the post of Director of Facilities Engineering, which gave him approval authority for contracting jobs of up to $50,000. (TR. 916.) On January 1, 2006, he was promoted to Vice President of Facilities Operations at the uptown location and had approval authority of up to $250,000. (TR. 148, 150, 164.)

At the time of the merger, Figueroa was a construction superintendent with relatively few responsibilities. In about 2003, Figueroa was promoted to the post of Building Systems Manager. (TR. 924). In about June of 2005, Figueroa was promoted, on the recommendation of Robert Volland and Paul Schwabacher, to the position of Director of Facilities Operations for the Uptown Campus. (TR. 150, 926.) In this capacity, he did have limited responsibilities over the contracting of work within his area of the hospital. He reported to Richard Lampeter, who in turn reported to Saglimbeni. (TR. 938.) Saglimbeni was supervised by Paul Schwabacher, who was responsible for reviewing the purchase requisitions and other tasks related to construction or abatement. (TR. 944-46.) Schwabacher

18

testified that at no time did he ever believe Saglimbeni was not properly discharging his duties.  (TR. 947.)

Construction projects or repairs involving asbestos abatement were overseen by the Office of Facility Operations (OFO).  (TR. 151.)   Projects in this area were approved by Volland personally.  (TR. 151.)  Volland relied on Schwabacher for answers on matters related to asbestos.  (TR. 151.)

The NYPH had a code of conduct that was distributed to employees.  (TR. 177, 949.)  Schwabacher testified that the code of conduct prohibited actual or perceived conflicts of interest with outside vendors, "meaning there shouldn't be any business connection or employees were not allowed to accept cash gifts . . . ."  (TR. 952.)[2]

There was testimony that, under the relevant laws, the air monitoring company checking for the presence of asbestos must be independent from the abatement company charged with removing or containing the asbestos.  (TR. 450.)  Air monitoring companies use pumps to take air samples in an area typically undergoing asbestos abatement.  (Tr. 451.)  The sample is then sent to a laboratory for analysis to determine whether asbestos fibers are present.  (Tr. 451.)  Paul Schwabacher further testified that it was his "understanding and assumption" that the air monitoring company must be separate from the abatement company.  (TR.

---

[2] The specific references to the policy and procedure manual are set forth as part of Mr. Volland's testimony between pages 177 and 185.

978.)  Michael Theodorobeakos testified that based on his training as an asbestos contractor, he understood that the abatement company had to be independent from the monitoring company.  (TR. 549.)   Schwabacher testified that he believed that NEA and E.Tal were in fact separate, independent companies.  (TR. 978.)

During much of 2005, an audit was conducted of the asbestos contracts at NYPH.  Volland indicated that he was so concerned about the indictment of three asbestos companies servicing the hospital (Independent Monitoring & Analysis, Inc. (IMA), Comprehensive Environmental of New York (CENY) and Specialty Service Contracting Inc. (SSC) –all competitors of NEA) that he commissioned an audit of the asbestos contracts and contractors.  (TR. 208.)  He further testified that the objective of the audit was to ensure that qualified vendors were performing the asbestos monitoring, analysis and abatement.  (TR. 207.)  The audit involved the asbestos contracts that were awarded pursuant to the unit bid price, the bid and other paperwork maintained by the hospital.  (TR. 1311, 1314.)   The auditors reviewed files of asbestos abatement projects and spoke to all relevant hospital employees, as well as outside consultants.  (TR. 208, 1315.)  Lampeter testified, for instance, that he was interviewed at least a dozen times in connection with the audit.  (TR. 1311.)   Lampeter testified that he spoke with Buchnik on two occasions about the audit.  In particular, the auditor asked Lampeter why NEA received a large percentage of the work from Lampeter's department and why

NEA was consistently the low bidder.  Lampeter responded that NEA had worked in the hospital a long time, consistently delivered high quality work, and that it was familiar with hospital protocols.  (TR. 1312-13.)  At trial, Lampeter noted that he really believed these were the reasons why NEA received the work.  (TR. 1313.)

After providing this information to the auditor, Lampeter asked Buchnik if there were other reasons for NEA's effectiveness, and Buchnik said that he could do the work more cheaply than the competition because he had the ability to store materials onsite, which reduced costs.  Also, Buchnik said, because he was so familiar with the hospital's layout and because he knew the security personnel, he was able to efficiently move about the hospital to perform the abatement work. (TR. 1313.)

Following the audit, the auditors drafted a report.  (TR. 1315.)  The report contained three major findings relevant to the case.  First, that "documentation of criteria for pre-qualifying vendors and responses from vendors were not available to internal audit."  (Gov. Ex. 107.)  Second, that "competitive bidding for air monitoring services . . . was not conducted which has resulted in one vendor . . . receiving 83%" of the work.  (Gov. Ex. 107.)  Third, that "competition for asbestos abatement . . . is limited potentially because of the number of vendors receiving bids and the make-up of the bidders list that always favors one vendor who has

received 93% of the total $21.7 million awarded over 4 to 5 years." (Gov. Ex. 107.)

Volland called a series of meeting among several high level administrators to discuss the report, and presented it to the audit committee. (TR. 210-11.) The different departments then commented on the audit report. Lampeter served on the committee that was assembled to respond to the asbestos issues; in fact, Lampeter was charged with the responsibility to draft his committee's response. (TR. 1315.)

The audit response, dated December 12, 2005 (Gov. Ex. 107) contained responses of the committee to the three major points relative to asbestos abatement and air monitoring. The response to the first point, concerning the availability of documentation regarding qualifying vendors, was as follows:

> We do not believe the finding to be entirely accurate. OEM maintains a list of ACM abatement contractors that have DEP approval to work in New York. The list was arbitrarily shortlisted to 12 contractors. These 12 contractors were subsequently checked to ensure that they had no outstanding DEP violations. Their financial records were reviewed by an outside auditor.

(TR. 1316; Gov. Ex. 107.)

On the topic of air monitoring contracts, the following response was provided by Lampeter and others:

> Presently air monitoring contracts are being awarded on a fixed negotiated percentage of the abatement cost. However, going forward, contract specifications will be developed by safety in conjunction with ODC and OEM. A bid package will be prepared . . . for air monitoring services. Sealed bids will be returned by the vendor . . . (hospital departments) will

review the bids and award based on vendor price and ability to commit the required resources on a timely basis.

(TR.1317; Gov. Ex. 107.)

On the topic of competition for asbestos abatement projects, the response was as follows:

> We do not agree that competition for abatement contracts is limited. All ACM abatement projects are awarded based on competitive bids. Projects over $50,000 are bid to a minimum of 4 contractors selected from a list of 12 approved contractors. Projects up to $50,000 are awarded based on unit price bids received from 4 contractors on the list. The bidders list does not favor one bidder. The list does, however, always include the previously successful bidder.

(TR. 1318; Gov. Ex. 107.)

The response went on to include the following observations about NEA:

> NEA has consistently bid less than the other bidders. They have been working with NYPH for many years. They are familiar with our hospital policies and procedures and there is no associated learning curve. As a result, they are able to do the work effectively, efficiently and at a lower cost. Their resultant efficiency has provided a benefit to the hospital in lower abatement costs.

(Gov. Ex. 107.)

Volland testified that in fact NEA was submitting lower bids than its competition and that this was due to NEA's familiarity with the hospital. (TR. 270.) In addition, Volland testified and the evidence showed that NEA's main two competitors for hospital asbestos projects – SSC and CENY – were indicted by the Manhattan District Attorney in 2004 for submitting falsely inflated bids. (TR.

23

341.)    Likewise, in the area of air monitoring, E.Tal's competitor, IMA, was indicted as part of the same fraudulent overbilling conspiracy. (TR. 341.)

Paul Schwabacher testified, based on his personal observations including his review of hospital business records, that NEA was consistently the lowest bidder on a great many projects. (TR. 1068.) Schwabacher said he would walk around the hospital, talk to people and "see what was going on." Schwabacher further noted that he himself would check on major construction and asbestos projects, and would delve into the details of these projects to make sure he understood them. (TR. 1069-70.) His conclusion based on his personal experience was that NEA was "very quick" in its response-time and was an effective asbestos abatement contractor – attributes that were very important to a hospital dealing with asbestos removal. (TR. 1070-71.)

Moreover, the hospital relied on NEA when it needed a company to address a significant health and safety concern. (TR. 1073.) In particular, Schwabacher recalled a situation when the hospital was undertaking a major construction project where walls and ceilings throughout the building would have to be opened. (TR. 1073.) The hospital's concern was that a ubiquitous fungus called Aspergillus, which exists wherever moisture is present, would be released through the hospital due to the construction and pose a hazard to certain patients. (TR. 1073.) In order

24

to safeguard the hospital and its patients, Schwabacher and the hospital brought in NEA to contain the Aspergillus and minimize the risk.  (TR. 1073.)

### Porath's Recorded Conversation

While the audit was being conducted in the hospital, a federal investigation was being conducted in the street.  On June 10 and 16, 2005, the FBI provided David Porath, then a cooperating witness, with a recording device.  The case agent, Melissa Fortunato, testified that

> we met with Mr. Porath before his meeting, we gave him a recording device that he was able to put on his person, then sent him to have his meeting, then when he came back, was finished with his meeting, he met us again and we took back the recording equipment.

(TR. 1920.)    Agent Fortunato stated that the agents were not able to hear the conversation as it occurred because the recording equipment did not transmit sound.  (TR. 1922.)    Moreover, the meetings between Porath and Figueroa were not physically surveilled by the agents.  Agent Fortunato noted that she "worked with (Porath) a lot," agreed that the two were on a first-name basis, and indicated that she was surprised that he fled to Israel.  (TR. 1940-41.)    Agent Fortunato testified that she understood that Porath would not be a witness at this trial.  (TR. 1957.)  Agent Fortunato provided this testimony concerning Porath on January 27, 2012.  (TR. 1850, 1909.)

On June 10, 2005, Porath approached Figueroa and the two had the following conversation, in relevant part:

Figueroa:     . . . Santo, he's a weirdo, man.  You know what Michael said?  "Tony, I'll give you some advice.  Never bite the hand that feeds you."

Porath:       Yeah, that's true too.

Figueroa:     He said that about someone.

Porath:       Yeah.

Figueroa:     I was like . . .

Porath:       Santo . . .

Figueroa:     . . . I don't want to tell you Michael. . .

Porath:       Santo got to be careful, you know.

Figueroa:     Mike doesn't want to do it.  He doesn't even want to work there.

(Gov. Ex. 1701, p.63.)

A few minutes later, the following exchange took place:

Porath:       Yeah, but Santo will relax.  He's always like that.

Figueroa:     yeah, yeah, yeah.

Porath:       But he's with everybody like that—he was with me like that, and then with Michael and then its going to be like, you know.

Figueroa:     the next guy.

Porath:       Yeah, it's – that's the way it is.

Figueroa:     So, what happened, he called you, spoke to him or no?

Porath:       Michael, yeah, I went to – I went to lunch with him.

26

(Gov. Ex. 1701, pp. 65-66.)

On June 16, 2005, Porath approached Figueroa again; the two men had the following recorded exchange, in relevant part:

Figueroa:     Like this, he's going through every manifest, every single fucking proposal, every single requisition, everything. Guess who signed every one of those reqs.

Porath:       Santo

Figueroa:     Who filled out every one of those reqs?

Porath:       Santo.

Figueroa:     Every one of 'em.

Porath:       You know, the worst part?

Figueroa:     What?

Porath:       It's the ETAL connection with NEA.

Figueroa:     With NEA?

Porath:       Yeah.

Figueroa:     If they find out it's done.

Porath:       It's done, that's it. They close the deal, they got to pack and go home.

Figueroa:     I never filled out one req.

Porath:       You better not, you got to . . .

Figueroa:     Nothing.

Porath:       . . . stay away from this shit, man.

27

| | |
|---|---|
| Figueroa: | I sit in my office with my feet up, no worries. |
| Porath: | Well yes, asbestos you didn't fill out anything. |
| Figueroa: | Nothing, never. |
| Porath: | No?  Never, good, yeah. |
| Figueroa: | Nothing.  I did a lot of Oxford work but . . . |
| Porath: | Yeah, Oxford is different. |
| Figueroa: | But never—nothing with asbestos. |
| Porath: | Yeah, asbestos (inaudible) |
| Figueroa: | It's all big shot, it's all big time Santo. |
| Porath: | Oh back then $4 million, $5 million . . . |
| Figueroa: | For what?  For doing nothing.  And he was writing—they were writing – he was writing, he was writing them reqs so they could write him checks. |
| Porath: | Yeah, no checks there? |
| Figueroa: | No checks. |
| Porath: | Better not.  It's the last thing he needs now. |

(Gov. Ex. 1702-01, pp. 101-103.)

Payments to and from Artech

Carl Bagell, a CPA, testified that he prepared Yaron's personal and corporate returns in and around 2009.  (TR. 1137.)  He also prepared Saglimbeni's personal returns and the corporate returns for Artech and SIC – companies

28

associates with Saglimbeni.   (TR. 1137.)   Saglimbeni's mother, Vincenza Saglimbeni, controlled all shares in Artech.  (TR. 2081; Gov. Ex. 1002.)  Bagell said he had a meeting with Saglimbeni concerning Artech's tax situation, explaining that Artech had "expenses that weren't that high" and substantial gross receipts of $360,000 in 2005.  (TR. 1145-47.)  As a personal services corporation, Artech was being taxed at the 35% rate, which Bagell stated was high.  (TR. 1146.)  Nonetheless, Bagell indicated that the taxes on income to Artech were being paid at the appropriate corporate rate.

Bagell identified a 2005 partnership tax return of JDM LLC, a company that was 75% owned by Marta Saglimbeni, defendant's wife, and 25% owned Santo Saglimbeni.  (TR. 1148-49.)  Bagell also identified a 2004 partnership tax return for WF3 LLC, a business that was 60% owned by Artech, 20% owned by Vincenza Saglimbeni and 20% owned by Santo's father Joseph.  (TR. 1150-52.)

Kim Fontaine, a paralegal for the Justice Department, testified as to a series of summary charts, based on other financial and business records admitted during the trial.  She indicated that the money paid by the hospital to NEA actually diminished during the time period of the charged conspiracy.  Particularly, in 2001, NEA received $11,294,310; in 2002, it received $9,147,971; in 2003, it received $6,013,268; in 2004, it received $4,255,079; in 2005, it received $2,395,171; in

2006, it received $676,720 and in 2007, it received $419,614. (TR. 2070; Gov. Ex. 1503.)

In regard to Oxford, the money from the hospital increased and then decreased during the conspiracy. Particularly, in 2002, Oxford received $3,850; in 2003, it received $1,839,165; in 2004, it received $7,037,217; in 2005, it received $12,354,589; in 2006, it received $4,273,582 and in 2007, it received $3,168,704. (TR. 2072)

Fontaine reviewed the payments from Oxford, Cambridge and Exeter to Artech through five intermediaries – Aaron Weiner, Jack & Sons, Winmar, Milan and Ursus. Weiner received a total of $1,060,500 from Cambridge and Oxford, and paid Artech 18 checks totaling $1,010,000. (TR. 2085-89.) Ursus, controlled by Debowski, received two wires from Oxford in the amounts of $99,881 and $100,000; in turn, Ursus wrote two checks to Artech each in the amount of $95,125. (TR. 2091.) Norman Milan, who controlled a company called Stormin Norman received a total of $168,300 from Oxford; in turn, Milan wrote $153,000 in checks to Artech. (TR. 2092-94.) Edwin Villegas, who controlled a company called Winmar, received $498,370 from Oxford, Cambridge and Exeter; in turn, Winmar wrote $438,450 in checks to Artech. (TR. 2094-96.) Buchnik, who controlled Jack & Sons, received $491,000 and sent that same amount to Artech. (TR. 2096-97.)

In sum, the summary charts showed that Oxford, Cambridge and Exeter paid about $2.3 million to Artech through the five intermediaries indicated, that Artech paid appropriate corporate tax on this income, and that the remainder of the money was disbursed to people and entities having some connection to Saglimbeni.

The Summations

The summations, particularly that of Buchnik's counsel, focused on the absence of Porath as a trial witness. Counsel made the following remarks in summation:

> [W]e're sort of forced here to guess because what Porath ends up doing, he commits these crimes, he cooperates, he makes tapes, and then he's gone. He's gone. He's back in Israel.

(TR. 2375.)

> Now . . . you've seen how the process works. Someone comes up here, gives testimony and then is cross examined. . . . That will never happen with David Porath. No one will be able to ask David Porath any questions he will be able to answer. He is gone.

(TR. 2375-76.)

> There are a million questions to ask David Porath, a million, a million questions that you would want to know the answers to, and you never will. You never will. . . . Mr. Porath, . . . were you told to say that Tony Figueroa the worst part is the connection between NEA and E.Tal. Really, who told you that.

(TR. 2376-77.)

> You would love to have David Porath here and question him. You never will. He is gone. But they rely on this like he is not.

31

At one point, Porath says if they find out the NEA-E.Tal connection they are going to have to pack up and go home.  What does that mean . . . . You don't know what it means and you never will because its unreliable.

(TR. 2377.)

And when someone puts a tape into evidence, you get to ask them on cross examination when you said this, what did you mean, what did you mean, Mr. Porath.

(TR. 2378.)

If the only basis for what the evidence is is what the lawyers say it means because there is no witness, that's not how it works.  They are making this work this way because they have no choice because for whatever reason, Porath got away from them.  Maybe nobody took his passport.  Maybe a flew a private jet.  You don't know.

What you do know, the only thing you need to know, he will never sit there, never put his hand on a bible, never swear to tell the truth, never be asked a single question.

(TR. 2378-79.)

<u>Porath Consents to Extradition and Is Brought to New York</u>

On November 27, 2011, Porath was arrested by Israeli authorities.  (Petty Decl., ¶ 6.)  On January 4, 2012, the Government wrote in a memorandum that Porath "is now in Israel awaiting extradition to the United States."  Porath had not yet consented to extradition when the Government made this assertion.  However, the very next day, January 5, 2012, four days before the trial began, Porath consented to extradition to the U.S. and waived his appellate rights to contest extradition.  (Petty Decl., ¶ 7.)  The U.S. Department of Justice (Office of

International Affairs) was advised of these facts that same day. With the extradition waiver, the Government could legally pick up Porath and deliver him to the Southern District of New York and was obligated to do so in no more than 60 days. (Petty Decl. ¶ 9.) At no time during the trial, which began on January 9, 2012 and concluded on February 2, 2012, did the Government ever inform the court or counsel of Porath's true status. Rather, the defense and the court were falsely led to believe that Porath was continuing to fight extradition, that the outcome of the Israeli extradition proceeding was still uncertain and that Porath was legally unavailable, when in fact none of those things were true.

It was not until after the trial was over that the defense became aware that in fact Porath had consented to extradition prior to the trial, and that his extradition to the U.S. had been imminent all along. Porath was brought to the United States about one week after the guilty verdicts were returned. Months later, Porath was sentenced to three months of home confinement.

<u>Sentencing</u>

Appellant Saglimbeni was sentenced on October 17, 2012 to a term of 48 months incarceration followed by three years of supervised release and a $500,000 fine. As an initial matter, the Court found that there was no provable loss to the hospital for the purposes of restitution. (Sent. Tr. 3.) The Court also found no evidence that the work of NEA or Oxford or E.Tal was in any way or degree

deficient.  The Court stated that "I don't think there's any evidence before this jury . . . presented to me that indicated that the work, the quality of the work was in any way deficient." (Sent. Tr. 67.)

However, the court found that the money paid to Artech totaling $2.3 million would be the amount used in the calculation of loss.  As noted below, the court reasoned that if Yaron and Buchnik agreed to kickback this sum to Artech, they must have artificially inflated the pricing of the hospital contracts by at least this amount.    The Government presented no evidence at trial that would support the trial court's assumption.

**ARGUMENT**

**POINT ONE**

**ADMISSION OF THE PORATH TAPES VIOLATED THE SIXTH AMENDMENT'S CONFRONTATION CLAUSE**

The Confrontation Clause in the Sixth Amendment of the U.S. Constitution bars the admission of a witness' out-of-court testimonial statements unless the witness is unavailable and the defendant had a prior opportunity to cross examine. In the present case, the admission of the Porath tapes violated defendant's Confrontation Clause rights.

First, Porath was within the class of witnesses contemplated by the Sixth Amendment's Confrontation Clause.  Second, his factual, and often accusatory,

34

statements intentionally made onto an electronic recording device provided by the FBI for the explicit purpose of amassing and preserving evidence for use at a criminal trial are testimonial; as will be shown below, Porath's particular statements on tape as well as the role he played in investigating past events make this case factually and legally distinct from this Court's decision in United States v. Burden, 600 F.3d 204 (2d Cir. 2010).

Third, since Porath had consented to be extradited to the U.S. and could have been brought to the Southern District of New York at any time during the trial, he was available.  Fourth, by misleading the court and counsel, even if unintentionally and through omission, that Porath was unavailable, the Government nonetheless prevented defense counsel from cross examining an available but missing witness about his affirmative, accusatory, factual statements on the FBI audio recording.  Fifth, these actions of the Government and the admission of this evidence in clear violation of the Sixth Amendment's Confrontation Clause are not harmless and should result in a new trial.

A.    Porath Was A Witness For Purposes of the Confrontation Clause

Crawford v. Washington, 541 U.S. 36 (2004) made it clear that the term witness, as contemplated by the Confrontation Clause, is not limited to a witness who testifies at trial but is not cross-examined.  Rather, the term also includes persons who are examined or questioned by the authorities pre-trial where the

authorities then seek to use the statement as evidence. <u>Id.</u> at 45, 46. In defining the term witnesses, <u>Crawford</u> used the dictionary definition of the word as "those who 'bear testimony.'" <u>Id.</u> at 51, *quoting* N. Webster, An American Dictionary of the English Language (1828). In this manner, the court's analysis focused on the testimonial or non-testimonial nature of the witness's statement. As indicated below, the particular facts of Porath's statements render them testimonial.

    B.    <u>Porath's Tape Recorded Statements Are Testimonial</u>

On June 10 and 16, 2005, in the midst of an FBI criminal investigation of bid rigging and fraud regarding hospital construction and asbestos contracts, Porath, a government cooperator, was outfitted with a recording device. Porath, and his FBI handling agent, Melissa Shields, who testified at the trial, hoped, expected and specifically intended that the recording that Porath was about to make would one day be played to a jury in a federal courtroom. Indeed, both Porath and the FBI hoped, expected and specifically intended to create admissible trial evidence to be used one day to establish the guilt of Figueroa and any alleged co-conspirators he may have.

By the time the FBI outfitted Porath with a recording device and sent him to Figueroa, the criminal investigation was in full swing. Porath had obviously already been approached, provided the FBI with incriminating information about himself and others, and had agreed to cooperate. The investigation was now

36

focusing on creating and preserving evidence about the criminal activities of others.

There was plainly no emergency unfolding on either June 10th or June 16th when Porath approached Figueroa with the FBI recording device. Rather, Porath's goal, and that of the FBI, was for Porath to make factual, accusatory statements about appellants Yaron, Buchnik and Saglimbeni and to lure Figueroa into having an inculpatory conversation about past events.

Porath approached defendant Figueroa that day and engaged him in conversation. During the conversation, Porath himself made several accusatory, factual, assertions that the Government used to establish the defendants' guilt. For instance, when Figueroa asked Porath, "guess who signed every one of those reqs," Porath replied "Santo." When Figueroa asked Porath, "who filled out every one of those reqs, Porath replied "Santo." Figueroa replied, "every one of them." (See page 26 above.) Porath continued, and asked Figueroa if Figueroa knew the "worst part" of the purported wrongdoing. When Figueroa asked "what," Porath went on to tell Figueroa, and, years later, the trial jury, what the worst part was. Specifically, Porath said the worst part was "the ETAL connection with NEA." Figueroa, apparently not knowing what Porath was telling him, replied "with NEA?". Porath replied, "yeah." Figueroa then said, "if they find out its done," to

which Porath responded, "It's done, that's it.  They close the deal they got to pack up and go home." (<u>See</u> page 27 above.)

Just from this brief exchange alone, the Government used Porath, an unexamined source of information central to the Government's case, to establish two critically important facts.  First, Porath made the detailed factual assertion that Santo (Saglimbeni) signed and filled out every one of those reqs (requisitions).  Second, Porath made the detailed, factual assertion that E.Tal (an air monitoring company connected to Yaron and Buchnik) and NEA (an asbestos abatement company connected to Yaron and Buchnik) were connected and that this connection was the "worst part" of conduct that was clearly unlawful.  The significance of Porath's statement is that it is unlawful for an air monitoring company to monitor the work of an asbestos abatement company with which it is associated.  The Government advanced evidence that despite the legal requirement that E.Tal and NEA be independent of each other, the two companies were in fact operated by common ownership.  The Government then used Porath's statements to establish that Figueroa and Saglimbeni knew this fact, despite Figueroa's non-committal response to Porath's statement.[3]  Therefore, Porath's factual statement is relevant to key issues in the case.  There can be little doubt, therefore, that the

---

[3] Notably, although Figueroa subsequently remarks that there would be a consequence to the discovery of the NEA connection to E.Tal, it's clear that Figueroa is doing nothing more than responding to the facts just provided to him by Porath.

statements made by Porath on the audio tape were testimonial in nature.  See Crawford v. Washington, 541 U.S. 36, 51-52 (2004) ("statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" are within the definition of the term "testimonial statements."); see also Davis v. Washington, 547 U.S. 813 (2006).

Had Porath been present as a trial witness, these critical factual assertions could have been tested and undermined by cross examination.  But, he was not a trial witness.  Instead, the Government pressed the Court hard to admit these tapes, over the repeated objections from all counsel that these tapes violated the Confrontation Clause of the Sixth Amendment to the U.S. Constitution.

The facts here fit squarely within the Confrontation Clause concerns raised by the Supreme Court in Crawford, 541 U.S. at 38, so far as Porath's affirmative factual statements are concerned.  Moreover, the present case is readily distinguishable from this Court's decision in United States v. Burden, 600 F.3d 204 (2d Cir. 2010).  In Burden, the Government's cooperating witness recorded a controlled drug buy with the defendant.  Burden, 600 F.3d at 223.  Because the cooperating witness did not testify at trial, the defendant argued that the recording was "an inadmissible testimonial statement."  Burden, 600 F.3d at 223.  Specifically, the defendant objected to the part of the recording where the

39

cooperating witness asked the defendant "[W]hat are you charging for a 14?" and the defendant responded "550." Burden, 600 F.3d at 224. The defendant argued that the cooperating witness' statement was testimonial because the witness, "who had consented to be wired, was aware that anything he said could be used against others at a future criminal trial." Burden, 600 F.3d at 223.

In rejecting the defendant's Confrontation Clause claim, this Court reiterated that its statement in United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) that "'Crawford at least suggests that the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial'" was only dictum. Burden, 600 F.3d at 223 (citing and quoting United States v. Feliz, 467 F.3d 227, 235 (2d Cir. 2006)).

The Second Circuit further ruled that the cooperating witness' statements were not testimonial because, "even to the extent that [the cooperating witness] knew his statements could be used at a future trial, this is not a case in which anything [the cooperating witness] said was spoken for the purpose of accusing. Rather, his comments were made to elicit inculpating statements by others present." Burden, 600 F.3d at 225. This Court further noted that the cooperating witness was merely "attempting to elicit statements from others, and anything he said was meant not as an accusation in its own right but as bait." Burden, 600 F.3d at 225.

In the present case, however, Porath statements were not meant as bait to elicit a response from Figueroa; rather, Porath's statements were accusatory factual allegations. For instance, when Figueroa asked Porath, "guess who signed every one of those reqs," Porath replied "Santo." This response by Porath was a factual statement alleging that Santo had done something wrong. Similarly, when Figueroa asked Porath, "who filled out every one of those reqs" and Porath replied "Santo," this response was another accusatory factual allegation.

Porath other statements were also accusations. Porath asked Figueroa if Figueroa knew the "worst part" of the purported wrongdoing. After Figueroa asked "what," Porath stated that the worst part was "the ETAL connection with NEA." This statement by Porath was not meant to elicit a response from Figueroa. Instead, it was an accusatory factual allegation made by Porath in response to <u>his own</u> question. In other words, when Porath realized that his question about the "worst part" did not elicit the desired incriminating response from Figueroa, Porath took it upon himself to create the incriminating response by answering his own question. Consequently, unlike in <u>Burden</u>, Porath statements were testimonial because the statements were accusatory factual allegations that Porath intended to be used at trial.

In sum, by admitting these tape recordings, including the affirmative, accusatorial, factual assertions by Porath, in the absence of the ability to cross

examine Porath, the District Court, most respectfully, violated defendant's confrontation rights under the Sixth Amendment.

C.    Porath Was Not Unavailable

Federal Rule of Evidence 804(a) provides, in relevant part, that "'unavailability as a witness' includes situations in which the declarant . . . (5) is absent from the hearing and the proponent of the witness' statement has been unable to procure the witness' attendance . . . by process or other reasonable means." As of January 5, 2012, the date on which Porath consented to extradition to the U.S., the Government had the absolute ability to secure his attendance at the trial. Even under the worst case scenario for the Government, the Government could have advised the Court and counsel that Porath had consented to extradition to the U.S. and then request a short adjournment to ensure his appearance in the U.S. to testify about the tape recordings he made. Because the Government had the ability to secure Porath's appearance at all times during the trial, Porath was available to testify.

In the past, the Government has justified its position by arguing, without any factual basis, that Porath "could have" invoked his Fifth Amendment right to remain silent. However, the simple fact is that Porath did not invoke his right to remain silent, and there was certainly no ruling of the Court as to Porath's invocation of his Fifth Amendment right. Federal Rule of Evidence 804 provides

42

that "'unavailability as a witness' includes situations in which the declarant – (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his or her statement."   In the present case, however, there was no such ruling on the ground of privilege, nor was there ever an actual assertion of privilege by Porath.  Consequently, the Government's *post hoc* justification does not change the analysis.  Rather, Porath was absolutely available at all times during the trial.

As the Supreme Court has announced: "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross examine." Crawford, 541 U.S. at 59.[4]  Moreover, the Supreme Court did "not read the historical sources to say that a prior opportunity to cross-examine was merely a sufficient, rather than a necessary, condition for admissibility of testimonial statements.  They suggest that this requirement was dispositive . . . ." Id. at 55.

Under the Sixth Amendment analysis, the touchstone is cross examination of the witness, not whether the statements are deemed reliable by the court on some other basis.  Id.  at 60.  The Crawford Court ultimately dispatched with the test developed by Ohio v. Roberts, 448 U.S. 56 (1980) because Roberts made

---

[4] The only exception to this rule identified by the Crawford majority relates to dying declarations which, while generally non-testimonial, can be both testimonial and admissible under the rules regarding hearsay exceptions. Crawford, at 56.

43

reliability dependent on factors aside from cross examination. <u>Roberts</u> "thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one." <u>Id.</u> at 62. <u>Crawford</u> reaffirms the paramount importance of cross examination as both a means to identifying reliable evidence and as a protected constitutional right.

In the present case, the defense had the constitutional right to cross examine Porath, an available witness, about the testimonial statements he made on the audio recordings implicating all defendants in the charged fraud scheme. By failing to afford that right, these convictions should be reversed.

> D.   By Misleading The Court And Counsel That Porath Was Unavailable, Even if Done Unintentionally And Through Omission, The Government Prevented The Cross Examination Of Porath

Had the Government informed the Court and counsel about Porath's actual status, Porath would have been cross examined on the recordings. This cross examination would have shown that Porath and Figueroa were not discussing the Artech scheme, as the Government errantly and repeatedly maintained during its summation. Moreover, it would have shown that Porath was a competitor of, and not co-conspirators with, Yaron and Buchnik in 2005 when the recordings were made. Additionally, it would have prevented the Government from taking isolated remarks in the recordings out of context. All of these concerns were raised to the

court below as part of the defendants' ongoing objection to the admission of the Porath recordings.

However, given the recordings and the fact that the Government was permitted to take them completely out of context – to argue in summation, without support by a witness, that "reqs for checks" refers to the Artech scheme – the only way to combat the damaging and inaccurate references made by the Government was to cross examine Porath on these points. Without Porath as a witness, the Government was free to argue false and damaging facts about the recordings. For instance, there is a reasonable interpretation of the recordings that the statement by Figueroa that "he was writing them reqs so they could write him checks," is not a reference to Artech at all. Right after that remark, Porath says, "Yeah, no checks there." Figueroa then says, "no checks." Porath finishes the exchange by making the statement "Better not. It's the last thing that he needs now." (See pages 28 above.)

The fair interpretation of Porath's statements was that if employees of the hospital were involved in taking payoffs, the payoffs would not be in the form of checks. In other words, there would be "no checks there." Because the Artech scheme was founded upon scores of payments by check, it stands to reason that Figueroa and Porath are not discussing the Artech scheme. However, without the defense being able to cross examine Porath about his own statements on tape, the

45

Government was able to falsely claim that the two men were discussing the Artech scheme, when in fact they were not. The Government was thus permitted to begin its summation with the phrase "reqs for checks . . . He was writing them reqs so they could write (him) checks." (TR. 2278.) The notion that Porath and Figueroa were discussing the Artech scheme is arguably the single most important prosecution argument in this case. Not only was "reqs for checks" the first thing the Government said in summation, it was the last thing as well. The Government ended where it began, "remember Figueroa's words. Reqs for checks." (TR. 2312.) The Jury then asked for the tape recordings or the transcripts from the recordings several times during deliberations.

This critical evidence, however, would have been undermined through the cross examination of Porath as is evident from Porath's own statements on the recording. But, the defense never had the chance to cross examine Porath.

E.    The Government Cannot Show That The Improper Admission Of Porath's Testimonial Statements Was Harmless Beyond A Reasonable Doubt

Chapman v. California, 368 U.S. 18 (1967) held "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24. The testimonial statements by Porath, including his statement that the connection between NEA and E.Tal is the "worst part" are at the heart of the prosecution's case. In the

absence of proof of any other benefit to Yaron and Buchnik in exchange for the payments to Artech, the Government seized on the NEA-E.Tal connection as an accommodation given by hospital employees. It must be remembered that the trial evidence was absent of any benefit or favor bestowed on Yaron or Buchnik's companies. For instance, there was no evidence that Saglimbeni or Figueroa gave bid information to Yaron or Buchnik or used their authority to ensure that they were awarded hospital contracts. Rather, the only fact that the Government could point to that was NEA and E.Tal had common ownership and worked on jobs together in violation of what hospital administrators believed the rules required.

Also, the Porath statement conveys two damaging facts. First, that NEA and E.Tal are connected. Second, that this connection is "the worst part," meaning that Yaron and Buchnik were conscious that they were doing something wrong by having NEA and E.Tal on the same asbestos jobs. Until Porath made this statement to the jury, there was no indication of the gravity of this problem. It was Porath who told the jury that it was a significant problem and something for which Yaron and Buchnik could get into trouble.

The Government cannot bear its burden here to prove that this error was harmless beyond a reasonable doubt.

## POINT TWO

### THE RECORDED STATEMENTS WERE NOT IN FURTHERANCE OF THE CONSPIRACY

As noted, the evidence shows that, by 2005, Porath had lost touch with Yaron and Buchnik; rather, at that time, Porath was operating his own business, Apache, a competitor of NEA, and he was involved in his own unlawful activity. The Government was not able to provide any evidence that Porath was involved in the conspiracy at the point-in-time he recorded his conversation with Figueroa. The Government further did not show that the other party to the conversation, defendant Figueroa, was making his statements to Porath while believing that Porath was part of the conspiracy. Instead, Figueroa's statements to Porath are idle in nature, informal, in the realm of gossip as to what is going on in the hospital with regard to an internal audit.

The law in this Circuit and others is clear that casual or informal conversation or the mere recounting of past events do not transform otherwise inadmissible hearsay into admissible coconspirator statements. See United States v. Desena, 260 F.3d 150, 157 (2d Cir. 2001) (testimony about declarant's statement concerning a past arson attempt was not admissible as a coconspirator statement because it was not made in furtherance of the conspiracy); see also United States v. Darwich, 337 F.3d 645 (6th Cir. 2003) (statement by defendants nephews about the amount of marijuana they packaged the previous evening were not made in furtherance of the conspiracy because they were informal exchanges); United States v. Mitchell, 31 F.3d 628 (8th Cir. 1994) (a statement that simply informs a

48

listener of the speakers' criminal acts does not satisfy the "in furtherance" requirement); United States v. Urbanik, 801 F.2d 692, 698 (4th Cir. 1986) (trial court committed error by admitting a statement identifying defendant as a marijuana connection when this statement was "casual aside" made in social setting).

The Government could not – and in fact did not – show that Porath acted jointly with defendants to further the conspiracy or that any of the defendants, and defendant Figueroa in particular, had thought that Porath was. In United States v. Coe, 718 F.2d 830, 835 (7th Cir. 1983), the Court held:

> Conspiracy as an evidentiary rule differs from conspiracy as a crime. The crime of conspiracy comprehends much more than just a joint venture or concerted action, whereas the evidentiary rule of conspiracy is founded on agency law. Recognizing this, some courts refer to the coconspirator exception as the "joint venture" or "concert of action" exception.

(citations omitted).

The Court therefore, respectfully, erred in concluding that the Porath-Figueroa conversation was in furtherance of the conspiracy.

## POINT THREE

**THE DISTRICT COURT ERRED IN DENYING THE DEFENDANTS' RULE 33 MOTION BASED ON THE VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS, AND IN DENYING THE DEFENSE'S MOTION FOR PRODUCTION OF PRIOR STATEMENTS BY THE DECLARANT**

49

Pursuant to Fed. R. App. P. 28(i), Appellants Saglimbeni and Artech adopt the argument set forth at Section II of the opening brief of Appellant Michael Yaron in No. 12-2940.

**POINT FOUR**

**THE TRIAL EVIDENCE WAS LEGALLY INSUFFICIENT BECAUSE THERE WAS NO EVIDENCE THAT THE ARTECH PAYMENTS WERE PART OF A KICKBACK SCHEME**

Upon this Court's *de novo* review, United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004), *cert. denied,* Allen v. United States, 543 U.S. 1092 (2004), "[a] defendant challenging a conviction based on a claim of insufficiency of the evidence bears a heavy burden. The evidence presented at trial should be viewed in the light most favorable to the Government, crediting every inference that the jury might have drawn in favor of the Government." United States v. Zhou, 428 F.3d 361, 369 (2d Cir. 2005) (quoting United States v. Bruno, 383F.3d 65, 82 (2d Cir. 2004)). However, even under this demanding standard, the evidence fails to show that there was an understanding among the appellants that Saglimbeni and Figueroa agreed to, or were in a position to, assist NEA or Oxford in securing hospital projects.

The Government tried this case as a criminal version of *res ipsa loquitur* in that the Artech payments spoke for themselves. Added to the Artech payments, the Government relied on the "reqs for checks" remark on the Porath recording. However, what the Government lacked was any evidence whatsoever that Saglimbeni or Figueroa did anything, or tried to do anything, to help Yaron or Buchnik get hospital contracts. The most the Government ever established in this

51

regard was that Saglimbeni and Figueroa had the ability to approve construction or abatement contracts of certain amounts, which, for each, changed over time. (TR. 148, 150, 908, 916.)  However, the evidence also showed that the hospital had a well-defined hierarchy concerning these approvals. (TR. 132, 136.)  There is no indication in the evidence that a sole administrator could ratify a contract absent broad consensus.  Volland testified that he approved construction projects or repairs. (TR. 151.)  Additionally, Schwabacher testified that he reviewed purchase requisitions related to construction and abatement.  (TR. 944-46.)  Given this administrative structure, including the close involvement of Volland and Schwabacher, Saglimbeni and Figueroa lack the singular discretion to award these projects.

Moreover, there is no evidence that NEA benefitted from the alleged payments.  On the contrary, the evidence shows that even prior to the first Artech payment in October of 2003, NEA was already getting the vast majority of the asbestos abatement work at the hospital.  The uncontradicted testimony of the hospital administrators was that NEA delivered high-quality abatement work, was highly responsive to the hospital's needs, was familiar with the infrastructure of the hospital building and proved itself to be a trusted vendor.  A second, and perhaps more indirect reason, for NEA's success was the fact that its two primary competitors – SSC and CENY – were indicted by the Manhattan District Attorney

52

for fraudulently inflating invoices for work not actually performed. Given these facts, NEA simply did not need to pay anyone off in order to secure hospital contracts.

Interestingly, the evidence showed that the total value of NEA's invoices markedly decreased during the period leading up to and during the Artech payments. In particular, in 2001, NEA won contracts totaling over $11 million. In 2002, this figure declined to just over $9 million. In 2003, it declined again to just over $6 million. In 2004, it was $4.2 million. In 2005, it was $2.3 million. (TR. 2070; Gov. Ex. 1503.) This substantial and steady decrease in NEA's business is simply inconsistent with a well-orchestrated kick-back scheme designed to increase its revenue. Therefore, from Buchnik's perspective, as the principal of NEA, the kickback scheme had no material impact whatsoever.

The Court is also asked to view Buchnik's limited role as an intermediary. As noted, the sources of the funds to Artech were Oxford, Cambridge and Exeter, three companies owned by Yaron. Buchnik, through his company Jack & Sons, was merely one of the five intermediaries. There is no other evidence that Buchnik was aware that the payments to Artech were a kickback.

## POINT FIVE

**BECAUSE THE GOVERNMENT FAILED TO PROVE A MONETARY LOSS TO THE HOSPITAL, AND BECAUSE THE COURT ERRED IN SUBSTITUTING "GAIN" FOR "LOSS," SAGLIMBENI SHOULD HAVE BEEN AT A LEVEL 9 FOR COUNTS ONE AND TWO**

Defendant's final adjusted offense level, as determined by the District Court, involved a base offense level of **7** pursuant to U.S.S.G. § 2B1.1(a)(1); a **2** level increase for sophisticated means pursuant to U.S.S.G. §2B1.1(b)(10)(C) and a **16** level increase to reflect a $2.4 million[5] loss pursuant to U.S.S.G. § 2B1.1(b)(1)(I), for a total offense level of **27**.

The District Court found that for the purposes of calculating restitution to NYPH, there was no sufficient basis to make any actual calculation of the loss amount to the hospital. In other words, the Court found there was no provable actual economic loss to the hospital. The Court also noted that there was no evidence that the quality of the work completed by NEA, Oxford and E.Tal was sub-standard or deficient in any manner. Indeed, the Court seemed to accept the testimony of Volland, Schwabacher and Lampeter that the quality of work was consistently high, and that the companies – especially NEA – were highly

---

[5] The $2.4 million is combined of approximately $2.3 million identified in defendant Saglimbeni's bank account and additional $100,000 that were paid in various amounts as fees to subsidiaries who transferred the $2.3 million from their bank accounts to defendant Saglimbeni's bank account.

responsive and efficient. Therefore, for the purposes of sentencing, the Court was contending with a situation where Yaron and Buchnik, by virtue of the jury verdict, secured the contracts through illegal means, but where the work itself was properly done and of economic value to the hospital.

Because the Court could not identify a loss to the hospital, it used defendant Saglimbeni's gain, in the amount of $2.4 million, as an alternative measure of loss,[6] and therefore increased Buchnik's offense level by 16 points, to the total offense level of 25.

The Court, most respectfully, erred in concluding that loss should be determined based on defendant Saglimbeni's gain. The guidelines are clear that "the court shall use the gain that resulted from the offense as an alternative measure only if there is loss but it reasonably cannot be determined." U.S.S.G. §2 B1.1.n. 3(B) (2010). However, this is simply not a case where the Government established that the hospital suffered a loss, but the amount of such loss could not be determined. Rather, this was a case where there was simply no evidence of loss. In particular, there was no evidence of overbilling, or that the hospital

---

[6] Pursuant to U.S.S.G. § 2B1.1 n. 3(B) "[T]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."

contracted for work that was not performed, or was not performed satisfactorily.[7] Instead, the evidence, in a light most favorable to the Government, was that defendant and others manipulated the hospital's bidding process in order to be awarded construction and abatement contracts. However, once being awarded the contracts, Buchnik and Yaron fulfilled their obligations by providing the required services and received payments from the hospital for the work that they provided.

By using the amount paid to Saglimbeni as the "loss" applicable to Buchnik, the Court engaged in a speculative, unreliable calculation as to loss. Essentially, the Court found that since Yaron paid $2.4 million to Artech, that it can be inferred, without any actual evidence whatsoever, that Yaron and Buchnik inflated the construction and abatement contracts to incorporate the amount kicked back to Saglimbeni. However, it is equally, if not more, likely that Yaron paid this money as a sort of investment in Oxford's future, and that the $2.4 million came out of the company's profits, and was not incorporated into the price tags of the jobs. This is the more likely scenario because Oxford and NEA continued to be the low bidder on construction and abatement contracts, and also because there was no evidence of increased prices or bids to make up for the $2.4 million.

---

[7] Indeed, AUSA McCahey acknowledged that fact to the District Court and defense counsel in a pre-trial appearance that took place on January 5, 2012. See, January 5, 2012 Trans. at p. 33-39.

Because of the speculation that was inherent in the calculation being made by the District Court, and because of the specific facts of this case, Buchnik suggested that the Court find loss based on the special rules of procurement,[8] pursuant to U.S.S.G. § 2B1.1.n 3 (v)(II), which provides:

> In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased cost to procure the product or service involved that was reasonably foreseeable.

Notably, neither the Government nor the Probation Department developed any evidence relevant to the administrative costs directly related to the offense conduct, nor of repeating or correcting the procurement.

Therefore, to the extent this Court agrees that the District Court engaged in an unsupported loss calculation, the total provable loss from the offense would be zero, and defendant's guideline range would be reduced by 16 levels, to a level 9, for a range of 4 to 10 months in zone B.

Based on the foregoing, appellant asks this Court to find on this record that the Government has not proven any loss to the hospital, and to remand this matter for resentencing consistent with such finding.

---

[8] Counsel for Buchnik challenged the District Court's alternative loss calculation of $2.4 million as well as suggested to apply the rules of procurement in Buchnik's Sentencing Hearing held on July 10, 2012. See Sent. Trans. at p. 63-72.

## CONCLUSION

**For the Reasons Stated in Points One through Four, This Court Should Reverse the Convictions of Saglimbeni and Artech and Dismiss Counts One and Two or, Grant a New Trial; Alternatively, For the Reasons Stated in Point Five, This Court Should Remand This Case Back to the District Court for Resentencing**

Dated:     New York, New York
             June 21, 2013

Respectfully submitted,

**NEAL S. COMER**
*Attorney for Defendant-*
*Appellants Santo Saglimbeni and Artech Corp.*
81 Main Street
White Plains, NY 10601
914-693-5400

## CERTIFICATE OF COMPLIANCE
### (FRAP 32(a)(7)(C))

I, Neal S. Comer, an attorney at law duly admitted to practice in the United States Court of Appeals for the Second Circuit, hereby certifies that the within Appellant's Brief complies with the word limitation contained in Fed. R. App. P. 32 (a)(7)(B)(i), in that, according to the word count in the Microsoft Word word-processing system used to prepare such brief, there are 12,547 words from the jurisdictional statement through the conclusion.

Dated:     White Plains , New York
           May 21, 2014

NEAL S. COMER